# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
RECEIVED
*Aug. 29, 2024*
FIFTH CIRCUIT

MAURINE MOLAK and MATTHEW MOLAK,

 *Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and THE UNITED STATES OF AMERICA,

 *Respondents.*

No. _____

## PETITION FOR REVIEW

Pursuant to Section 402(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 402(a), and 28 U.S.C. § 2342(1), and in accordance with Federal Rule of Appellate Procedure 15, Maurine Molak and Matthew Molak ("Petitioners") hereby petition for review of the Report and Order and Further Notice of Proposed Rulemaking issued by the Federal Communications Commission ("FCC") titled *Addressing the Homework Gap through the E-Rate Program*, FCC 24-76, WC Docket No. 21-31 ("Report and Order"). The FCC adopted the Report and Order on July 18, 2024, released it on July 29, 2024, and published it in the Federal Register on August 20, 2024. 89 Fed. Reg. 67,303, 67,304. This petition for review is timely filed. *See* 28 U.S.C. § 2344; 47 C.F.R. § 1.4(b)(2). Venue is proper because Petitioners reside in this circuit. *See* 28 U.S.C. § 2343. Petitioners filed a petition for reconsideration of the Report and Order on July 31, 2024. *See* 47 U.S.C. § 405(a).

1

The Report and Order unlawfully expands the FCC's E-Rate Program to subsidize Wi-Fi service and equipment anywhere students might go. Petitioners are aggrieved by the Report and Order because it will increase the outlays of the E-Rate Program and thereby directly increase the amount of the Federal Universal Service Charge that Petitioners pay each month as a line-item on their phone bill to fund the cost of the E-Rate Program. Petitioners also have a special interest in this matter as co-founders of David's Legacy Foundation, a non-profit dedicated to the memory of their late son and committed to ending cyberbullying through education, legislation, and legal action. The Report and Order undermines that crucial mission by enabling unsupervised social-media access by children and teenagers.

The Report and Order exceeds the FCC's statutory authority and is contrary to law. Petitioners request that this Court hold unlawful, vacate, enjoin, and set aside the Report and Order, and grant such other relief as it may deem appropriate.

A copy of the Report and Order is attached as Exhibit A.

Dated: August 29, 2024

Respectfully submitted,

*/s/ Jacob (Yaakov) M. Roth*
Jacob (Yaakov) M. Roth
David K. Suska
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-7658
yroth@jonesday.com

*Counsel for Petitioners*

**CERTIFICATE OF ELECTRONIC SUBMISSION**

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: August 29, 2024                    Respectfully submitted,

                                          */s/ Jacob (Yaakov) M. Roth*
                                          Jacob (Yaakov) M. Roth

                                          *Counsel of Record for Petitioners*

**CERTIFICATE OF SERVICE**

I certify that on August 29, 2024, the foregoing Petition for Review was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system and two copies were sent to the Clerk of Court by overnight United Parcel Service. I further certify that there are no parties "admitted to participate in the agency proceedings" for purposes of Federal Rule of Appellate Procedure 15(c)(1) other than the respondents.

Dated: August 29, 2024                 Respectfully submitted,

                                       */s/ Jacob (Yaakov) M. Roth*
                                       Jacob (Yaakov) M. Roth

                                       *Counsel of Record for Petitioners*

# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Addressing the Homework Gap through the E-Rate | )     WC Docket No. 21-31 |
| Program | ) |

**REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                  **Released: July 29, 2024**

**Comment Date: [45 days after date of publication in the *Federal Register*]**
**Reply Comment Date: [75 days after date of publication in the *Federal Register*]**

By the Commission: Chairwoman Rosenworcel and Commissioner Starks issuing separate statements; Commissioners Carr and Simington dissenting and issuing separate statements.

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | BACKGROUND | 5 |
| III. | DISCUSSION | 17 |
| | A. Making Off-Premises Use of Wi-Fi Hotspots and Services Eligible for E-Rate Support | 18 |
| | B. Equipment & Service Eligibility | 22 |
| | C. General Framework of a Wi-Fi Hotspot Lending Program Mechanism | 30 |
| | D. Categorization/Prioritization | 44 |
| | E. Safeguards | 46 |
| |    1. Educational Purposes | 47 |
| |    2. Usage | 53 |
| |    3. Recordkeeping | 68 |
| |    4. Duplicate Funding | 74 |
| |    5. Equipment Disposal | 78 |
| |    6. Certain Populations | 80 |
| |    7. Gift Rule & Bundling | 82 |
| |    8. Audits and Other Compliance Tools | 85 |
| | F. Legal Authority | 88 |
| | G. Children's Internet Protection Act | 97 |
| IV. | SEVERABILITY | 102 |
| V. | FURTHER NOTICE OF PROPOSED RULEMAKING | 103 |
| VI. | PROCEDURAL MATTERS | 114 |
| VII. | ORDERING CLAUSES | 125 |
| | APPENDIX A – LIST OF COMMENTERS, REPLY COMMENTERS, & EX PARTES | |
| | APPENDIX B – FINAL RULES | |
| | APPENDIX C – FINAL REGULATORY FLEXIBILITY ANALYSIS | |
| | APPENDIX D – INITIAL REGULATORY FLEXIBILITY ANALYSIS | |

## I. INTRODUCTION

1. Technology has become an integral part of the modern classroom and receiving an education, especially in the recent past, and the barrier to accessing such technology puts individuals at a significant disadvantage to their peers and often prevents educators from being able to teach. In this Report and Order and Further Notice of Proposed Rulemaking, we take steps to modernize the E-Rate program to meet the evolving needs of schools and libraries around the country by allowing for the distribution of Wi-Fi hotspots and services to students, school staff, and library patrons for off-premises use.

2. Since its inception more than 25 years ago, the Federal Communications Commission's (Commission) E-Rate program has supported high-speed, affordable Internet services to and within school and library buildings, and has been instrumental in providing students, school staff, and library patrons with access to the essential broadband services that are required for next-generation learning.[1] Recognizing our responsibility to ensure the E-Rate program evolves with the educational needs of students and library patrons, the Commission has frequently modernized the program to reflect the changes in education and technology, including by providing more equitable access to funding for Wi-Fi networks in schools and libraries.[2] Recently we have seen significant advances in technology that have changed not only the way schools and libraries provide educational resources, but also the way students, school staff, and library patrons access such resources. In particular, an Internet connection has become an essential requirement for learners to access tasks that are vital to obtaining an education, including homework assignments, online classes, library materials, continuing education, and career and government applications.

3. The need for Internet connectivity beyond the campus boundaries was further underscored by nationwide school and library closures beginning in 2020 as a result of the COVID-19 pandemic, when most educational activities were unexpectedly forced to shift online overnight. During this time, thanks to the creativity and resourcefulness of schools and libraries around the country, many students, school staff, and library patrons that would have been caught on the wrong side of the digital divide or the "Homework Gap"—i.e., students unable to fully participate in educational opportunities because they lack broadband connectivity in their homes—were able to obtain a broadband connection provided by their local school or library. Many schools and libraries used funding provided through the congressionally-appropriated Emergency Connectivity Fund (ECF) program to purchase connected devices, Wi-Fi hotspot devices, broadband connections, and other eligible equipment and services for students, school staff, and library patrons in need, to use at a variety of locations, including locations other than schools and libraries, during the pandemic.[3] Notably, schools and libraries found success in establishing ECF-funded Wi-Fi hotspot lending programs to provide the hotspot equipment and monthly mobile wireless broadband services needed to connect individuals who otherwise lacked the Internet access needed to fully participate in remote learning.[4]

---

[1] The E-Rate program is formally known as the schools and libraries universal service support mechanism.

[2] *See generally Modernizing the E-Rate Program for Schools and Libraries*, WC Docket No. 13-184, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8870 (2014) (*First 2014 E-Rate Order*).

[3] *See* American Rescue Plan Act, 2021, H.R. 1319, Pub. L. No. 117-2, 117th Cong., tit. VII, § 7402(a)(1)-(2) (2021) (enacted), *available at* https://www.congress.gov/bill/117th-congress/house-bill/1319/text (American Rescue Plan Act) (enrolled bill); *Establishing the Emergency Connectivity Fund to Close the Homework Gap*, WC Docket No. 21-93, Report and Order, 36 FCC Rcd 8696 (2021) (*Emergency Connectivity Fund Report and Order or ECF Order*) (establishing the Emergency Connectivity Fund program to distribute funding to help schools and libraries provide devices and connectivity needed to engage in remote learning during the pandemic).

[4] *See, e.g.*, Associated Press, *Mississippi County Offering Hotspot Devices for Free* (Feb. 12, 2022), https://www.usnews.com/news/best-states/mississippi/articles/2022-02-12/mississippi-county-offering-hotspot-devices-for-free (using ECF funding to purchase 2,000 hotspots that will be available for checkout to residents using their library cards and reporting that only 68% of the Jones County residents have access to the Internet and the

(continued….)

4. Even with schools and libraries reopening and returning to in-person instruction, the need for Internet connections outside of the school or library buildings to fully engage in education remains, and schools and libraries are seeking to continue funding these valuable lending programs to keep their students, school staff, and library patrons connected. That is why today we adapt the E-Rate program to recognize these needs. Building on our experiences in the ECF program and the comments we received in response to the *Notice of Proposed Rulemaking* (*NPRM*),[5] we adopt a budget mechanism to allow for the equitable distribution of Wi-Fi hotspots and services to students, school staff, and library patrons. These rules are intended to be another step in updating the E-Rate program to reflect the realities of many schools and libraries by lending Wi-Fi hotspots and services through community and school libraries across the country so that students, school staff, and library patrons with the greatest need can be connected and learn without limits. We also adopt a Further Notice of Proposed Rulemaking (*FNPRM*) to seek comment on additional ways to ensure the continued success of such Wi-Fi hotspot lending programs funded through the E-Rate program.

## II. BACKGROUND

5. *E-Rate Program.* The E-Rate program was authorized by Congress as part of the Telecommunications Act of 1996, and created by the Commission in 1997, as a universal service support mechanism to ensure the delivery of affordable telecommunications and information services to eligible schools and libraries.[6] Under the E-Rate program, eligible schools, libraries, and consortia comprised of eligible schools and libraries may request universal service discounts for eligible services and/or equipment (collectively, eligible services). Eligible services are divided into "category one" services (which provide connectivity, including broadband connectivity, *to* eligible locations) and "category two" services (which provide connectivity *within* eligible locations).[7] Category one services generally include data transmission and Internet access services, while category two services include internal connections (e.g., wireless access points, routers, switches), managed internal broadband services (e.g., managed Wi-Fi), and basic maintenance of internal connections.[8] The E-Rate program currently supports wireless Internet services for use at a school or library only in limited circumstances.[9]

---

hotspots will benefit families that are under-served); Tom Matthews, *One-Third of Worcester Students Have No Internet at Home, but COVID Relief Funds Provide Opportunity to Boost Broadband Access, Worcester Regional Research Bureau Report Reveals* (Apr. 28, 2022), https://www.masslive.com/worcester/2022/04/one-third-of-worcester-students-have-no-internet-at-home-but-covid-relief-funds-provide-opportunity-boost-broadband-access-worcester-regional-research-bureau-report-reveals.html (purchasing 7,700 Wi-Fi hotspots with ECF support to provide to Worcester Public Schools students without consistent Internet connections at home and noting that additional budget resources will be necessary to support the initiative after the emergency relief funding ends); *see also infra* notes 41-43, 72-75.

[5] *See generally Addressing the Homework Gap through the E-Rate Program*, WC Docket No. 21-31, Notice of Proposed Rulemaking, FCC 23-91, 2023 WL 8602208 (Nov. 8, 2023) (*Notice of Proposed Rulemaking* or *NPRM*).

[6] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 151 *et seq.*) (Communications Act).

[7] *See* 47 CFR §§ 54.501, 54.502.

[8] 47 CFR § 54.502(a)(1)-(2).

[9] In 2014, the Commission found that individual data plans for mobile devices are generally not cost-effective when those users already have access to the Internet through internal wireless broadband networks on wireless-enabled devices within a school or library without the help of stand-alone data plans. *See First 2014 E-Rate Order*, 29 FCC Rcd at 8932-34, paras. 151-53; *Modernizing the E-Rate Program for Schools and Libraries; Connect America Fund*, WC Docket Nos. 13-184, 10-90, Second Report and Order and Order on Reconsideration, 29 FCC Rcd 15538, 15601, para. 158 (2014) (*Second 2014 E-Rate Order*). However, recognizing that there could be locales where wireless local-area networks (WLANs) could be impracticable (e.g., bookmobiles) or difficult to install or there may be some schools or libraries where installation of a wireless network would be possible but more costly than individual data plans, the Commission allows applicants to seek funding for individual data plans only if the school

(continued....)

6.       Section 254(h)(1)(B) of the Communications Act of 1934, as amended (Communications Act) provides that E-Rate discounts be applied to services provided to eligible schools and libraries for "educational purposes."[10]  As a result, E-Rate rules require schools and libraries to use eligible services "primarily for educational purposes."[11]  In the case of schools, "educational purposes" is defined as "activities that are integral, immediate, and proximate to the education of students."[12]  In the case of libraries, "educational purposes" is defined as activities that are "integral, immediate, and proximate to the provision of library services to library patrons."[13]  The Commission also established a presumption that activities that occur on library or school property serve an educational purpose and, therefore, are eligible for E-Rate funding.[14]

7.       Section 254(h)(2)(A) of the Communications Act directs the Commission to promulgate rules "to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms . . . and libraries."[15]  While Congress has made clear that the goal of such universal service funding is to enhance access "to Americans everywhere via schools and libraries" to ensure that "no one is barred from benefiting from the power of the Information Age,"[16] neither Congress nor the Commission has defined the term "classroom" or placed any explicit location restrictions on schools or libraries.  However, in general, the E-Rate program does not provide support for most off-premises uses of eligible services, and applicants are usually required to cost-allocate the costs of the portion of services used off-premises from their funding requests.[17]

8.       *Eligible Off-Premises Use of E-Rate-Supported Services & Equipment.*  In certain instances, the Commission has provided support for the off-premises use of E-Rate-supported services, after first finding that the off-premises provision of such service is "integral, immediate, and proximate to the education of students or the provision of library services to library patrons, and thus, serves an educational purpose."[18]  For example, in 2003, the Commission determined that "a school bus driver's use of wireless telecommunications services while delivering children to and from school, a library staff's person's use of wireless telecommunications services on a library's mobile library unit van, and the use by teachers or other school staff of wireless telecommunications services while accompanying students on

---

or library can demonstrate that the plans are the most cost-effective option for providing internal broadband access for mobile devices.  *Id.*; *see also Modernizing the E-Rate Program for Schools and Libraries*, WC Docket No. 13-184, Order, DA 23-1171, 2023 WL 8803733 at *11 (WCB Dec. 15, 2023) (*FY 2024 Eligible Services List*).

[10] 47 U.S.C. § 254(h)(1)(B).

[11] 47 CFR §§ 54.503(c)(2)(ii)(A), 54.504(a)(1)(v); *see Schools and Libraries Universal Service Support Mechanism*, CC Docket No. 02-6, Sixth Report and Order, 25 FCC Rcd 18762, 18774, para. 22 (2010) (*Schools and Libraries Sixth Report and Order*) (amending the rules to require that services be used *primarily* for educational purposes and explaining that "[t]o primarily use services supported by E-[R]ate, E-[R]ate recipients must ensure that students always get first priority in use of the schools' resources").

[12] 47 CFR § 54.500 (defining "educational purposes"); *Schools and Libraries Universal Service Support Mechanism*, CC Docket No. 02-6, Second Report and Order and Further Notice of Proposed Rulemaking, 18 FCC Rcd 9202, 9208, para. 17 (2003) (*Schools and Libraries Second Report and Order*) (clarifying the meaning of educational purposes).

[13] 47 CFR § 54.500; *Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9208, para. 17.

[14] *Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9208, para. 17.

[15] 47 U.S.C. § 254(h)(2)(A).

[16] S. Rep. No. 104-230, at 132-33 (1996) (Joint Explanatory Statement).

[17] 47 CFR § 54.504(e) (detailing the requirement to cost-allocate ineligible services from requests); *FY 2024 Eligible Services List*, 2023 WL 8803733 at *12 (adopting the eligible services list for funding year 2024 and requiring that off-campus use generally be cost-allocated from a funding request, among other things).

[18] *See Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9208-9209, para. 19.

a field trip or sporting event" are permissible activities that could be supported by the E-Rate program.[19] Similarly, recognizing the unique challenges of certain residential student populations, the Commission allowed E-Rate support for eligible services serving the residential areas of schools that serve unique populations—including schools on Tribal lands and schools designed to serve students with medical needs, among others—because such services are primarily, if not exclusively, for educational purposes.[20]

9.      The Commission has also examined other measures to help address the digital and educational divide, including allowing E-Rate support for wireless connectivity services used outside of the school or library building.  For example, in the *2010 E-Rate Broadband NPRM*, the Commission sought comment on whether to adopt the National Broadband Plan's recommendation to provide E-Rate support for wireless Internet access service for portable learning devices that are used beyond school or library premises.[21]  In response, commenters generally agreed that students need to be able to learn virtually, which requires Internet access outside of school and library buildings.[22]  Accordingly, the Commission launched a pilot program—E-Rate Deployed Ubiquitously (EDU2011)—to investigate the merits and challenges of funding wireless off-premises connectivity services for mobile learning devices through the E-Rate program.[23]  As part of the pilot program, for funding year 2011, the Commission authorized up to $10 million in E-Rate support for a small number of off-premises wireless connectivity projects that were submitted by schools and libraries and approved by the Commission.

10.      More recently, on October 19, 2023, the Commission issued the *School Bus Wi-Fi Declaratory Ruling*, which clarified that the use of Wi-Fi on school buses is an educational purpose for the E-Rate program in light of the lack of reliable broadband connections at students' homes and the need for connectivity to complete homework and other assignments before and after school hours.[24]  Therefore,

---

[19] *See id.* at n.28.

[20] *See Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18779, paras. 31-32.

[21] *See Schools and Libraries Universal Service Support Mechanism, A National Broadband Plan for our Future*, CC Docket No. 02-6, GN Docket No. 09-51, Notice of Proposed Rulemaking, 25 FCC Rcd 6872, 6891-93, paras. 45-51 (2010) (*E-Rate Broadband NPRM*); *see also* FCC, Connecting America: The National Broadband Plan at 239 (2010), https://www.fcc.gov/general/national-broadband-plan (National Broadband Plan).

[22] *See, e.g.*, San Diego Unified School District Reply, CC Docket No. 02-6, GN Docket No. 09-51, at 5 (rec. July 25, 2010) (SDUSD Reply) (explaining that "[m]obile broadband equipment, access and applications will allow our teachers to reach our students, and vice versa, no matter where they are during the day and in the evenings"); AT&T Inc. Comments, CC Docket No. 02-6, GN Docket No. 09-51, at 9 (rec. July 11, 2010) (AT&T Comments) ("[T]oday's educational systems increasingly require students to have access to information outside of the classroom."); Cisco Systems, Inc. Comments, CC Docket No. 02-6, GN Docket No. 09-51, at 5-6 (rec. July 8, 2010) (Cisco Comments) ("[T]echnological advances create educational opportunities for students anywhere students have access to a broadband connection, allowing learning to continue even after students leave school grounds."); eChalk, Inc. Comments, CC Docket No. 02-6, GN Docket No. 09-51, at 3-4 (rec. July 8, 2010) (eChalk Comments) (supporting the "learning outside of the classroom that is increasingly occurring with the advent of new technologies focused on educating students"); Dr. Anthony D. Machado Comments, CC Docket No. 02-6, GN Docket No. 09-51, at 6 (rec. July 8, 2010) (filed on behalf of Miami-Dade County Public Schools) (MDCPS Comments) (supporting E-Rate funding for Internet access services used for learning both on and off school premises); Ohio E-Rate Consortium Comments, CC Docket No. 02-6, GN Docket No. 09-51, at 15-16 (rec. July 8, 2010) (Ohio E-Rate Consortium Comments) ("For elementary and high school students to maintain a level of competency (both technological and general) comparable to that of their peers, they must have Internet access outside of the classroom."); Public Broadcasting Service Comments, CC Docket No. 02-6, GN Docket No. 09-51, at 2-4 (rec. July 8, 2010) (PBS Comments) (explaining that students without broadband access at home are increasingly being left behind and the E-Rate program should "close the gap so that more children can take advantage of the vast library of educational content on the Internet both inside and outside the classroom").

[23] *Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18783-87, paras. 41-50.

[24] *See Modernizing the E-Rate Program for Schools and Libraries*, WC Docket No. 13-184, Declaratory Ruling, FCC 23-84, 2023 WL 8586523 at *6, para. 9 & n.32 (Oct. 25, 2023) (*School Bus Wi-Fi Declaratory Ruling*).

the provision of such service, including the equipment needed to provide such service, was deemed eligible for E-Rate support beginning in funding year 2024.[25] In the *School Bus Wi-Fi Declaratory Ruling*, the Commission concluded that any further determination to support off-campus use of E-Rate-supported services would require that the Commission first find that the off-campus provision of such service is "integral, immediate, and proximate to the education of students or the provision of library services to library patrons," and therefore, would be considered to serve an educational purpose.[26]

11. In addition to the above-referenced proceedings, over the years, multiple applicants and other stakeholders have requested that the Commission allow the use of E-Rate-funded equipment and services off-premises to enhance broadband access for students and library patrons who lack reliable access outside of their school or library without requiring the removal of the costs of this ineligible use from their E-Rate funding requests.[27] The volume of requests asking to allow the off-premises use of E-Rate-supported equipment and services increased dramatically during the COVID-19 pandemic, when schools and libraries were abruptly forced to close their doors and unexpectedly had to transition to full-time remote learning. In February 2021, the Wireline Competition Bureau (Bureau) issued a Public Notice seeking comment on several emergency relief petitions requesting to allow applicants to enable remote learning during the pandemic[28] by opening their E-Rate-funded broadband networks to students and library patrons located near the school or library,[29] or by providing off-premises Wi-Fi hotspots and services to students and library patrons who lacked access to the Internet at their homes.[30] In response, the vast majority of commenters asserted that because of the massive shift to remote learning, students' homes became "virtual classrooms" and students without broadband access were being left behind during

---

[25] *Id.*; *see also FY 2024 Eligible Services List*, 2023 WL 8803733 at *3-5, paras. 8-14 (making mobile wireless broadband connectivity for school buses and the equipment needed to make the services functional eligible as a category one service beginning in funding year 2024).

[26] *See School Bus Wi-Fi Declaratory Ruling*, 2023 WL 8586523 at *6, para. 9 & n.32.

[27] *See, e.g.*, *Modernizing the E-Rate Program for Schools and Libraries*, WC Docket No. 13-184, Notice of Proposed Rulemaking, 28 FCC Rcd 11304, 11397-99, paras. 319-23 (2013) (seeking comment on two petitions for waiver to permit E-Rate funding for offsite use of community hotspots); *Wireline Competition Bureau Seeks Comment on Petitions Regarding Off-Campus Use of Existing E-Rate Connectivity*, CC Docket 02-6, WC Docket Nos. 10-90 and 13-184, Public Notice, 31 FCC Rcd 10510 (WCB 2016) (seeking comment on two petitions for waiver of E-Rate program cost allocation rule to allow off-campus use of E-Rate-funded services by students at home for educational purposes).

[28] *Wireline Competition Bureau Seeks Comment on Petitions for Emergency Relief to Allow the Use of E-Rate Funds to Support Remote Learning During the COVID-19 Pandemic*, WC Docket No. 21-31, Public Notice, 36 FCC Rcd 1304 (WCB 2021) (*2021 Remote Learning PN*).

[29] *See* Petition for Waiver on behalf of the State of Colorado, WC Docket No. 13-184 (filed Sept. 2, 2020), https://www.fcc.gov/ecfs/filing/10902218280692 (Colorado Petition).

[30] *See, e.g.*, Petition for Expedited Declaratory Ruling and Waivers filed by the Schools, Health & Libraries Broadband Coalition, et al., WC Docket No. 13-184, at 8-10, 18-19 (filed Jan. 26, 2021), https://www.fcc.gov/ecfs/filing/101260036427898 (SHLB Petition) (arguing that connectivity solutions to expand broadband accessibility for remote learning during the pandemic are for educational purposes, including personal hotspots with mobile data connections); Letter from John Kraman, Chief Information Officer, Mississippi Department of Education, to Ajit Pai, Chairman, FCC, CC Docket No. 02-6, at 1 (filed Mar. 24, 2020), https://www.fcc.gov/ecfs/filing/1032470516353 (asking the Commission to make data cards and Wi-Fi hotspots eligible as long as schools provide remote education due to the COVID-19 pandemic); Letter from Lyell Walker, State E-Rate Coordinator, Florida Department of Management Services, to Ajit Pai, Chairman, FCC, CC Docket No. 02-6, at 1 (filed Mar. 12, 2020), https://www.fcc.gov/ecfs/filing/10312280696180; Letter from Terry Loftus, Assistant Superintendent & Chief Technology Officer, San Diego County Office of Education, to Kris Monteith, Chief, Wireline Competition Bureau, FCC, WC Docket No. 21-31, at 1-2 (filed Apr. 9, 2020), https://www.fcc.gov/ecfs/filing/104231014223661 (asking the Commission to deem mobile Wi-Fi hotspots and the monthly recurring services eligible for E-Rate support).

the pandemic.[31] They also urged the Commission to provide E-Rate support for the off-premises use of Wi-Fi hotspots and services on a permanent basis,[32] arguing that the pandemic only underscored that Internet access at home is essential to the modern technology-based learning environment of today's schools and libraries.[33] The Commission's consideration of permitting E-Rate funding for off-premises uses was temporarily placed on hold when Congress created the ECF program to address those needs during the COVID-19 pandemic emergency.[34]

12. *Emergency Connectivity Fund Program.* As part of the American Rescue Plan Act of 2021, Congress appropriated $7.171 billion to create an Emergency Connectivity Fund and directed the Commission to promulgate rules providing for the distribution of funding to eligible schools and libraries for the purchase of eligible equipment and/or advanced telecommunications and information services for use by students, school staff, and library patrons at locations that include locations other than a school or library during the COVID-19 emergency period.[35] On May 10, 2021, the Commission adopted a Report and Order establishing the ECF program and allowing eligible schools and libraries to request funding for the purchase of eligible equipment and/or services needed to support remote learning during the COVID-19 pandemic.[36] The ECF program provides funding to connect students, school staff, and library patrons who would otherwise be unable to fully engage in remote learning and includes funding for the purchase

---

[31] *See, e.g.*, Education & Libraries Network Coalition *2021 Remote Learning PN* Comments at 7 (rec. Feb. 16, 2021) (EdLiNC *2021 Remote Learning PN* Comments) (explaining that home Internet access is now a prerequisite for receiving an education); Internet Association *2021 Remote Learning PN* Comments at 5 (rec. Feb. 16, 2021) (IA *2021 Remote Learning PN* Comments) (stating that the COVID-19 emergency has "drastically changed the way all students are able to learn and educators are able to teach"); Infinity Communications & Consulting, Inc. *2021 Remote Learning PN* Comments at 1 (rec. Feb. 16, 2021) (Infinity *2021 Remote Learning PN* Comments) (arguing that the "presumption that educational opportunities and environments occur only in the school or library is an antiquated concept").

[32] *See, e.g.*, New York State Education Department *2021 Remote Learning PN* Comments at 4 (rec. Feb. 16, 2021) (NYSED *2021 Remote Learning PN* Comments) (recommending that the E-Rate program provide support for the off-campus use of hotspots during and after the pandemic to close the Homework Gap); Lee County School District *2021 Remote Learning PN* Comments at 1-2 (rec. Feb. 16, 2021) (LCSD *2021 Remote Learning PN* Comments) (urging the Commission to provide funding for mobile hotspots to address the Homework Gap, both during and after the pandemic); Qualcomm Incorporated *2021 Remote Learning PN* Comments at 10 (rec. Feb. 16, 2021) (Qualcomm *2021 Remote Learning PN* Comments) (arguing that the E-Rate program should cover mobile hotspots "without restriction" and noting that mobile hotspots provide important benefits because students can use them whenever and wherever); Aurora Institute *2021 Remote Learning PN* Comments at 2-3 (rec. Feb. 16, 2021) (Aurora *2021 Remote Learning PN* Comments) (explaining that the E-Rate program should step in as a more permanent solution to funding wireless hotspots to continue the temporary solutions provided through emergency pandemic relief); Kellogg & Sovereign Consulting, LLC *2021 Remote Learning PN* Comments at 3-5 (rec. Feb. 16, 2021) (KSLLC *2021 Remote Learning PN* Comments) (surveying 12 school districts that reported needing E-Rate support to cover wireless hotspots the most because students with the greatest need are often high mobility and require mobile connectivity solutions like hotspots).

[33] *See, e.g.*, IA *2021 Remote Learning PN* Comments at 2 (supporting the use of E-Rate funds for remote learning as a way of adapting to modern educational needs in "the age of the 'virtual' campus"); Qualcomm *2021 Remote Learning PN* Comments at 1-2 (referring to connectivity as "the 21st Century version of textbooks"); INCOMPAS *2021 Remote Learning PN* Reply Comments at 6 (rec. Feb. 23, 2021) (INCOMPAS *2021 Remote Learning PN* Reply) (recognizing the need to prepare for future emergencies that may cause additional campus closures); Los Angeles Unified School District *2021 Remote Learning PN* Comments at 4-5 (rec. Feb. 12, 2021) (LAUSD *2021 Remote Learning PN* Comments) (urging the Commission to re-examine the E-Rate rules to support the rapidly changing face of education, even beyond the pandemic).

[34] H.R. 1319, tit. VII, § 7402(a)(1)-(2).

[35] *Id.*

[36] *See generally Emergency Connectivity Fund Report and Order*, 36 FCC Rcd 8696.

of Wi-Fi hotspots and services for use at different locations, including locations other than at their school or library, among the eligible equipment and services that are available for funding through the program.[37]

13.    Following three successful application filing windows and almost three years of funding broadband services, mostly through Wi-Fi hotspots, for students, school staff, and library patrons with unmet needs,[38] the Commission has committed more than $122 million for the purchase of Wi-Fi hotspot devices[39] and nearly $1.3 billion for the associated services to provide off-premises broadband connectivity to students, school staff, and library patrons who otherwise would lack sufficient broadband access needed to fully engage in remote learning.[40]  With ECF funding, schools and libraries have made

---

[37] *See, e.g.*, *id.* at 8708, 8712-13, 8721-23, paras. 29, 35, 49-52 (allowing schools and libraries to use ECF support to purchase Wi-Fi hotspots and commercially available Internet access services to provide off-premises broadband connections to students, school staff, and library patrons who otherwise lack sufficient broadband access).

[38] News Release, FCC, FCC Announces Emergency Connectivity Fund Application Window Will Open on June 29 (June 15, 2021), https://www.fcc.gov/document/emergency-connectivity-fund-application-window-opens-june-29 (*First ECF Application Window News Release*) (opening the first application filing window from June 29, 2021 to August 13, 2021); News Release, FCC, FCC Announces Over $5 Billion in Funding Requests Received in Emergency Connectivity Fund Program (Aug. 25, 2021), https://www.fcc.gov/document/fcc-announces-over-5-billion-emergencyconnectivity-fund-requests (*Second ECF Application Window News Release*) (opening the second application filing window from September 28, 2021 to October 13, 2021); *Wireline Competition Bureau Announces Third Application Filing Window for the Emergency Connectivity Fund Program*, WC Docket No. 21-93, Public Notice, DA 22-309, 2022 WL 867322 at *3 (WCB Mar. 23, 2022) (*Third ECF Application Window PN*) (opening the third application filing window from April 28, 2022 to May 13, 2022, and announcing demand of $6.4 billion requested during the first two filing windows); News Release, FCC, FCC Announces Over $2.8 Billion in Funding Requests for Final Window in Ongoing Work to Close the Homework Gap (May 25, 2022), https://docs.fcc.gov/public/attachments/DOC-383685A1.pdf (*Third ECF Application Window News Release*) (announcing demand of $2.81 billion during the third and final ECF filing window).

[39] We note that some funding commitments have been returned or canceled, resulting in a lower figure than previously reported in the *NPRM*.  *See NPRM*, 2023 WL 8602208, at *2, para. 4.

[40] *See* Universal Service Administrative Company, *Emergency Connectivity Fund FCC Form 471*, https://opendata.usac.org/Emergency-Connectivity-Fund/Emergency-Connectivity-Fund-FCC-Form-471/i5j4-3rvr (last visited July 15, 2024) (reporting data on what Wi-Fi hotspot devices and services have been requested in the ECF program to date).  When creating the ECF program, the Commission established certain metrics to measure the success of the limited-time, emergency funding in addressing the unmet need for off-premises connectivity by students, school staff, and library patrons, including the number of connected devices and broadband Internet access connections provided during the pandemic.  *See ECF Order*, 36 FCC Rcd at 8703, para. 16.  Through the ECF program, over 23,052 applications, including 39,290 funding requests for over $9.3 billion, were submitted, reviewed, and processed.  Analyzing ECF application and disbursement data since 2021, the ECF program has successfully funded more than 13.5 million connected devices and 8 million broadband connections to students, school staff, and library patrons.  By supporting the eligible equipment and services needed to provide off-premises connectivity, the program has helped more than 12,700 schools, libraries, and consortia of schools and libraries in all 50 states, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands, and the District of Columbia.  In doing so, the funding has reached students, school staff, and library patrons with unmet need in both rural and urban areas across the country, with 47 percent of ECF funding commitments going to schools and libraries located in rural areas.  This is particularly meaningful when paired with the fact that more than 18 million students—or approximately one-third of all K-12 students in the United States—were supported by this funding source for the purpose of providing off-premises connectivity.  *See* Universal Service Administrative Company, *Emergency Connectivity Fund FCC Form 471*, https://opendata.usac.org/Emergency-Connectivity-Fund/Emergency-Connectivity-Fund-FCC-Form-471/i5j4-3rvr (last visited July 15, 2024) (providing data on the eligible equipment and services requested and funded through the ECF program to date).  Taken together, this data demonstrates how ECF funding has helped to address the digital divide and Homework Gap by enabling schools and libraries to connect students, school staff, and library patrons in some of the most rural or economically-disadvantaged communities around the United States.

(continued….)

significant progress over the past few years in closing the Homework Gap and digital divide.[41]  For example, one report shows that schools across the state of California were able to devote the majority of their ECF funding toward providing connectivity to students with historically lower levels of Internet access.[42]  Libraries have also found great success with establishing Wi-Fi hotspot lending programs with ECF funding to provide the Wi-Fi hotspots and recurring mobile wireless broadband services needed to connect their most vulnerable residents to library resources.[43]

---

Moreover, the Commission also established a goal of collecting and publishing pricing data for ECF-funded equipment and services in order to inform future purchasing and policy decisions.  *See ECF Order*, 36 FCC Rcd at 8705-8706, para. 22.  In the past three years, the ECF program has provided the Commission with valuable information about supporting off-premises equipment and services, including the costs of Wi-Fi hotspots and wireless Internet services purchased by schools and libraries across the country and paid for by the ECF program.  *See* Universal Service Administrative Company, *Emergency Connectivity Fund FCC Form 471*, https://opendata.usac.org/Emergency-Connectivity-Fund/Emergency-Connectivity-Fund-FCC-Form-471/i5j4-3rvr (last visited July 15, 2024) (publishing information about ECF program demand and funding for equipment and services including one-time unit costs, monthly recurring costs, taxes, installation costs, and makes and models).  As discussed in Section III, the Commission is able to rely on ECF program data to inform the general costs of Wi-Fi hotspots and mobile wireless broadband services for the purposes of establishing funding caps in the E-Rate program, as well as to estimate potential demand for such equipment and services in future years.  *Infra* note 128 (relying on the median cost of Wi-Fi hotspots funded through the ECF program to calculate the funding caps) and 324 (estimating demand for Wi-Fi hotspots based on ECF program data).  Additionally, the Commission was able to learn from the challenges faced in the ECF program in funding off-premises Wi-Fi hotspots and mobile wireless broadband service by establishing numerous safeguards to ensure proper use of the same equipment and services in the E-Rate program.  *See generally* Section III.E (establishing safeguards to protect the use of E-Rate funds for off-premises use of Wi-Fi hotspots and services).  In sum, we find that the ECF program has served as a prime source of recent information about supporting off-premises Internet access for schools and libraries and enabled the Commission to effectively consider the benefits, costs, and challenges associated with its decision to make Wi-Fi hotspots and services eligible for E-Rate support.  *See* Government Accountability Office (GAO), *Wireless Internet: FCC Should Assess Making Off-School-Premises Access Eligible for Additional Federal Support*, GAO-19-564 (July 29, 2019) (recommending that the Commission assess potential benefits, costs, and challenges in making off-school-premises wireless services eligible for E-Rate program support).

[41] *See* Javeria Salman, *How One City Closed the Digital Divide for Nearly all its Students* (Apr. 14, 2022), https://hechingerreport.org/how-one-city-closed-the-digital-divide-for-nearly-all-its-students/ (reporting that schools in Oakland, California have used ECF support and other funds to connect 98% of their student population through the distribution of Wi-Fi hotspots and connected devices); Marla K. Kuhlman, *Federal Grant Gives Westerville Middle Schoolers Access to Laptops, Hot Spots for Homework* (Dec. 2, 2021), https://www.dispatch.com/story/news/local/communities/westerville/2021/12/02/grant-gives-westerville-middle-schoolers-access-laptops-hot-spots-for-homework/8837114002/ (reporting that students in Westerville, Ohio were provided connected devices and Wi-Fi hotspot service to meet their remote learning needs).

[42] *See* Joseph Hayes & Niu Gao, *How Have California School Districts Used the Emergency Connectivity Fund* (Dec. 4, 2023), https://www.ppic.org/blog/how-have-california-school-districts-used-the-emergency-connectivity-fund/ (explaining that the majority of the $859 million in approved ECF funding for California school districts went to districts with high concentrations of groups that tend to have lower levels of internet access, such as low income students).

[43] *See e.g.*, Cindy Aguirre, *Need Internet Access?* (Mar. 8, 2022), https://seguintoday.com/2022/03/08/need-internet-access/ (using ECF funding to purchase and provide 30 hotspots for rural families in Sequin, Texas to check out and receive unlimited Internet access for up to 30 days and reporting that "there are many many families [without Internet access] so being able to offer them a resource that gives them access to the internet and provides that unlimited data is huge"); Aaron Stuve, *Blue Earth County Library System to Offer Wi-Fi Hotspots for Checkout* (Oct. 25, 2021), https://www.keyc.com/2021/10/25/blue-earth-county-library-system-offer-wi-fi-hotspots-checkout/ (explaining that Wi-Fi hotspots would be available to patrons in Blue Earth County, Minnesota "if they don't have Internet access at home, if they need internet, as so many do, for school, for work, for job applications, for so many things"); North West Alabamian, *Need Free Wi-Fi for a Week? Visit your Local Library* (Jan. 25, 2022), https://mynwapaper.com/node/10439 (reporting that each of the three Carl Elliot libraries in Winston County,

(continued….)

14. On May 11, 2023, the U.S. Department of Health and Human Services (HHS) permitted the COVID-19 public health emergency to expire,[44] triggering the ECF program's statutory requirement to sunset on the June 30 that first occurs one year after the date that the Secretary of HHS determines that a public health emergency no longer exists—i.e., June 30, 2024.[45] In light of the end of the ECF program, several stakeholders reiterated pre-ECF requests for the Commission to permit E-Rate support for off-premises connectivity services, including the provision of devices.[46]

15. *Emergency Broadband Benefit & Affordable Connectivity Programs.* At the end of 2020 and due to the COVID-19 pandemic, Congress provided the Commission with $3.2 billion to create the Emergency Broadband Benefit program (EBB program) to provide discounted Internet service and connected devices to low-income households.[47] The EBB program was launched on May 12, 2021, and grew to more than 9 million households by the end of that year.[48] Just six months after the launch of the EBB program, as part of the Infrastructure Investment and Jobs Act (Infrastructure Act), Congress established a $14.2 billion successor program to the EBB program, the Affordable Connectivity Program

---

Alabama will have three hotspot devices available for check out for a week using a library card); Samantha Silva, *Emergency Connectivity Program gives $2.4 million in Grant Funding to Corpus Christi Public Libraries* (Aug. 6, 2022), https://www.kiiitv.com/article/news/local/grant-funding-corpus-christi-public-libraries/503-7320a4fd-bc31-42c1-9d33-024ff36a83e6 (providing 5,000 Wi-Fi hotspots and services for Corpus Christi Public Libraries' patrons who are otherwise without access); *see also* Liam Niemeyer, *Hotspot Lending Programs at Rural Libraries Finding Success, High Demand Through First Year* (Sept. 2, 2022), https://www.weku.org/education/2022-09-02/hotspot-lending-programs-at-rural-libraries-finding-success-high-demand-through-first-year (reporting that ECF funding allowed 26 libraries throughout the state of Kentucky to purchase more than 2,700 hotspots to provide Internet access to their residents and that there continues to be a high demand for this library resource).

[44] The Public Health Emergency concerning COVID-19 was originally declared on January 30, 2020 "as in existence since January 27, 2020," by the Secretary of HHS, pursuant to section 319 of the Public Health Service Act. *See* 47 U.S.C. § 247d. Although the COVID-19 national emergency declared pursuant to section 202 of the National Emergencies Act (50 U.S.C. § 1622) terminated on April 10, 2023, when President Biden signed bipartisan congressional resolution H.J. Res. 7, the public health emergency declared by HHS pursuant to section 319 of the Public Health Service Act expired on May 11, 2023. *See* News Release, Department of Health and Human Services (HHS), HHS Secretary Xavier Becerra Statement on End of the COVID-19 Public Health Emergency (May 11, 2023), https://www.hhs.gov/about/news/2023/05/11/hhs-secretary-becerra-statement-on-end-of-the-covid-19-public-health-emergency.html; Department of Health and Human Services (HHS), COVID-19 Public Health Emergency (PHE), https://www.hhs.gov/coronavirus/covid-19-public-health-emergency/index.html (last visited July 15, 2024).

[45] *See* H.R. 1319, tit. VII, § 7402(d)(5)(B). We note that June 30, 2024 is also the service delivery deadline for third window funding requests for equipment, and recurring and nonrecurring services submitted in the ECF program; *see also* 47 CFR § 54.1711(e)(2).

[46] *See, e.g.*, Letter from Debra Duardo, Superintendent, Los Angeles County Office of Education and Los Angeles County Library et al., to Jessica Rosenworcel, Chairwoman, FCC, WC Docket No. 21-476, at 2 (filed Feb. 16, 2022) (Los Angeles Schools and Library *Ex Parte*) (urging the Commission to consider the off-premises use of E-Rate supported services to enable remote learning an educational purpose and to modify E-Rate rules to support devices funded by the ECF program, including Wi-Fi hotspots); Aaron Gifford, *FCC Connectivity Fund for Closing Homework Gap is Sunsetting* (Feb. 22, 2024), https://www.govtech.com/education/k-12/fcc-connectivity-fund-for-closing-homework-gap-is-sunsetting (citing a spokesman for Oakland Unified School District as saying that the scaling back of connectivity funded by emergency funding that students rely on after school would be "reintroducing the digital divide").

[47] Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020), *available at* https://www.congress.gov/bill/116th-congress/house-bill/133/text (Consolidated Appropriations Act).

[48] *See Wireline Competition Bureau Announces Emergency Broadband Benefit Program Launch Date*, WC Docket No. 20-445, Public Notice, 36 FCC Rcd 7614 (WCB 2021).

(ACP).[49]  The ACP provided a discount of up to $30 per month toward Internet service for eligible low-income households and up to $75 per month for households on qualifying Tribal lands, as well as a one-time discount of up to $100 to purchase a laptop, desktop computer, or tablet from participating providers.[50]  In just two years, ACP helped provide discounted Internet service to more than 23 million low-income households to ensure these households were able to afford the broadband they needed for work, school, healthcare, and more.[51]  Due to the lack of additional funding from Congress, the $14.2 billion initially made available for ACP officially ran out in May 2024.[52]  As a result, beginning on June 1, 2024, millions of households including students, school staff, and library patrons around the country lost the ACP benefit that helped them stay connected.

16.      *Notice of Proposed Rulemaking.*  To address ongoing remote learning needs of schools and libraries, on November 8, 2023, the Commission adopted a Notice of Proposed Rulemaking seeking comment on its proposal to permit eligible schools and libraries to receive E-Rate support for Wi-Fi hotspots and mobile wireless Internet services that could be used off-premises.[53]  The Commission sought comment on how the Commission can implement funding for the off-premises use of Wi-Fi hotspots and services within existing E-Rate program processes,[54] and how it can best target E-Rate funding to students, school staff, and library patrons with the greatest need.[55]  In addition, the Commission sought comment on what actions are necessary to safeguard limited E-Rate program funds from potential waste, fraud, or abuse.[56]  Finally, the Commission sought comment on how to adapt the E-Rate program to reflect the virtual nature of today's modern technology-driven educational environment and its legal authority to adopt such measures.[57]

## III.    DISCUSSION

17.      In this Order, we take steps to modernize the E-Rate program to ensure that schools and libraries across the nation have the tools necessary to connect their students, school staff, or library patrons who have fallen onto the wrong side of the digital divide or the Homework Gap.  First, we permit schools and libraries to purchase Wi-Fi hotspots and services that they can lend to students, school staff, and library patrons for off-premises use and direct the Bureau to make the services and equipment eligible as part of the funding year 2025 eligible services list proceeding.  Second, relying on the successes of and

---

[49] Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 60502(a)(3), 135 Stat. 429, 1240 (2021) (codified at 47 U.S.C. § 1752); Consolidated Appropriations Act, div. N, tit. IX, § 904(b)(1), (4); *Wireline Competition Bureau Seeks Comment on the Implementation of the Affordable Connectivity Program*, WC Docket No. 21-450; Public Notice, 36 FCC Rcd 16290, 16291, para. 3 (WCB Nov. 18, 2021) (*ACP Public Notice*).  The EBB program transitioned to the ACP before the original funding of $3.2 billion was fully expended.  Congress renamed the Emergency Broadband Benefit Fund as the Affordable Connectivity Fund and appropriated additional funds to the renamed program.  Section 60502(a)(2) *Change to Program Name*.  As such, the remaining funds from the original appropriation were used to support the ACP, bringing the total funding appropriated for the FCC's broadband affordability program to $17.4 billion.  Information on the claims made under the EBB program and per month for the ACP are available at https://www.usac.org/about/affordable-connectivity-program/acp-enrollment-and-claims-tracker/.

[50] *See* 47 CFR § 54.1803(a).

[51] *See More Than 20 Million Households Enroll in Nation's Largest Broadband Affordability Program*, Fact Sheet (Aug. 14, 2023), https://docs.fcc.gov/public/attachments/DOC-396000A1.pdf.

[52] *See* Press Release, FCC, FCC Brings Affordable Connectivity Program to a Close (May 31, 2024), https://docs.fcc.gov/public/attachments/DOC-402930A1.pdf.

[53] *NPRM*, 2023 WL 8602208.

[54] *Id.* at *8-12, paras. 19-29.

[55] *Id.* at *12-14, paras. 30-33.

[56] *Id.* at *14-19, paras. 34-44.

[57] *Id.* at *19-24, paras. 45-58.

lessons learned from the ECF program, as well as the Wi-Fi hotspot lending programs established by schools and libraries with ECF support, we establish a budget mechanism to set a limit on the amount of support that an eligible school or library can request for Wi-Fi hotspots and services that can be loaned to their students, school staff, and library patrons, thereby allowing schools and libraries the flexibility to target those with the greatest need in their respective populations. Next, we also remain committed to supporting the connectivity needs of school and library buildings by prioritizing funding for these off-premises services after on-premises-related funding requests. Mindful of our duty to be a responsible steward of limited universal service resources, we also adopt safeguards to ensure the E-Rate funds are used for their intended purpose. Finally, we reaffirm our conclusions that the obligations of the Children's Internet Protection Act (CIPA) apply if the school or library receives E-Rate support for Internet service, Internet access, or network connection services or related equipment, including Wi-Fi hotspots.

### A. Making Off-Premises Use of Wi-Fi Hotspots and Services Eligible for E-Rate Support

18.     Based on the record and consistent with our authority pursuant to section 254(h) of the Communications Act, we adopt our proposal to permit schools and libraries to receive E-Rate support for Wi-Fi hotspots and services to be used off-premises by students, school staff, and library patrons.[58] Although the E-Rate program has not historically provided support for most off-premises uses of E-Rate-supported services, we agree with commenters that today's educational environment has substantially changed since the advent of the E-Rate program in 1997.[59] Namely, the increasing shift to digital learning due to evolving technologies as well as pandemic-related changes has resulted in Internet connectivity becoming a necessity to being able to fully participate in modern education for students, school staff, and library patrons alike.

19.     For schools, the pandemic highlighted the digital divide, leaving those students without access to reliable home Internet unable to access educational resources, participate in remote learning, or connect with teachers. SBi described how emergency funding during the pandemic increased educational opportunities for Tribal students by focusing on digital inclusion and introducing digital learning tools that have been available to urban and suburban communities for years, allowing them to connect to schools on days they would otherwise miss and allowing teachers to reach students that would otherwise be left disconnected.[60] The digital divide between students with access to broadband at home and those without exacerbates existing inequalities, particularly for certain communities—such as those in rural or economically-disadvantaged areas.[61] Commenters note that stable Internet connectivity at home is essential to "educational opportunity, equity, and achievement"[62] with digital learning tools enabling

---

[58] *Id.* at *7, para. 18.

[59] *See, e.g.*, Cellular South Licenses, LLC Comments at 3 (C Spire) ("[I]t is not a secret that the education system of 2024 looks much different than it did twenty-eight years ago."); Education & Libraries Networks Coalition Comments at 6 (EdLiNC) ("[A]llowing E-Rate support for home connectivity would be reflective of much broader trends in K-12 education, with education no longer confined to classrooms and libraries."); American Library Association Comments at 1 (ALA) ("New technologies continue to emerge, shaping modern life. With these shifts, the needs of library patrons and students evolve, as well, to rely more heavily on access to virtual and/or hybrid learning.").

[60] *See* Smith Bagley, Inc. Comments at 1-4 (SBi) (describing the challenges for Tribal students in remote Tribal communities lacking home Internet access and thus "the means to learn at home"); 6 ("[s]ometimes, a teacher's ability to check in and encourage a student makes all the difference, and these [technology] tools are vital to that educational mission").

[61] *See* CoSN, Defining Digital Equity, 1 (2022), https://www.cosn.org/wp-content/uploads/2022/04/CoSNDefiningDigitalEquity-1-1.pdf.

[62] *See, e.g.*, North American Catholic Educational Programming Foundation, Inc. and Mobile Beacon Comments at 1 (NACEPF & Mobile Beacon).

"more expansive, up-to-date content, the inclusion of educational videos, and effective online collaboration."[63]  Others explain the reliance on online digital resources allows learners "to engage with supplemental educational materials, complete homework assignments, and connect with one another," which leaves "[s]tudents and staff that are unable to access the connected classroom . . . at a significant disadvantage."[64]  A 2021 report observed that "[h]istorically students caught in the digital divide have lower academic achievement with a significant impact on lifetime earnings."[65]

20.     Likewise, for libraries, providing free, high-speed access to the Internet is critical to many of the services libraries provide, particularly for disadvantaged communities.[66]  Library services increasingly include virtual offerings.[67]  For example, libraries allow patrons to access digital resources remotely, including reserving or renewing books,[68] accessing digital collections and e-materials,[69] providing community support resources,[70] and even offering support to library patrons who are educators

---

[63] *See* Qualcomm Inc. Comments at 4-5 (Qualcomm); *see also, e.g.*, Association of California School Administrators, California School Boards Association Comments at 1 (ACSA-CSBA) ("[e]xpanding access to off-campus digital learning opportunities, including expanded access to instruction, collaboration opportunities, and high-quality digital resources, is a top priority"); California Association of School Business Officials Comments at 1-2 (CASBO) (noting the need for access to digital learning so students "are prepared for academic, workforce, and life success after graduation").

[64] *See* Ohio Internet Technology Centers Comments at 2-3 (OITCs).

[65] Titilayo Tinubu Ali et al., *Looking Back, Looking Forward: What it Will Take to Permanently Close the K-12 Digital Divide* 8 (2021), https://www.commonsensemedia.org/sites/default/files/featured-content/files/final_-_what_it_will_take_to_permanently_close_the_k-12_digital_divide_vfeb3.pdf (last visited July 15, 2024); *see also* NACEPF & Mobile Beacon Comments at 5-6.

[66] *See cf* ALA Comments at 2 (explaining that homes lacking internet access are disproportionately low-income, in communities of color, or rural/remote, who rely on connectivity provided through E-Rate to schools and libraries).

[67] *See, e.g.*, ALA Comments at 1 (noting services occurring outside of the library building, such as access to virtual learning and e-materials).

[68] *See* DC Public Library, *Find & Borrow*, https://www.dclibrary.org/find-borrow (last visited July 15, 2024) (enabling DCPL patrons to search the library's catalog remotely and place a hold on a resource in circulation); New York Public Library, *How to Access the Library's Digital Resources 24/7*, https://www.nypl.org/about/remote-resources (last visited July 15, 2024) (allowing NYPL patrons to manage their library account online to renew books).

[69] *See, e.g.*, Bridges Library System, *Research and Resources*, https://bridgeslibrarysystem.org/library-resources/digital-tools/research/ (last visited July 15, 2024) (listing the online resources available 24/7 to library patrons in southeastern WI, including access to genealogy, history, and newspaper databases, health and wellness resources, homework help and research databases, job search and resume assistance, audiobooks, eBooks, and online classes); Carson City Library, *Digital Resources,* https://carsoncitylibrary.org/digital-resources/ (last visited July 15, 2024) (listing the online resources available to library patrons in Carson City, NV, including educational programs and offerings for all ages, research and reference databases to access digitized content like newspapers, magazines, and journals, language learning resources, and tutorials for the library's most commonly used electronic resources); San Antonio Public Library, *Library Digital Offerings,* https://guides.mysapl.org/librarydigitalofferings (last visited July 15, 2024) (listing the online resources available to library patrons in San Antonio, TX to access audiobooks, eBooks, digital newspapers, digital magazines, and continuing education); Aiken Bamberg Barnwell Edgefield (ABBE) Regional Library System, *Digital Resources*, https://www.abbe-lib.org/digital/ (last visited July 15, 2024) (listing the online resources available to patrons of the ABBE Regional Library System in SC, including eBooks, audiobooks, research reference content, and educational content for students).

[70] *See, e.g.*, Prince George's County Memorial Library System, *Community Resources*, https://www.pgcmls.info/community-resources (last visited July 15, 2024) (providing a frequently updated list of helpful resources from government agencies, non-profits, partner organizations and other localized resources like food provider and distribution resources to library patrons in Prince George's County, MD); Boise Public Library, *Community Resources,* https://www.boisepubliclibrary.org/using-the-library/community-resources/ (last visited July 15, 2024) (providing information to patrons in Boise, ID about organizations and information gathered by the

(continued….)

or students,[71] making these digital resources available to library patrons at the moment they need them. Additionally, Wi-Fi hotspot lending programs that provide remote access to the Internet for library patrons are both successful and in high demand.[72]  For instance, one commenter explains that at the Chicopee Public Library, Wi-Fi hotspots are checked out "every day to people who have no other way of accessing this service without putting themselves in danger of being unable to afford basic necessities."[73]

21.    With today's action, we modernize the E-Rate program to address this digital inequity that leaves some students, school staff, and library patrons unable to fully participate in school work or access library resources.  We further recognize how learning is no longer confined to the physical school or library building during regular operating hours, and how libraries and schools often serve to fill the educational and connectivity gap for their students, school staff, and library patrons who lack access to the Internet.  Additionally, based on our experiences through the ECF program, we further seek to recognize the utility of Wi-Fi hotspots as an easily sourced and affordable means of providing connectivity for schools and libraries and acknowledge the commenters' countless examples of how Wi-Fi hotspot lending programs established with ECF funding have benefitted communities and students around the nation.[74]  Now, numerous libraries and schools are faced with the difficult decision to reduce the number of Wi-Fi hotspots available for circulation or start charging fees, not because of lack of demand, but because of lack of available funding.[75]  This has only been further exacerbated by the recent

---

library's resource team to promote the wellbeing of its patrons, including mental health, legal, and housing resources).

[71] *See, e.g.*, Jefferson County Public Library, *Launch into Learning: A Guide for K-12 Educators*, https://jeffcolibrary.org/educator-guide/ (last visited July 15, 2024) (providing a comprehensive list of in person and online resources designed to help educators and students of all ages in Jefferson County, CO); San Jose Public Library, *Teachers & Educators*, https://www.sjpl.org/teachers-educators/ (last visited July 15, 2024) (providing links to eResources for teachers, online resources for students, and other free resources and programs to support San Jose, CA teachers and educators).

[72] *See, e.g.*, E. Hoover de Galvez Comments at 1 (noting that Des Moines Public Library has 250 Wi-Fi hotspots available for check out, which are in high demand and regularly have a waiting list of over 100 people).

[73] *See, e.g.*, H. Chauvin Comments at 1 (reporting as the librarian for Chicopee Public Library that Wi-Fi hotspots are checked out "every day to people who have no other way of accessing this service without putting themselves in danger of being unable to afford basic necessities").

[74] *See, e.g.*, NACEPF & Mobile Beacon Comments at 6 (explaining that some schools loan out hotspots so that students without home Internet can complete school assignments, engage in remote learning, and otherwise fully engage in their educational experience), at 7-8 (partnering with Providence Community Library back in 2012 to loan out hotspots); R. Sheffield Comments at 1 (stating that their library's hotspots are constantly in high demand and used for homework, telehealth, continuing education, job upskilling, and more); EveryLibrary Institute NFP Comments at 2 (EveryLibrary Institute) (reporting that the New York Public Library began checking out hotspots in 2014); ALA Comments at 3-6, 14 (citing examples of library-offered hotspot lending programs that date back more than a decade from all over the country); New York State Library Reply at 2 (providing librarian accounts of how lending hotspots have benefitted their local communities in New York, including to complete schoolwork, telework, connect educators, and help during power outages); Laurel-Jones County Library System Inc. Reply at 1 (Laurel-Jones Libraries) (detailing the steady demand for the 2,000 hotspots funded through the ECF program and circulated in their community, noting that they receive 6-8 daily calls to check out the devices); Maine State Library Comments at 1 (reporting the value provided to patrons by loaning hotspots because of lack of Internet access).

[75] *See, e.g.*, S. Taylor Comments at 1 (explaining that their library will reduce the number of hotspots in circulation when the ECF funding ends); C.A. DeLuca Comments at 1 (stating that they cannot afford to purchase more hotspots, despite needing more); S. Bodine Comments at 1 (reporting that the public library in Oakham, MA reduced their available hotspots from 10 to 3 due to lack of funding, despite being in constant circulation with waitlists); A. Dunn Comments at 1 (stating that their library is only able to afford a third of the hotspots on circulation and in high demand after ECF funding ended); B. McGraw Comments at 2 (noting that their school was forced to reduce their available hotspots from 100 funded through ECF to 10 with local funding); A. Six Comments at 1 (explaining that their library circulated over 300 hotspots using ECF funds and other resources, but will be

(continued….)

loss of ACP benefits by many low-income households across the country. As such, we extend eligibility to provide eligible schools and libraries with much-needed assistance in getting the students, school staff, and library patrons with the greatest need connected via Wi-Fi hotspots and services that can be used off-premises.

### B. Equipment & Service Eligibility

22. *Eligible Equipment & Services.* We adopt the proposed definitions to permit Wi-Fi hotspots and mobile wireless Internet services as eligible for E-Rate support. In the *NPRM*, we sought comment on what specific equipment and services should be deemed eligible for the off-premises use of Wi-Fi hotspots and mobile wireless Internet services.[76] Specifically, we sought comment on adopting the ECF program's definition of a Wi-Fi hotspot (i.e., "a device that is capable of (a) receiving advanced telecommunications and information services; and (b) sharing such services with a connected device through the use of Wi-Fi") and limiting service eligibility to commercially available mobile wireless Internet services that can be supported by and delivered with such Wi-Fi hotspots.[77] Commenters are largely supportive of making off-premises uses eligible for E-Rate funding and, despite also requesting additional equipment and services be made eligible, were supportive of the proposed definitions of Wi-Fi hotspots and mobile wireless Internet services that can be used off-premises.[78] Based on the record and as discussed further below, we adopt the proposed definitions for the equipment and services eligible for support in the E-Rate program and direct the Bureau to add Wi-Fi hotspots and mobile wireless Internet services that can be used off-premises as eligible services as part of the funding year 2025 eligible services list proceeding.

23. With respect to eligible equipment, we adopt definitions of "Wi-Fi" and "Wi-Fi hotspot" in our rules that are based on the definitions adopted by the Commission in the ECF program. Specifically, we define "Wi-Fi" as "wireless networking protocol based on Institute of Electrical and Electronics Engineers standard 802.11" and we define "Wi-Fi hotspot" as "a device that is capable of receiving advanced telecommunications and information services, and sharing such services with another connected device through the use of Wi-Fi."[79] We find that this decision is both supported by the record and by our own experiences successfully providing connectivity to students, school staff, and library patrons delivered by Wi-Fi hotspots through the ECF program. However, we also wish to acknowledge that these terms may have other accepted meanings within the communications industry. For example, Intel defines "Wi-Fi hotspot" to mean "a physical location where individuals can access the Internet wirelessly through a wireless local area network (WLAN) using Wi-Fi technology."[80] We conclude that this definition would be overly broad for these purposes, as the function described can be provided by

---

unable to afford the hotspot lending service moving forward); The Council of the Great City Schools Comments at 1 (The Council) (expressing concern for how schools will continue to support remote Internet access once many of the emergency programs lapse); *see also* Liam Niemeyer, *Hotspot Lending Programs at Rural Libraries Finding Success, High Demand Through First Year* (Oct. 4, 2022), https://hoptownchronicle.org/hotspot-lending-programs-at-rural-libraries-finding-success-high-demand-through-first-year/ (reporting that smaller libraries, like ones in Crittenden County, Kentucky, may have to start charging fees to be able to check-out a hotspot device once funding ends).

[76] *NPRM,* 2023 WL 8602208 at *8-9, paras. 19, 21.

[77] *Id.*

[78] *See, e.g.*, Schools, Health & Libraries Broadband Coalition (SHLB) & Open Technology Institute at New America (OTI) Comments at 7 (SHLB & OTI); State E-Rate Coordinators' Alliance Comments at 3 (SECA); N. Anokye Comments at 2 (supporting the proposed definition); CTIA Reply at 4-5 (supporting the inclusion of Wi-Fi hotspot devices and wireless data plans for such services).

[79] *See* Appendix B, amending 47 CFR § 54.500; *see also* 47 CFR § 54.1700(l)-(m) (defining "Wi-Fi" and "Wi-Fi hotspot" for the ECF program).

[80] *See* Intel, *What Is a Hotspot*, https://www.intel.com/content/www/us/en/tech-tips-and-tricks/what-is-a-hotspot.html (last visited July 15, 2024).

many different types of devices and may permit unintended scenarios such as funding public Wi-Fi hubs in a public park or a community center, which is beyond the scope of our goal to provide connectivity to individual students, school staff, or library patrons caught in the Homework Gap or digital divide. Therefore, for the purposes of the E-Rate program, the definition we adopt for "Wi-Fi hotspot" means a device (sometimes referred to as a "mobile hotspot" or "portable hotspot device")[81] that is intended to provide Wi-Fi connectivity to a hotspot user as its sole function. Additionally, we limit the capability of a sole purpose Wi-Fi hotspot to devices that: (1) are portable; and (2) are a single device (i.e., not a set of linked devices). Finally, these Wi-Fi hotspots must be for use with a commercially available mobile wireless Internet service, rather than for use with CBRS or other private network services.[82]

24.     We decline to make other multi-functional devices that can support Wi-Fi eligible for E-Rate support. Thus, we find such multi-functional devices, e.g., smartphones, PCs, notebooks, tablets, customer premises equipment, routers or switches, and wireless access points, etc., are not eligible.[83] In the *ECF Order*, we also found it unnecessary to support costly smartphones used as Wi-Fi hotspots, when much less expensive hotspot devices can serve the same purpose.[84] We find this determination remains true today; and therefore, we limit E-Rate support to sole function Wi-Fi hotspot devices. Additionally, with respect to the requests to support end-user devices like laptops or tablets,[85] we conclude that this equipment remains ineligible for E-Rate support, consistent with the Commission's previous decisions to decline support for "computers and other peripheral equipment" based on its finding that only equipment that is an essential element in the transmission of information is eligible (e.g., internal connections) for E-Rate support.[86] Similar to our reasoning for making smartphones ineligible, we also find it unnecessary to take on the costly expenses of laptops or tablets with built-in wireless connections, when less expensive, sole purpose Wi-Fi hotspots are capable of delivering the same service. We also decline to permit applicants to request the mobile wireless services delivered to broadband-enabled end user devices (e.g., laptops, tablets). While we recognize that there are some benefits to students using these devices,[87] we are concerned that they add unneeded complexity in our review of the services eligibility, particularly in trying to ensure these E-Rate-supported services are targeted to students with need, rather than just to

---

[81] *See* T-Mobile, *What is a Wi-Fi hotspot?*, https://www.t-mobile.com/devices/iot/hotspots (last visited July 15, 2024).

[82] CBRS customer premises equipment is ineligible as a Wi-Fi hotspot. *But see* Letter from Kristen Corra, Policy Counsel, SHLB, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 7 (filed July 11, 2024) (providing an example of a large library system seeking to expand its lending program for hotspots that can be used with an existing CBRS network) (SHLB July 11, 2024 *Ex Parte* Letter).

[83] Equipment that is currently eligible for category one or category two support is not changed. E-Rate funding can still be requested and received, for example, for routers, switches, and wireless access points, as eligible category two internal connections. *See e.g.*, *FY 2024 Eligible Services List*, 2023 WL 8803733, at *9 (specifying the eligibility of internal connections, including switches, routers, and access points).

[84] *See ECF Order*, 36 FCC Rcd at 8711-12, para. 33.

[85] *See, e.g.*, Computer Technology Link Corp. Comments at 2 (CTL); NACEPF & Mobile Beacon Comments at 8-9; SHLB & OTI Comments at 7-8; Dallas Independent School District Comments at 2 (Dallas ISD); R. Frisby at 1; Leech Lake Band of Ojibwe Reply at 1 (LLBO); CTIA Reply at 5; Qualcomm Comments at 1.

[86] *See Federal State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order, 12 FCC Rcd 8776, 9021-22, paras. 459-60 (1997) (*First Universal Service Order*).

[87] *See, e.g.*, SHLB & OTI Comments at n.10 (requesting eligibility for services delivered to LTE-enabled devices, but not the devices themselves); Los Angeles Unified School District Comments at n.1 (LAUSD) (noting that funding hotspot devices would be unnecessary if the FCC funds services to LTE-enabled devices); SHLB July 11, 2024 *Ex Parte* Letter at 7 (recommending the FCC permit funding for services to 4G/5G enabled devices because the embedded modems "utilize the same functionality as a traditional Wi-Fi hotspot, service-only to these devices can still be competitively bid, and an applicant can turn off service to any particular device or transfer service from one device to another dynamically").

students who need a school-assigned tablet or laptop.

25.     With respect to mobile wireless Internet services, we limit the use of services to those that can be supported by and delivered with Wi-Fi hotspots provided to an individual user.[88]  We appreciate the suggestions of several commenters who urge the Commission to also expand eligibility beyond just Wi-Fi hotspots and mobile wireless services.[89]  Citing concerns that limiting eligibility to Wi-Fi hotspots and mobile wireless services would be contrary to the statutory requirement in section 254(h)(2)(A) of the Communications Act to establish "competitively neutral" rules,[90] these commenters argue that the Commission should also permit E-Rate support for other off-premises technologies, including:  fixed wireless connections and the related equipment,[91] private 5G/LTE networks,[92] Citizens Band Radio Service (CBRS) and television white space (TVWS),[93] fiber,[94] and network expansion or construction.[95]  We acknowledge these commenters' concerns and recognize that connectivity provided by Wi-Fi hotspots is not a one-size-fits-all solution.[96]  However, in taking this action, we remain focused on the statutory obligation to establish rules that enhance access to the extent it is "economically

---

[88] *NPRM,* 2023 WL 8602208 at *9, para. 21.

[89] *See, e.g.*, B. Rasko Comments at 1 (suggesting that schools and libraries be given flexibility to find a solution that works best for them); Mississippi Center for Justice Comments at 5-7 (MCJ) (recommending the Commission provide flexibility to fund alternative solutions); Tekniam, LLC Comments at 2 (Tekniam) (urging the Commission to allow schools to select the technology that best meets their needs).

[90] *See, e.g.*, NCTA - The Internet & Television Association Comments at 9-10 (NCTA) (arguing that limiting support to wireless service would be in conflict of section 254 (h)(2)(A)'s obligation to adopt competitively neutral rules); NACEPF & Mobile Beacon Reply at 22-23; Tekniam Comments at 2; Cox Communications, Inc. Reply at 1-2 (Cox Reply); WISPA – Broadband Without Boundaries Reply at 6 (WISPA Reply); Letter from Charles Dudley, General Counsel, Florida Internet & Television Association et al., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 2 (filed July 11, 2024) (State Cable Providers *Ex Parte*).

[91] *See, e.g.*, Utah Education and Telehealth Network Comments at 2 (UETN) (requesting both fixed and wireless solutions); LLBO Reply at 1 (supporting hotspots and/or fixed wireless services); WISPA Reply at 6 (recommending support for both mobile and fixed wireless options); Cox Reply at 1 (requesting a technology-neutral approach); Texoma Communications, LLC d/b/a TekWav Reply at 3 (TekWav) (requesting the same equipment that was eligible for ECF, including modems and routers).

[92] *See, e.g.*, SHLB & OTI Comments at 18-19, 23-24 (suggesting that the costs of a private LTE or Wi-Fi network would be comparable over a period of time); UETN Comments at 2 (recommending support for private 5G/LTE networks, where necessary).

[93] *See, e.g.*, ALA Comments at 11-12 (providing examples of CBRS and TVWS providing the best solutions for certain areas); SHLB & OTI Comments at 18-19 (providing examples of successful CBRS deployment models as an alternative solution); Wisconsin Department of Public Instruction Comments at 2 (WIDPI) (supporting eligibility of CBRS or TVWS when it is the most cost-effective option).

[94] *See, e.g.*, Advocates for the EMS Disabled Comments at 4 (suggesting that fiber is a superior alternative to other technologies).

[95] *See, e.g.*, CASBO Comments at 2-3 (urging the Commission to allow schools to use their own networks to provide off-premises connectivity); SHLB & OTI Comments at 11 (urging the Commission to allow new network deployment where there are no commercially available options suitable for remote learning). *But see* SECA Comments at 5 (stating that there is insufficient E-Rate support to fund building out in communities that lack adequate Wi-Fi service).

[96] *See, e.g.*, #OaklandUndivided, Oakland Unified School District Comments at 6 (#OaklandUndivided, OUSD); B. Rasko Comments at 1 (noting the lack of coverage and speed provided by hotspots in some areas across the country); MCJ Comments at 5-6 (explaining that weak mobile wireless broadband services were experienced by some students); The Council Comments at 2-3; TekWav Reply at 3; Letter from Kristen Corra, Policy Counsel, SHLB, and Michael Calabrese, Director, OTI, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 2-3 (filed May 16, 2024) (SHLB & OTI May 16, 2024 *Ex Parte*) (stating that hotspots and mobile wireless service can be inadequate to support remote learning in rural areas and low-income urban neighborhoods).

reasonable.'"[97]  At this time, we do not possess the information necessary to make a broader determination, nor did any commenters sufficiently analyze the feasibility of broadening the scope of eligibility.  In particular, we do not have sufficient data to rely on to establish funding caps on the equipment or service costs associated with other solutions or to establish an overall budget like the one adopted for Wi-Fi hotspots herein.  At this time, we establish caps in this program on both services and equipment in order to simplify review, aid administration, and constrain costs.  Commenters provided examples of costs for existing network builds, but not in a way that would allow us to establish caps or assess cost-effectiveness on costs of access points, antennas, switches, radios, customer premises equipment, backhaul, installation, RF design and planning, engineering, licenses, maintenance, software updates, and other miscellaneous charges.[98]  For example, while some stakeholders urge the Commission to permit E-Rate support for applicant-enabled off-campus networks, and provide some analysis for the potential cost efficiency of such solutions,[99] they also acknowledge that these alternatives that would require much higher up-front deployment costs and rely on reaching a large number of students, school staff, and library patrons.[100]  Even if constrained by the overall budgets adopted below, we are concerned that these alternative solutions would be challenging to review for cost-effectiveness by applicants and the Administrator without additional data and analysis.  In contrast, our experiences funding Wi-Fi hotspots and mobile wireless Internet services through the ECF program have demonstrated that this particular solution can reasonably be supported.[101]  We therefore find that taking this incremental step toward supporting the off-premises educational needs of our nation's students, school staff, and library patrons is not only in the public interest, but it is also within our legal authority.  As such, we limit eligibility to commercially available mobile wireless Internet services and the Wi-Fi hotspots needed to deliver such services to an individual user.[102]

26.     *Per-User Limits.*  Mindful of the importance of maximizing the use of limited funds, and consistent with the limitation adopted in the ECF program, we adopt a rule to prohibit an eligible school or library from applying for more than one Wi-Fi hotspot provided for use by each student, school staff member, or library patron in the E-Rate program.[103]  The *NPRM* sought comment on whether we should impose per-user limitations on eligible Wi-Fi hotspots and services.[104]  The ECF program limited support to one Wi-Fi hotspot device per student, school staff, or library patron.[105]  Many commenters expressed

---

[97] 47 U.S.C. § 254(h)(2)(A).

[98] *See generally* Dr. Raul Katz, The "To and Through" Opportunity: An Economic Analysis of Options to Extend Affordable Broadband to Students and Households via Anchor Institutions (2022), https://assets.noviams.com/novi-file-uploads/shlbc/PDFs_and_Documents/SHLB_Research_and_Publications/Raul_Katz_Economic_Study1.pdf.

[99] *See*, *e.g.*, SHLB & OTI Comments at 18-20.

[100] *See*, *e.g.*, Letter from Kristen Corra, Policy Counsel, SHLB, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 3 & n.5 (filed June 13, 2024).

[101] *See* Universal Service Administrative Company, *Emergency Connectivity Fund FCC Form 471*, https://opendata.usac.org/Emergency-Connectivity-Fund/Emergency-Connectivity-Fund-FCC-Form-471/i5j4-3rvr (last visited July 15, 2024) (reporting more than $24 million in ECF commitments by 16 applicants for construction projects).  We also note that while alternative solutions were eligible for ECF support, the overwhelming majority of ECF funding provided for connections were mobile wireless connections provided via Wi-Fi hotspots and therefore, we conclude that further data and additional analysis is required to determine the economic reasonableness and to understand the potential impact of making other solutions eligible, such as fixed solutions.

[102] The Commission expects these Wi-Fi hotspots and services to be accessible to and usable by students, school staff, and library patrons with disabilities, and that schools and libraries will accommodate requests by such individuals.

[103] *See* Appendix B, adopting 47 CFR § 54.502(e)(8).

[104] *See NPRM,* 2023 WL 8602208 at *8, para. 20.

[105] 47 CFR § 54.1706(c).

support for this approach.[106]  In adopting a per-user limitation on these equipment and services, we seek to equitably distribute and maximize the use of limited funds and the number of students, school staff, and library patrons served.

27.    *Minimum Service Standards.*  We decline to adopt minimum service standards for Wi-Fi hotspots and services used off-premises at this time.  While we understand commenters' requests to establish limits related to data and quality of service,[107] we find that adopting minimum service standards runs the risk of penalizing the students, school staff, and library patrons in places where slower speed, data capped, and/or high latency services are currently the only affordable options.  Furthermore, we agree with commenters' views that schools and libraries are in the best position to know what is available and sufficient for their students', school staff members', and library patrons' remote learning needs.[108] We expect that schools and libraries will make the best decisions to meet the remote learning needs of their students, school staff, and library patrons.

28.    *Demonstrating Cost-Effective Purchases of Wireless Services.*  In making the off-premises use of Wi-Fi hotspots and mobile wireless services eligible, we conclude that the E-Rate program's current requirement that applicants demonstrate that mobile wireless services are more cost-effective than internal broadband services is not applicable to off-premises use.[109]  The Commission adopted that requirement because schools and libraries often require substantial bandwidth connections to meet their on-premises connectivity needs, which in turn would require them to seek E-Rate support for large numbers of data plans to meet those needs that may be more expensive than other methods of providing internal broadband access for mobile devices at the school or library.  Here, the Commission solely makes the off-premises use of mobile wireless services eligible at this time; and thus, we find no need to impose any such requirements for applicants seeking support for the off-premises use of wireless Internet service and the Wi-Fi hotspots needed to deliver the services.  In the event that the off-premises use of additional services and equipment become eligible in the future, we will reconsider this approach and whether other requirements may be necessary.  We also remind applicants seeking support for the off-premises use of wireless Internet services and Wi-Fi hotspots that they remain subject to the E-Rate program's competitive bidding rules when seeking support for these services and equipment, including the requirement that they select the most cost-effective service offering, using price of the eligible equipment and services as the primary factor considered.[110]

29.    *Implementation.*  We direct the Bureau to make Wi-Fi hotspots and Internet services eligible for E-Rate funding as part of the funding year 2025 eligible services list proceeding.[111] Additionally, in implementing these changes, we reaffirm the delegation of authority to the Bureau to interpret our rules and otherwise provide clarification and guidance regarding any ambiguity that may

---

[106] *See, e.g.*, MCJ Comments at 4 (supporting a per-user limitation); EdLiNC Comments at 8-9 (same); ALA Comments at 11 (noting that a per-user limitation would be consistent with library lending practices); #OaklandUndivided, OUSD Comments at 4; Kajeet Reply at 2.

[107] *See, e.g.*, MCJ Comments at 5 (recommending the E-Rate program only support service plans with no data limits); T-Mobile Comments at 7 (urging the Commission not to adopt rules prohibiting data caps); #OaklandUndivided, OUSD Comments at 6-8 (suggesting limitations to ensure service is sufficient for remote learning, including a minimum download speed of 5 Mbps); TekWav Reply at 3 (urging the Commission to ensure there are speed requirements and no data caps).

[108] *See, e.g.*, SECA Comments at 2 (suggesting that minimum speeds and technical parameters be left to the discretion of applicants); WISPA Reply at 6 (same).

[109] *See FY 2024 Eligible Services List*, 2023 WL 8803733 at *11 ("[D]ata plans and air cards for mobile devices are eligible only in instances when the school or library seeking support demonstrates that the individual data plans are the most cost-effective option for providing internal broadband access for mobile devices at schools and libraries.") (citing the *2014 Second E-Rate Order*, 29 FCC Rcd at 15600, para. 156)).

[110] 47 CFR § 54.511(a).

[111] *See* Appendix B, adopting 47 CFR § 54.502(f) (as amended).

arise to ensure that support for these services provided to schools and libraries further the goals we have adopted for the E-Rate program.[112]  We also direct the Universal Service Administrative Company (USAC), the Administrator of the E-Rate program, in coordination with and under the oversight of the Bureau, to issue further guidance and training on administrative and related processes for requesting support for the off-premises use of Wi-Fi hotspots and services.

## C.    General Framework of a Wi-Fi Hotspot Lending Program Mechanism

30.    *Wi-Fi Hotspot Lending Program Mechanism.*  We now adopt a budget mechanism to allow for the equitable distribution of Wi-Fi hotspots and services to students, school staff, and library patrons.  In doing so, the budget mechanism will allow eligible schools and libraries to develop hotspot lending programs, while setting a limit on the amount of support that an applicant can request for Wi-Fi hotspots and services.  In the *NPRM*, we sought comment on how to establish a Wi-Fi hotspot program, recognizing that there are insufficient E-Rate funds to support a Wi-Fi hotspot and recurring service for every student, school staff member, and library patron across the nation.[113]  The *NPRM* also asked whether a per-student limit, like the one used for category two funding budgets, could help ensure support was distributed equitably to schools and libraries.[114]  The *NPRM* sought administratively feasible ways to prioritize support to students and library patrons without sufficient Internet access.[115]  In response, several commenters described the challenges to the approaches used in the ECF program and sought greater flexibility for schools and libraries.[116]  We also look to lessons learned from our administration of the ECF program in addressing these challenges, with particular focus on program integrity.  With these considerations in mind, we adopt a budgeted approach based on a mechanism provided in the comments to create a targeted lending program that allows eligible schools and libraries to be able to request a limited number of Wi-Fi hotspot devices and services, if they have need for them, within a pre-discount budget similar to the E-Rate program's category two budgets.[117]  This approach takes into account the applicant size, using information that is already collected as part of the category two budget process, and also relies on the E-Rate program's historic focus on poverty and rurality by using the applicants' discount rates to calculate a Wi-Fi hotspot budget.[118]  Schools and libraries at higher discount rate levels will be eligible to request and receive a greater amount of E-Rate support for Wi-Fi hotspot devices and services than schools and libraries at lower discount rate levels.[119]

31.    In establishing a budgeted approach to the lending program mechanism, we expect that the limited number of available Wi-Fi hotspots will more naturally be targeted to students, school staff, or library patrons with the most need.[120]  The budget mechanism will allow schools and libraries to target the

---

[112] *Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Third Report and Order, 12 FCC Rcd 22485, 22488-89, para. 6 (1997) (*Universal Service Third Report and Order*).

[113] *NPRM,* 2023 WL 8602208 at *12, para. 30.

[114] *Id.* at *12, para. 29.

[115] *Id.* at *12, para. 30.

[116] *See, e.g.*, Dallas ISD Comments at 4; EveryLibrary Institute Comments at 5-6; WIDPI Comments at 2 (noting that very few schools and libraries have the time or resources to conduct a survey); SHLB & OTI Comments at 28 (stating that the existing 10-year requirement is already burdensome without additional requirements); The Council Comments at 4; ALA Comments at 6-8 (explaining that recordkeeping serves as a barrier to participation in smaller, underserved communities lacking the staff capacity).

[117] *See* E-Rate Central Comments at 2-3.

[118] *See id.* at 3.

[119] *See id.*

[120] *See, e.g.*, E-Rate Central Comments at 2 (noting that a targeted loan program would provide funding "for those who need service the most, when they need it the most"); Letter from Lori Fisher, State Librarian, Maine State Library, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31 (filed Mar. 6, 2024) (explaining that its

(continued….)

appropriate individuals that lack broadband access; therefore, we find we do not need to adopt a survey requirement or other document collection requirement. Specifically, except in the one occasion discussed below,[121] this limited lending approach will not require applicants to document whether a particular student, school staff member, or library patron has "unmet need" as we defined that term in the ECF program,[122] relying instead on establishing a hotspot budget to prevent applicants from over-purchasing Wi-Fi hotspots and services and permitting applicants to use their judgment to determine the need in their own localities within those limits.[123] Instead, to ensure that use of the hotspot lending program is consistent with its objectives, we will require schools and libraries to adopt and provide notice to the Wi-Fi hotspot recipients of an acceptable use policy (AUP) that highlights that the goal of the hotspot lending program is to provide broadband access to students and library patrons who need it.[124] In combination with the applicant's requirement to pay its non-discounted share of costs, schools and libraries will be incented to right-size their Wi-Fi hotspot and service requests. However, the details of such a hotspot lending program—such as length of lending periods and how to target the appropriate students and library patrons—will be left to the applicant to determine and tailor the hotspot lending program to their local needs.[125] For these reasons, we can streamline the procedures that caused applicants the most challenges in the ECF program, benefiting applicants, service providers, and the Administrator.

32.    We find adopting this approach to be a reasonable mechanism for limiting how many Wi-Fi hotspots and connections can be requested by an applicant.[126] Specifically, applicants will be limited to

---

libraries "strongly adhere to the assumption that a patron who requests a hotspot, is in need of it"); WiDPI Comments at 2 (suggesting that patrons asking for a Wi-Fi hotspot "is *prima facie* evidence that they lack internet access").

[121] *See infra* para. 32 (prohibiting funding 1:1 hotspot initiatives absent individualized documentation of need).

[122] *See, e.g.*, WIDPI Comments at 2 (explaining that requiring a survey is too burdensome for most schools and libraries and noting that while schools may have surveyed their students during the pandemic, libraries often do not have such information about their patrons); EveryLibrary Institute Comments at 5-7 (noting the issues between ECF's requirements and libraries' privacy requirements); EdLiNC Comments at 7 (suggesting that current E-Rate program rules should continue to govern with respect to prioritizing for unmet needs); Dallas ISD Comments at 4 (stating that requiring a pre-certification of need or collecting AUPs would increase operational complexity and deter participation); SECA Comments at 6-7 (arguing that such requirements are unnecessary because of the non-discounted share).

[123] *See, e.g.*, EdLiNC Comments at 12-13 (suggesting that schools should annually collect connectivity data for students, but it should not be required by the Commission); NACEPF & Mobile Beacon Comments at 18; OITCs Comments at 3-4; SECA Comments at 6-7.

[124] *See, e.g.*, EveryLibrary Institute Comments at 7 (preferring a publicly posted Internet use policy to collecting signed statement); EdLiNC Comments at 13 (asserting that the FCC should encourage schools and libraries to use their normal sign-off processes when disseminating technology, rather than requiring parent certification). We recognize that "acceptable use policies" are also referred to as "eligible use policies." For ease, we use the term "acceptable use policy" throughout, but consider them to be the same and expect program participants to treat them similarly for purposes of implementing any of the relevant requirements we adopt today. *See infra* at Section E.1.

[125] *See, e.g.*, E-Rate Central Comments at 4 (suggesting that hotspot loan terms should be left to the discretion of the schools and libraries); ALA *Ex Parte* at 1 (explaining that a typical hotspot lending period is three weeks but that different loan periods can be used to accommodate "different needs for different individuals").

[126] The funding formula discussed in paragraph 36 would approximately limit the funding for hotspots to between 4% to 18% of a school's student total with the variation being due to the category one discount rate for the entity. Based on publicly available surveys, this would be reasonably consistent to meet the needs of students with limited access to broadband service at home. Pew Research Center finds that for students whose school closed in response to the Covid-19 pandemic, 22% of students had to rely on public Wi-Fi because of limited reliable service at home. Pew Research Center, 53% of Americans Say the Internet Has Been Essential During the COVID-19 Outbreak at 6 (2020), https://www.pewresearch.org/internet/2020/04/30/53-of-americans-say-the-internet-has-been-essential-during-the-covid-19-outbreak ("Overall, roughly one-in-five parents with homebound schoolchildren say it is very

(continued….)

a budget based on their full-time student count or library square footage, and their category one discount rate. In doing so, we establish bright line limits that are fair and equitable—allowing eligible schools and libraries to request Wi-Fi hotspots and service, but limiting the pool of Wi-Fi hotspots and service lines an applicant can request based on its discount rate and school or library size. This will allow schools and libraries to request funding for a Wi-Fi hotspot lending program that can provide wireless Internet service to its students, school staff, and library patrons when it is needed most. We prohibit one situation based on our experience in the ECF program—using Wi-Fi hotspots as part of a one to one (1:1) hotspot initiative, where every student receives a Wi-Fi hotspot. We recognize that even under the limiting mechanism, applicants might have a sufficient Wi-Fi hotspot budget that they could try to focus them all in to a 1:1 initiative at a single low-income school in a district or a particular grade (e.g., all juniors). Generally, applicants are prohibited from seeking E-Rate support for a 1:1 hotspot initiative like this and will be required to certify on the FCC Form 471 application that the hotspots and service will not be used for a 1:1 hotspot initiative. If E-Rate-funded Wi-Fi hotspots are used as part of a 1:1 initiative – either in practice by providing all of the devices to a single school in the district or in conjunction with Wi-Fi hotspots funded via other sources, applicants must document clearly (i.e., individual survey results or attestations) that each individual student needed a Wi-Fi hotspot, in accordance with the AUPs, and may not rely on general or estimated findings about income levels. Funding disbursements for applicants without specific documentation to support a 1:1 Wi-Fi hotspot initiative will be subject to denial and/or recovery.

33.    *Wi-Fi Hotspot and Services Funding Caps.*  We first adopt pre-discount funding caps on the amounts that can be requested for services and hotspot equipment in the E-Rate program. Specifically, we adopt a pre-discount $15 per month limit on recurring mobile wireless Internet service and a pre-discount $90 per Wi-Fi hotspot limit, based on the median cost of monthly services and Wi-Fi hotspots purchased in the ECF program.[127] Taxes and state electronic waste fees are not included in the cap,[128] while other reasonable costs such as delivery fees, activation, and configuration costs are included in the capped amounts. All taxes and fees should be separately identified on invoices and requested on a separate funding line. In the *NPRM*, we sought comment on cost control mechanisms, including funding

---

or somewhat likely their children will not be able complete their schoolwork because they do not have access to a computer at home (21%) or have to use public Wi-Fi to finish their schoolwork because there is not a reliable internet connection at home (22%).").  Similarly, during the pandemic, 14% of parents had to access public Wi-Fi because there was no reliable connection to the home.  This figure was 4% in high-income households and 23% in lower income households.  *See* C. McClain, The Internet and the Pandemic, Parents, Their Children and School During the Pandemic, Pew Research Center (2021), https://www.pewresearch.org/Internet/2021/09/01/parents-their-children-and-school-during-the-pandemic/.

[127] *See* Universal Service Administrative Company, Emergency Connectivity Fund FCC Form 471, https://opendata.usac.org/Emergency-Connectivity-Fund/Emergency-Connectivity-Fund-FCC-Form-471/i5j4-3rvr (last visited July 15, 2024) (reporting data on Wi-Fi hotspot devices and services that have been requested in the ECF program to date).  The median cost of Wi-Fi hotspots funded through the ECF program is $90 per device, and the median cost of mobile wireless services per user, per year is $15 per user, per month, for twelve months.  The funded cap calculations are based on contract price weighted by the quantity requested, rounded to the nearest dollar increment.  Special use Wi-Fi hotspots and those that were associated with vehicles were excluded from the analysis as well as a share of mobile wireless services that may have been sold bundled with other services.  Because of the cost of some Wi-Fi hotspots at the upper range of the ECF funding cap, we find the median a more appropriate choice, and note the median costs are not significantly different than the average ECF costs of $107.80 per device and $15.44 per month.  *NPRM,* 2023 WL 8602208 at *10, para. 23 n.76.  *But see* Letter from Amy E. Bender, Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 1 (filed July 10, 2024) (CTIA *Ex Parte*) (urging the Commission to increase the funding caps); SHLB July 11, 2024 *Ex Parte* Letter at 4-5 (suggesting recurring service rates as high as $40 per month).

[128] *See* NACEPF & Mobile Beacon Comments at 16 (noting that the numbers cited in the *NPRM* did not include taxes).  State-imposed electronic waste ("e-waste") fees were treated as taxes for the purposes of the ECF program, and will be treated the same in the E-Rate program.

caps on Wi-Fi hotspots or services.[129]  Some commenters support a cap on the Wi-Fi hotspots and services,[130] with some suggesting that the averages from the ECF program would be an appropriate place to start.[131]  Others disagreed, suggesting that competitive bidding and the applicants' non-discounted share of costs requirement would be sufficient, with some cost-effectiveness checks during the Program Integrity Assurance (PIA) review process.[132]

34.     On balance, we agree with commenters suggesting that funding caps will more effectively ensure equitable distribution of Wi-Fi hotspots, drive more cost-effective purchasing within the E-Rate program, and reduce the likelihood that these costs become unsustainable.[133]  We also expect that clear funding caps will lead to a more streamlined review of these funding requests, simplifying administration of these requests.  For example, we disagree with commenters that unreasonable costs are easily taken up in the PIA reviews,[134] when the data we have from the ECF program and the record in this proceeding shows a large variation in costs depending on service provider, technology type, and how contracts are structured.[135]  Setting funding caps will also reduce concerns about applicants selecting multiple service offerings in instances where a single service provider will not be able to cover the entire coverage area.[136]  In these instances, the program's competitive bidding rules would otherwise be less effective in ensuring cost-effective purchasing when applicants may need multiple service providers in order to provide coverage options in various geographic parts of the student or library patron community.[137]  By using a funding cap, applicants that select multiple service providers will still be capped at a cost-effective price, even if they require selection of service offerings that may be more expensive.

35.     Consistent with the ECF program, applicants are permitted to select a Wi-Fi hotspot or

---

[129] *NPRM,* 2023 WL 8602208 at *10, para. 23 n.80.

[130] *See, e.g.*, ACSA-CSBA Comments at 3 (ACSA-CSBA) (suggesting the adoption of inflation-adjusted spending caps consistent with the average of such costs in California); CASBO Comments at 3 (supporting a per-student cap); NCTA Comments at 11 (supporting a per-student limit "to preserve E-Rate resources for other uses"); TekWav Reply at 5 (urging the FCC to consider the existing practices when establishing funding caps).

[131] *See, e.g.*, EdLiNC Comments at 9-10 (suggesting that ECF averages should be given significant weight in determining an initial cap); NACEPF & Mobile Beacon Comments at 1 (agreeing with the EdLiNC assessment).

[132] *See, e.g.*, ALA Comments at 12 (recommending that standard E-Rate processes apply, including competitive bidding, state and local procurement policies, and discounts); Dallas ISD Comments at 4 (stating that the non-discounted share and competitive bidding rules are effective methods to control costs); WIDPI Comments at 2 (recommending use of competitive bidding and non-discounted share to control costs, while considering soft targets over which additional review would be warranted).

[133] *See, e.g.*, CASBO Comments at 3 (supporting a cap to ensure equitable distribution); EdLiNC Comments at 9-10 (providing support for a cap as a means "to ensure that new E-Rate services do not become an unsustainable burden").

[134] *See, e.g.*, ALA Comments at 12 (suggesting that if costs seem unreasonable, PIA reviewers can contact the applicant and inquire about the higher than usual funding).

[135] *See, e.g.*, NACEPF & Mobile Beacon Comments at 17 (noting a wide range in costs from between $57 and $459, depending on the technology type and other factors).  *See* Universal Service Administrative Company, Emergency Connectivity Fund FCC Form 471, https://opendata.usac.org/Emergency-Connectivity-Fund/Emergency-Connectivity-Fund-FCC-Form-471/i5j4-3rvr (last visited July 15, 2024) (showing a wide range in costs for hotspots, but over 62.73% percent funded at less than $90).

[136] *NPRM,* 2023 WL 8602208 at *10, para. 24; *see also, e.g.*, Dallas ISD Comments at 4 (explaining that variations in network coverage and other factors may require the use of multiple carrier networks).

[137] Additionally, we are not persuaded that it is necessary to adopt prohibitions on competitive bidding on a district-wide or consortia basis and leave this to each applicant to determine.  *See* Letter from Michael Romano, Executive Vice President, NTCA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 2 (filed July 9, 2024) (NTCA *Ex Parte*).

service that costs more than the funding caps,[138] but E-Rate commitments will not exceed the funding caps. We expect the E-Rate program's competitive bidding rules to aid applicants in selecting the most cost-effective service offerings,[139] but we also direct USAC to examine costs that do not appear to be cost-effective, based upon other costs within the program or other commercially available offerings.[140] Although we are adopting funding caps for recurring services and Wi-Fi hotspots to help control overall costs to the E-Rate program, we expect applicants to request E-Rate support based on actual, commercial-based costs. For example, an applicant cannot request funding at the cap levels, but purchase Wi-Fi hotspots and recurring services at lower costs and allow service providers to keep the difference in costs as their profit or windfall. We will also require service providers to certify that the costs of the Wi-Fi hotspots do not exceed commercial value. USAC is permitted to modify or reduce such funding requests, as appropriate, to reflect the actual, market-based price of commercially-available Wi-Fi hotspots and to seek recovery in the event of a later determination that the E-Rate funded costs were higher than the actual costs of the requested Wi-Fi hotspots and/or recurring services.

36.    *Calculating Budgets.* Next, we establish a formula to calculate a three-year pre-discount Wi-Fi hotspot and service budget, limiting the amount of E-Rate support that can be requested by an applicant for Wi-Fi hotspots and recurring service over three funding years. E-Rate Central suggests adopting a formula modeled after the category two budgets that limits applicants to 20 hotspots per 100 students and 5.5 hotspots per 1,000 library square feet, adjusted by discount rate.[141] Using this proposed formula and multiplying the result by the three-year cost of the funding caps ($630),[142] applicants will calculate a three-year Wi-Fi hotspots and service budget. This is the maximum amount of pre-discount funding permitted for Wi-Fi hotspots and/or service over three funding years.[143] E-Rate Central proposed limiting the quantity of Wi-Fi hotspots and services, but there are important benefits to calculating a maximum Wi-Fi hotspot budget for several reasons. One, a budget will allow schools and libraries greater flexibility in spending by allowing applicants to request funding for the most appropriate mix of Wi-Fi hotspots and service, depending on their needs. Two, a budget will provide applicants better incentives to make cost-effective purchases by permitting them to purchase higher quantities if there are lower costs. Three, budgets will also facilitate use of existing Wi-Fi hotspots purchased through the ECF program or with other federal funds that are still functional by permitting applicants to purchase higher quantities of service requests, if needed. Applicants that select lower-cost Wi-Fi hotspots, or that find ways to maintain Wi-Fi hotspots for longer, will be able to request a larger quantity of E-Rate supported hotspots or lines of service depending on their individual needs and budget.

---

[138] *ECF Order*, 36 FCC Rcd at 8730-31, para. 69.

[139] 47 CFR §§ 54.503(c)(2)(ii)(B); 54.511(a).

[140] *Request for Review by Ysleta Independent School District of the Decision of the Universal Service Administrator*, CC Docket Nos. 96-45, 97-21, Order, 18 FCC Rcd 26407, 26431-32, paras. 53-54 (2003) (*Ysleta Order*) (noting applicants are required to select cost-effective services, even in instances where an applicant receives only one bid).

[141] *See* E-Rate Central Comments at 2 (suggesting applicants be limited to 20 hotspots per 100 students and 5.5 hotspots per 1,000 library square feet).

[142] To calculate $630, we use the $90 funding cap for the Wi-Fi hotspot and add 36 months of capped $15 monthly service. *See supra* para. 33 (establishing funding caps).

[143] To clarify, the calculation uses the applicant discount rate to come up with an overall Wi-Fi hotspot budget. That Wi-Fi hotspots budget is a *pre-discount* budget, which means that applicants with a higher discount rate will receive a larger discount on the same amount of Wi-Fi hotspots and services. This provides applicants with a higher rate of poverty or rurality with a higher budget than an applicant with a lower rate of poverty or rurality. *See* SHLB July 11, 2024 *Ex Parte* Letter at 6 (seeking clarification on the "pre-discount" budgets).

Independent School or District Budget = [student count x $\dfrac{20 \text{ hotspots}}{100 \text{ students}}$ x C1 discount rate]  x $630

Library or Library System Budget = [square feet x $\dfrac{5.5 \text{ hotspots}}{1000 \text{ square feet}}$ x C1 discount rate] x $630

Note: The value in the brackets above for both the schools and libraries budgets is rounded up to the nearest ten.

37.     *Calculating Independent School and School District Hotspot Budgets.*  Independent schools and school district applicants will calculate their Wi-Fi hotspot and service budgets by multiplying their student counts by 20% (i.e., 20 hotspots per 100 students), and adjusting by their category one discount rates.[144]  This number is rounded up to the nearest ten.  The applicant then multiplies that rounded number by $630 to determine the three-year budget.  For example, an independent school with 500 students and a 90% discount rate would have a three-year, pre-discount budget of $56,700, while a school district with 500 students and a 40% discount rate would have pre-discount budget of $25,200.[145]  Unlike the ECF program, these limits will reduce the number of hotspots that could be requested from the start, requiring schools and districts to make choices about how to distribute and prioritize access for students with the greatest need or set lending terms that allow students to access devices at times when need is high.  To the extent that the formula needs adjustments, we provide a means for future changes as discussed below, but expect that the benefits of a single formula applicable to all school applicants will be simpler and more administrable than attempting to find a precise number for different types of applicants and will greatly decrease burdens on applicants and the Administrator than if different formulas were adopted dependent upon type of school applicant.

38.     *Calculating Independent Libraries and Library System Hotspot Budgets.*  Likewise, independent libraries and library systems would calculate their Wi-Fi hotspots and service budgets using their square footage,[146] allowing 5.5 devices per 1,000 square feet, adjusted by their category one discount rates.  This number is rounded up to the nearest ten.  The applicant then multiplies that rounded number by $630 to determine the three-year pre-discount budget.  For example, an independent library of 10,000 square feet at the 90% discount rate would have a three-year pre-discount budget of $31,500, while a library system with 100,000 square feet and a 90% discount rate would have a three-year pre-discount budget of $315,000.[147]  Smaller libraries would thus be eligible for at least 10 devices and services lines, while larger library systems would be eligible for more.  Like schools, we adopt this formula in order to allow libraries to plan for and determine how and whether to request E-Rate support for a library hotspot lending program.  We adopt the factor suggested in the comments, which is roughly based on the ratios

---

[144] *See* E-Rate Central Comments at 2 (suggesting school applicants be limited to 20 hotspots per 100 students).

[145] The calculations, as shown, provide for a budget based on student count, and taking poverty and rurality into account.  The calculation for the 90% discount rate school is: [500 students * 0.2 * 0.9] * $630 = $56,700.  The calculation for the 40% discount rate school district is: [500 students * 0.2 * 0.4] * $630 = $25,200.

[146] *See* E-Rate Central Comments at 2 (suggesting library applicants be limited to 5.5 hotspots per 1,000 library square feet).

[147] The calculations, as shown, provide for a larger budget based on library size, poverty, and rurality.  The calculation for the smaller library is: [10,000 square feet * 5.5/1000 * 0.9] * $630 = $31,500, while the calculation for the library system is [100,000 square feet * 5.5/1000 * 0.9] * $630 = $315,000.  Note that in this second library system calculation, the bracketed formula was rounded up from 495 to the next ten, or 500 before being multiplied by $630.

developed in the category two budgets for schools and libraries,[148] but also adopt a means to adjust the formula in the future should the library factor be insufficient for library patron access, particularly in areas of the country where there may be higher need, but small libraries, such as rural-remote areas.

39. For purposes of the calculation, full-time student count and square footage figures will be calculated at the district-wide or library system level in order to make use of existing information collections and procedures.[149] Independent schools may apply using entity-level student counts.[150] In doing this, we seek to use data that is already collected on the FCC Form 471 application for the applicants' category two budgets. Similarly, we will allow an applicant to rely on a validated category two student count or square footage figure for purposes of the Wi-Fi hotspot limiting mechanism.[151] Relying on information already collected and validated for category two purposes will reduce burdens on applicants and the Administrator. For funding year (FY) 2025 through FY 2027, schools and school districts with a validated category two student count could rely on that number (and similarly, libraries with a validated square footage), but would need to revalidate student counts in the next three-year Wi-Fi hotspot funding cycle (i.e., FY 2028 through FY 2030).[152]

40. We also will use fixed three-year budget cycles, after which the budgets will reset, beginning with funding years 2025 through 2027.[153] Based on the experience with category two budgets,

---

[148] A library with approximately 3711.1 square feet would be eligible (in the absence of the funding floor) for a category two budget of $16,700, or roughly equivalent to the budget for a school with 100 students. Thus, using the equivalent category two ratio, the library would be eligible for approximately 5.5 devices per 1,000 square feet.

[149] *Modernizing the E-Rate Program for Schools and Libraries*, WC Docket No. 13-184, Order, 34 FCC Rcd 11219, 11229-30, 11234, paras. 26, 40 (2019) (*Category Two Order*) (using full-time student counts for district-wide category two budgets). Independent schools with part-time students only will be eligible for Wi-fi hotspots by counting these students as full-time students consistent with guidance provided under category two budget rules. *See Wireline Competition Bureau Provides Guidance on E-Rate Program Category Two Budgets*, WC Docket No. 13-184, Public Notice, 35 FCC Rcd 11508, 11509-10 (WCB 2020) (*Category Two Guidance Public Notice*).

[150] Consistent with the category two budget rules, if state law considers a charter school to be part of a school district, the charter school will be presumed to be a part of the district for purposes of calculating the category two budget and discount rate, unless the charter school demonstrates financial and administrative independence from the district, in which case it will have its own separate category two budget and discount rate. *See Category Two Guidance Public Notice*, 35 FCC Rcd at 11508-11509.

[151] As a reminder, applicants are required to validate their category two student counts in the first funding year in which they seek category two E-Rate support. That number can then be relied upon for purposes of the category two budget for the entirety of the five-year funding cycle, unless the applicant decides to seek a category two recalculation. *See Category Two Order*, 34 FCC Rcd at 11236, para. 44; 47 CFR § 54.502.

[152] These student count or square footage numbers must align with the category two budgets. Therefore, if a category two student count or square footage number has already been validated when an applicant applies for Wi-Fi hotspots in FY 2028, that is the applicable student count or square footage number for the hotspot budget. If an applicant has not requested funding for category two services, applicants will be required to validate student counts or square footage in the first funding year that they request Wi-Fi hotspots or services. We note, however, that the Administrator may continue to ask for additional information regarding an applicant's student count or square footage to verify the number during its reviews as necessary.

[153] For purposes of the calculation, applicants will use their category one discount rate for the first funding year that they request Wi-Fi hotspots or associated services. The calculation will remain the same for the three-year funding period. For example, if an applicant requests funding in FY 2025, the budget will be calculated using the existing full-time student enrollment and the FY 2025 discount rate and remain the same through FY 2027. If an applicant does not request Wi-Fi hotspots and associated service until FY 2027, the calculation would only last one year, before resetting in the next three-year cycle (FY 2028). We direct USAC to develop an open data tool, similar to the Category Two Budget Tool, to help applicants determine their forecasted, preliminary, and confirmed hotspot budgets. *See* Universal Service Administrative Company, Emergency Connectivity Fund FCC Form 471, E-Rate C2 Budget Tool Data FY2021+, https://opendata.usac.org/E-Rate/E-Rate-C2-Budget-Tool-Data-FY2021-/6brt-5pbv/about_data (last visited July 15, 2024) (calculating category two budgets in various stages).

we believe a fixed cycle will reduce applicant confusion and simplify administration.  Entities are allowed to spread out their requests for Wi-Fi hotspots and services over the three-year timeframe, as long as the total pre-discount amount does not exceed the budget over the three funding years.[154]  Entities may request support for Wi-Fi hotspot service even if the associated Wi-Fi hotspots were not directly funded under the new E-Rate rules.  However, applicants may not request more than 45% of its three-year budget in any year.  We find this valuable in order to prevent applicants with high numbers of existing Wi-Fi hotspots from simply using the entire budget in a single funding year.[155]  We will also require that such services must be competitively bid prior to requesting E-Rate support pursuant to the program's competitive bidding rules.[156]

41.    We emphasize that the hotspot budget represents the maximum pre-discount amount an applicant may request across three funding years, rather than an allocation of funding for Wi-Fi hotspots and service lines for which an applicant is entitled reimbursement.  Applicants should evaluate whether there is need in their own school and library communities and what can be effectively used and tracked in compliance with program rules.[157]  Applicants will also continue to be subject to the E-Rate program rules requiring that schools and libraries are responsible for paying the non-discounted share of the costs.[158]  The intent of this hotspot lending program is for the Wi-Fi hotspots to be available for loan and for use by students, school staff, or library patrons without sufficient broadband access at home and other off-campus locations for educational purposes.  Applicants and service providers will be subject to E-Rate program rules, certifications, and other requirements designed to protect program integrity, as discussed in further detail below.

42.    Applicants may not request funding for Wi-Fi hotspots for future use or to be stored in case of an emergency, and we will not allow applicants to purchase Wi-Fi hotspots to store in case of theft, loss, or breakage.[159]  Each Wi-Fi hotspot must be associated with a line of service.[160]  We recognize from commenters about replacing Wi-Fi hotspots,[161] but based on lessons from the ECF program, determine that a streamlined approach would be simpler to administer, provide clarity for applicants, and ensure limited E-Rate program funds are used appropriately.  In the event of loss or breakage, applicants may purchase extra devices with other sources of funding to use with the E-Rate-supported service or they can request replacement devices paired with lines of service in the next funding

---

[154] The limiting mechanism is only applicable to Wi-Fi hotspots funded through the E-Rate program and does not factor in devices funded through the ECF program or through other sources of funds.

[155] *But see* SHLB July 11, 2024 *Ex Parte* Letter at 5-6 (arguing that removing the 45% threshold would better meet individual applicant needs because it adds unnecessary complexity and does not accommodate the "readiness" levels of each school and library participating in the lending program).

[156] This is consistent with E-Rate competitive bidding requirements for applicants requesting school bus Wi-Fi services, even in instances where the applicant previously entered into multi-year contracts in the ECF program.  *See FY 2024 Eligible Services List*, 2023 WL 8803733 at *5, para. 13, n.53.  ECF-funded Wi-Fi hotspot contracts are not grandfathered, but applicants may seek competitive bids for services to be delivered via ECF- or other separately-funded Wi-Fi hotspots.

[157] *See e.g.*, ALA *Ex Parte* at 2 (noting that libraries in Maine "determine need [for Wi-Fi hotspots] by assessing patron demand through methods used for other materials that circulate").

[158] 47 CFR § 54.523.

[159] *See infra* para. 58.  Applicants will be required to certify on the FCC Form 471 application that the hotspots will not be used for these purposes.  *See* Appendix B, adopting 47 CFR § 54.504(a)(1)(xii) (as amended).

[160] Applicants may request Wi-Fi hotspots and service together or service only, but Wi-Fi hotspots without an associated service line will not be eligible for funding.

[161] *See, e.g.*, ALA Comments at 11 (noting that hotspots will need to be replaced over time); The Council Comments at 4 (urging caution with regard to limits on hotspot eligibility over a certain timeframe due to loss, theft, or breakage); SHLB & OTI Comments at 28 (stating that limiting purchases to a three-year timeframe could leave applicants unable to replace stolen or damaged equipment).

year if they have not exhausted their budgets. We caution, however, that applicants that do not replace lost or broken hotspots must work with their service providers to discontinue the associated service within a reasonable amount of time of becoming aware of the issue (e.g., 30 days). In order to ensure the E-Rate program is not paying for services that sit unused for these or other reasons, we will require service providers to exclude or waive any associated early termination fees for the services to Wi-Fi hotspots being funded with E-Rate support that are lost, broken, or unused and can no longer be distributed to students, school staff, or library patrons.[162] We remind applicants that they must document information about lost or broken equipment in the asset inventory containing details about each Wi-Fi hotspot.[163]

43. In combination, we expect this three-year pre-discount budget mechanism and the funding caps to be effective in ensuring that schools and libraries with students, school staff, and library patrons with need have access to E-Rate funding to effectively set up and request funding for hotspot lending programs, while protecting the Universal Service Fund from overspending and reducing administrative burdens, as compared to the ECF program.[164] At the same time, we are cognizant that a one-size formula for limiting hotspot requests may not fit every school and library and may need to be adjusted if it is impacting program participation.[165] As such, we delegate to the Bureau, working with the Office of Economics and Analytics, the ability to adjust the limiting mechanism quantities (i.e., 20 per 100 students and 5.5 per 1,000 square feet) as well as the funding caps in future funding years or future three-year budget cycles, after seeking comment on such an adjustment.[166] We also delegate to the Bureau the authority to resolve technical, procedural, and administrative issues that may arise in connection with this formula.

### D. Categorization/Prioritization

44. In the *NPRM*, the Commission sought comment on what category of service should be used for wireless Internet service and the Wi-Fi hotspots needed to deliver the service, as well as how to prioritize such services should demand for E-Rate support exceed the annual funding cap.[167] Consistent with the existing eligible services list,[168] wireless Internet services will be listed as eligible as a category one service, and will not be subject to the category two budgets. Wi-Fi hotspots will be eligible as category one network equipment necessary to make category one wireless Internet services functional. We agree with commenters arguing that it should be eligible as category one, consistent with the treatment of supporting equipment necessary to sustain connectivity.[169]

45. At the same time, in the event that demand for E-Rate support exceeds available funding, we also adopt a rule to fund requests for eligible off-premises use of Wi-Fi hotspots and services after requests for eligible on-premises services, inclusive of both category one and category two services.[170] Based on recent funding years and the limits that we are adopting on Wi-Fi hotspot and recurring service

---

[162] *See* SECA Comments at 10-11 (asking that the Commission mandate or encourage service providers to allow for cancellation or suspension of service without requiring early termination charges).

[163] *See infra* Section III.E.3.

[164] *Infra* note 329.

[165] *See, e.g.*, EdLiNC Comments at 2-3 (recommending setting caps that can continue to be evaluated); T-Mobile Comments at 5 (raising concerns about setting caps or limits that could stifle program participation).

[166] In the event that the data received in the first three years of the Wi-Fi hotspot lending program does not reflect market costs of such equipment and services, the Bureau can reassess these funding caps.

[167] *NPRM,* 2023 WL 8602208 at *12, paras. 28-29.

[168] Category one services generally include data transmission and Internet access services. *See FY 2024 Eligible Services List*, 2023 WL 8803733 at *8. 47 CFR § 54.502(a)(1).

[169] *NPRM,* 2023 WL 8602208 at *12, para. 28. *See* T-Mobile Comments at 3-4.

[170] *See* Appendix B adopting 47 CFR § 54.507(f) (as amended) (funding off-premises use of mobile wireless services after on-premises category one and category two services).

requests,[171] we do not expect the changes we adopt today to cause demand to exceed the E-Rate funding cap.[172] However, we agree with commenters that this approach will ensure that on-campus E-Rate funding is available and predictable for schools and libraries in future funding years.[173] In making this determination, we also apply it to requests for funding for off-premises use of school bus Wi-Fi services.[174] Mobile wireless broadband connectivity for school buses is also eligible as a category one service, but as an off-premises wireless Internet service, it will be funded after eligible on-premises services should demand exceed the E-Rate annual funding cap.[175] This appropriately treats these off-premises wireless Internet services and the equipment needed for the connectivity in the same manner and ensures that future demand for these off-premises services does not make access to on-premises broadband connectivity to and within the schools and libraries less predictable.[176]

### E. Safeguards

46. Next, mindful of our obligation to protect the integrity of the E-Rate program and be a careful steward of these limited funds, we adopt a number of safeguards aimed at ensuring compliance with our rules and strengthening program integrity. In deciding whether and which measures to adopt, we consider a variety of factors, including, importantly, the intended purpose for which this funding is available, our experience with the ECF program, and commenters' concerns regarding the burdens associated with and feasibility around adopting such protections. We also rely on and leverage existing tools to ensure compliance with our rules, such as our audit procedures and competitive bidding, non-discounted share of costs, and discount rate rules. Coupled with those protections already built into the design of the mechanism we establish today for the distribution of Wi-Fi hotspots and services, we seek to protect the Fund, and we reiterate our commitment to identify and pursue instances of waste, fraud, and abuse, including recovery of improperly disbursed funds where appropriate.

#### 1. Educational Purposes

47. In the *NPRM*, we sought comment on ways to ensure that the off-premises use of Wi-Fi hotspots and services primarily serves an educational purpose consistent with the Commission's rules and

---

[171] *See supra* para. 36.

[172] We acknowledge the commenters who request that the new off-premises services made eligible herein be prioritized after equipment and services needed for cybersecurity. *See, e.g.*, LAUSD Comments at 2-3; SECA Comments at 4; NCTA Comments at 11. However, we note that the Commission has created a separate pilot program to support the costs associated with cybersecurity equipment and services for schools and libraries. *See generally Schools and Libraries Cybersecurity Pilot Program*, WC Docket No. 23-234, Report and Order, FCC 24-63, 2024 WL 3010578 (June 6, 2024). In the event such cybersecurity services and equipment become eligible for E-Rate support in the future, the Commission can address these prioritization concerns at that time.

[173] *See, e.g.*, LAUSD Comments at 2-3 (encouraging the Commission to ensure schools and libraries continue to have access to important on-campus connectivity); SECA Comments at 4-5 (suggesting that off-campus requests be funded after category one and two funding requests are fully funded); NCTA Comments at 11 (stating the Commission should adopt safeguards to prioritize Wi-Fi hotspots after category one and two services); WISPA Reply at 5-6 (supporting comments recommending prioritization of off-campus services after on-campus funding requests).

[174] *See generally School Bus Wi-Fi Declaratory Ruling*, 2023 WL 8586523.

[175] *FY 2024 Eligible Services List Order*, 2023 WL 8803733 at *3, para. 8; *see also* Appendix B adopting 47 CFR § 54.507(f), which will be effective 30 days after Federal Register publication.

[176] We note that under current rules, library bookmobiles are eligible for wireless services in some states to the extent that state law considers them libraries. Those services would continue to be considered on-premises category one services if libraries request them in that manner. We also clarified above that the cost-effectiveness test required in the eligible services list applies only to on-premises use and is not required for this off-premises hotspot lending program. *See supra* para. 28; *First 2014 E-Rate Order*, 29 FCC Rcd at 8898-8922, paras. 76-133.

section 254(h)(1)(B) of the Communications Act.[177] Specifically, we asked whether requiring schools and libraries to certify on their forms that E-Rate support is being used primarily for this purpose is sufficient or if additional safeguards should be imposed to protect against improper use.[178] Based on our experience with the ECF program and recognizing that the off-premises use of Wi-Fi hotspots and services raises novel challenges about ensuring their proper use, we find that adopting additional safeguards is necessary to ensure that E-Rate program funds are used for their intended purpose and to protect the integrity of the program. In so doing, we reject those views expressed by commenters that the existing certifications are sufficient safeguards,[179] and that ensuring the proper use of Wi-Fi hotspots and services off-premises is overly burdensome or impractical.[180]

48. We remind applicants that E-Rate program rules require schools and libraries to use E-Rate-supported services, including Wi-Fi hotspots and services used off-premises, primarily for educational purposes.[181] Thus, in addition to requiring schools and libraries to use the existing E-Rate certifications to ensure that the off-premises use of E-Rate-funded Wi-Fi hotspots and services is primarily for an educational purpose,[182] we require applicants to maintain and—where necessary—update their acceptable use policies (AUPs) to clearly state that this off-premises use must be primarily for an educational purpose as defined by our rules.[183] With respect to schools, this means that the acceptable use policy must state that the use must be "integral, immediate, and proximate to the education of students."[184] Similarly, for libraries, the acceptable use policy must clearly state that the use must be "integral,

---

[177] *NPRM,* 2023 WL 8602208 at *14, para. 35; *see also* 47 U.S.C. § 254(h)(1)(B); 47 CFR §§ 54.503(c)(2)(ii)(A), 54.504(a)(1)(v) (requiring applicants to certify that E-Rate-supported services will be used primarily for educational purposes).

[178] *NPRM,* 2023 WL 8602208 at *15, para. 36.

[179] *See, e.g.*, EPIC Reply at 4 (stating that the "Commission should go no further than requiring that schools and libraries…certify compliance on program forms that they will be used for educational purposes"), 8 (urging that the Commission "require at most a certification from the distributing school or library that devices are used for 'primarily' educational purposes"); NACEPF & Mobile Beacon Comments at 12-13, 21-22 (maintaining that "the FCC's existing rules properly allow educators to determine how best to ensure that off-premises services are used for educational purposes"); EveryLibrary Institute Comments at 7. *But see* ACA Connects – America's Communications Association Comments at 9 n.27 (ACA Connects) (stating that it "does not believe [a] certification alone will be sufficient to ensure compliance with section 254(h)(1)(B), as it will not allow the Commission to adequately confirm that the hotspot devices are being used for educational purposes").

[180] *See, e.g.*, ACA Connects Comments at 3 (stating that the NPRM "downplays or overlooks the practical difficulties of ensuring that hotspots are used 'primarily for educational purposes'"), 8 (noting that the Commission "does not offer any realistic mechanism to ensure that [Wi-Fi hotspots and wireless broadband connectivity are used primarily for educational purposes]"), 9 (claiming that ensuring that hotspots be primarily used for educational purposes is too difficult and unlikely given the amount of time students spend using the Internet for recreational use and notwithstanding any requirement that users adhere to AUPs or that they log on with unique user credentials); NTCA–The Rural Broadband Association Comments at 6-7 (NTCA) (asserting that "there is no practical way for schools to ensure any and every hotspot…is used solely for educational purposes" and noting that it may be even more difficult for libraries to do so); *see also* WISPA Reply at 7, 8-9 (expressing doubt that the Commission can adequately develop and enforce the proposed expansion of the E-Rate program to ensure that hotspots are used primarily for educational purposes).

[181] 47 CFR §§ 54.503(c)(2)(ii)(A), 54.504(a)(1)(v).

[182] *See id.*

[183] As noted above, we also require that these acceptable use policies state that the Wi-Fi hotspots and services are being provided to students, school staff, and/or library patrons who need broadband access. *See supra* Section III. C., para. 31 & note 125.

[184] *Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9208, para. 17; 47 CFR § 54.500.

immediate, and proximate to the provision of library services to library patrons."[185]

49.    While the Commission's rules require schools and libraries to ensure the use of E-Rate-funded services align with these purposes, the Commission has long-recognized that schools and libraries are in the best position to determine what guidelines and restrictions should govern the appropriate use of their networks and other technology.[186]  We did not find the need to impose any other restrictions or specifications in the ECF program;[187] and we agree with commenters that schools and libraries are appropriately positioned to make determinations about acceptable use in their communities.[188]  Applicants are subject to the requirements under the Children's Internet Protection Act, which requires local educational agencies and libraries to establish specific technical protections before allowing network access.[189]  In establishing such protections, applicants often create AUPs that outline expected user behaviors.[190]  For example, schools in Virginia are "required to establish guidelines for appropriate technology use" and AUPs must, among other things, state "the educational uses and advantages of the Internet" and identify "prohibited forms of technology-based applications and hardware use."[191]  School staff and students are also required to "monitor the use of technologies for grade-level and content appropriateness, ethics, and safety."[192]  Similarly, Maine State Libraries are encouraged to have an AUP in place for technology that is available for patron use and to review these policies with library staff.[193]  We expect that schools and libraries will implement content and user network restrictions consistent with

---

[185] *Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9208, para. 17; 47 CFR § 54.500.

[186] *See* 47 CFR § 54.520(c)(4) (requiring local determination and providing that "[n]o agency or instrumentality of the United States Government may establish criteria for making such determination; review the determination made by the certifying school, school board, school district, local educational agency, library, or other authority, or consider the criteria employed by the certifying school, school board, school district, local educational agency, library, or other authority").  As such, we do not require that these AUPs impose any other restrictions or specifications, including certain minimum requirements or limits on the duration of time a student, school staff member, or library patron can use a hotspot as contemplated in the *NPRM*.  *NPRM,* 2023 WL 8602208 at *15, para. 36.

[187] *See, e.g.*, *ECF Order*, 36 FCC Rcd at 8718-19, para. 42 (explaining the decision to refrain from applying minimum service standards in the ECF program and basing it, in part, on the fact that schools and libraries are in the best position to know what is available and sufficient for their remote learning needs).

[188] *See* 47 CFR § 54.520(c)(4); *see also, e.g.*, NACEPF & Mobile Beacon Comments at 12-13 (urging the Commission to "rely on educators and library administrators to ensure that funded hotspots are used for an educational purpose"), 21 (stating that schools and libraries are best positioned to monitor whether hotspots are being used for an educational purpose and suggesting that the practice of providing copies of AUPs is sufficient); *see also* EdLiNC Comments at 14 (expressing significant concerns with the notion that the Commission require changes to acceptable or Internet use policies that would require applicants to include certain minimum requirements or limit the duration of time a student, school staff member, or library patron can use a hotspot and noting that such a requirement would "place a significant burden on all applicants to go through a process to review, revise, and approve such policies" and deter many from participating in the program).

[189] *See supra* Section III.G.

[190] *See* CoSN, Creating Effective Responsible Use Policies for Schools (2022), https://cdn.iste.org/www-root/2022-12/Creating_Effective_Responsible_Use_Policies_for_Schools_DEC_2022.pdf (last visited July 15, 2024).  *See also, e.g.,* Louisiana Department of Education, Acceptable Use Policies (AUP), https://www.louisianabelieves.com/docs/default-source/district-support/acceptable-use-policies-docx.pdf?sfvrsn=b9796118_2 (last visited July 15, 2024) (providing districts with best practices in connection with a Louisiana requirement for adopting local AUPs).

[191] Virginia Department of Education, Acceptable Use Policy, https://www.doe.virginia.gov/programs-services/school-operations-support-services/safety-crisis-management/internet-safety/acceptable-internet-use-policy (last visited July 15, 2024).

[192] *Id.*

[193] Maine State Library Comments at 2-3.

the restrictions that they place on their building-based networks, and to adopt suitable AUPs and other policies to limit access, but we seek to ensure applicants have the flexibility for unique situations and to avoid layering additional, similar restrictions that could result in program violations. For example, duration limits could deter applicants seeking to use hotspots for students that are home sick or home for inclement weather and accessing school or homework remotely.

50. Nor do we require applicants to restrict access to the off-premises use of Wi-Fi hotspots and services to only users with appropriate credentials at this time.[194] Based on the record before us, we find that we do not have sufficient information to adopt such requirements; and our experience with the ECF program suggests that many schools and libraries already require appropriate credentials when logging into their networks and using school- or library-issued devices, while those that do not have such restrictions typically have other technical solutions to limit access.[195] To avoid unnecessarily penalizing those applicants with technical limitations and to provide applicants with flexibility, we do not require schools and libraries to implement specific user access restrictions at this time, and we seek additional comment on this issue in the attached *Further Notice of Proposed Rulemaking*. Notwithstanding, consistent with Bureau's expectation around the use of Wi-Fi services on school buses, to the extent schools and libraries already restrict access to their networks and devices, we expect them to continue to implement content and user network restrictions consistent with those restrictions that they place on their building-based broadband networks as described in their acceptable use and other policies.[196] We find that this approach provides reasonable limits to ensure that the off-premises use of Wi-Fi hotspots and services is primarily for educational purposes in accordance with a school's and library's existing AUP and other policies.

51. To ensure students, school staff, and library patrons are aware of the limited purpose for which they might use E-Rate-funded Wi-Fi hotspots and services off-premises, we require schools and libraries to provide notice by adopting and publicly posting their acceptable use policies in whatever form they deem appropriate, but do not require them to collect signed documentation of user compliance with these policies as we required of libraries participating in the ECF program.[197] Given that schools and libraries already typically provide some form of notice of their acceptable use policies to students, school staff members, and library patrons,[198] we find that imposing such a requirement would not be overly

---

[194] In the case of schools, however, we emphasize that the provision of Wi-Fi hotspots and services for school staff is limited to school staff that provide educational services to students consistent with our definition of "educational purposes." *See* 47 CFR § 54.500 (defining educational purpose as "activities that are integral, immediate, and proximate to the education of students").

[195] *See ECF Order*, 36 FCC Rcd at 8729, para. 66 & n.189 (explaining that Miami-Dade County Public Schools require user credentials for students, staff, and school-based tutors, as well as for parents, to access the network, as well as credentialing for Wi-Fi users); *see also, e.g.*, OITCs Comments at 3 (explaining that Ohio schools can limit Wi-Fi usage to ensure it will be used primarily for educational purposes through "either: (1) the Wi-Fi hotspot is overlain with filtering that limits usage; or (2) the Wi-Fi hotspot can be accessed solely by a school-supplied laptop that is configured to only allow access for educational purposes."); E-Rate Central Comments at Appendix A (briefly describing an example of how wireless services can be configured to provide access to only certain sites).

[196] *See FY 2024 ESL Order*, 2023 WL 8803733 at *3, para. 9.

[197] *NPRM*, 2023 WL 8602208 at *15, para. 36 (seeking comment on whether the Commission should require schools and libraries to provide copies of their eligible use policies and collect signed documentation of user compliance from patrons, school staff members, or parents/guardians of students); *see also ECF Order*, 36 FCC Rcd at 8737, para. 82; 47 CFR § 54.1710(a)(1)(viii) (requiring libraries to certify on their ECF FCC Form 471 application that they are only seeking support for eligible equipment and/or services provided to library patrons who have signed and returned a statement that the library patron would otherwise lack access to equipment or services sufficient to meet the patron's educational needs if not for the use of the equipment or service being provided by the library).

[198] *See, e.g.*, EveryLibrary Institute Comments at 7 (asserting that "libraries already provide their internet use policy to users either by posting it online or physically in the building" and that, by entering the building and using the

(continued….)

burdensome. We likewise agree with those commenters who argue that collecting signed documentation of user compliance with these policies is a significant burden on applicants, many of whom have limited resources and staff to collect and maintain such documentation.[199] Indeed, our experience with libraries who participated in the ECF program has demonstrated just how onerous and complicated collecting and maintaining signed user compliance documentation can be;[200] and we are particularly sensitive to the concerns raised by some commenters that such measures might cause libraries to run afoul of their state privacy laws and, as a result, discourage participation.[201] Accordingly, we do not require applicants to collect this sort of user compliance documentation. However, applicants will be required to certify on their FCC Forms 486 that they have updated and publicly posted their acceptable use policies in accordance with the rules adopted herein.[202] Additionally, applicants may be requested to provide their acceptable use policies and provide evidence of where it is publicly posted, upon request by the Commission or the Administrator.[203]

52.     Finally, while we recognize that schools and libraries may not have the same level of supervision or control over their students', school staff members', or patrons' off-premises use of Wi-Fi hotspots and services as they might have on-premises or even on a school bus as one commenter suggests,[204] with these additional safeguards in place, we expect to better ensure their proper use

---

Internet, library patrons self-certify that they will use the connection consistent with the library's use policy); EdLiNC Comments at 14 (stating that providing copies of AUPs "should obviate the need for any additional requirements around requiring parents and library patrons to sign new parental certifications").

[199] *See, e.g.*, #OaklandUndivided, OUSD Comments at 13-14 (urging the Commission not to require signed documentation regarding the use of hotspot devices and services, noting that it would be a significant burden on schools and that acknowledgement and receipt of a school's AUP during registration is preferable); EdLiNC Comments at 14 (arguing that requiring signed user compliance documentation would create a significant burden on schools and school districts to collect and store these certifications each year); *see also* Dallas ISD Comments at 4 ("pre-certification of need" and other proposed requirements would only serve to increase operational complexity and reduce program participation); WIDPI Comments at 2 (noting that very few schools and libraries have the time or staff resources to accomplish the user needs requirements adopted in the ECF program and highlighting that libraries very rarely maintain this kind of information).

[200] *See, e.g.*, ALA Comments at 7-8 (describing how in order to comply with state privacy laws, ECF recordkeeping of Wi-Fi hotspots would need to occur outside of normal library systems, including on paper or on an excel spreadsheet).

[201] *See, e.g.*, Maine State Library Comments at 2-3 (noting the privacy concerns related to retaining any records containing personally identifiable information regarding library patrons and opposing any measure that would cause libraries to run afoul of state privacy law or give the appearance of doing so, while also finding no merit in requiring libraries to maintain a signed copy of an AUP). While many of the privacy concerns raised by commenters relate specifically to retaining asset inventories and the level of detail required there, we find that these concerns are similarly applicable to requiring signed documentation of user compliance with the acceptable use policies as both require that the library patron name be collected and retained. *See infra* Section III.E.1, para. 69, n.250; *see also* ALA Comments at 8 (observing that "[w]hen completing acceptable use documents that included personally identifiable information (PII), Chicago Public Library staff frequently received questions about how the information would be used…[and] [p]atrons had reservations that the information could be shared with vendors or the government…or that they could be faulted for exceeding data limit or incorrect use").

[202] *See* Appendix B, adopting 47 CFR § 54.504(g) (as amended).

[203] 47 CFR § 54.516(b) (requiring E-Rate participants to produce documentation upon request by any representative (including any auditor) appointed by a state education department, the Administrator, the FCC, or any local, state or federal agency with jurisdiction over the entity).

[204] *See, e.g.*, EWA Comments at 3 (asserting that "[i]t may not be possible to verify that every single usage is for a legitimate educational purpose, but that this is the case in schools and libraries" and even school buses where "by definition, the only persons with access to Wi-Fi on school buses will be students or those supervising them"). *But see* OITCs Comments at 3 (observing that in Ohio, schools are able to limit Wi-Fi usage to ensure it is primarily

(continued….)

consistent with our rules and the Communications Act than if we only relied on the existing E-Rate certifications. And, consistent with our existing rules, we remind applicants that our rules require that E-Rate-supported equipment and services be *primarily* used for educational purposes, not *solely* used for this purpose as one commenter submits.[205] Thus, our rules provide some, albeit intentionally limited, flexibility to use these Wi-Fi hotspots and services for other purposes when they are not needed for educational purposes in the first instance. Applicants may be required, during a post-commitment review or audit, to explain what steps they have taken to comply with the requirement that use of the Wi-Fi hotspots is primarily for educational purposes (e.g., user restrictions, content restrictions, or duration or time limits).

## 2. Usage

53. In the *NPRM*, we sought comment on how to prevent the warehousing of Wi-Fi hotspots and reimbursement for unused equipment and/or services.[206] Among the various ways contemplated, we asked whether we should adopt numerical criteria to assess usage, require participants to provide evidence of usage, direct service providers to terminate services that are not being used, and/or limit E-Rate support to nine months out of the year (i.e., the length of a typical school year) to prevent the program from covering the costs of unused devices and services during the summer.[207] Many commenters agree that the E-Rate program should not pay for unused and/or warehoused equipment or services. At the same time, commenters urge us to create requirements that are both administrable for participants and also take into consideration the practical reasons why equipment or services may go unused for limited periods of time before adopting specific non-usage requirements and reimbursement denial procedures.[208] As a general matter, we agree with these commenters and recognize that there are numerous reasons for non-usage and that applicants and service providers are often unable to monitor or mitigate all instances of non-usage.[209] We therefore distinguish the treatment for equipment or services that are entirely unused or warehoused from instances where Wi-Fi hotspot equipment and services may have limited periods of non-usage.[210]

54. We first rely on the agency's extensive experience overseeing the ECF program in designing a hotspot program that protects against waste and abuse. Our experience suggests that reasonable safeguards to prevent warehousing and manage non-usage are necessary and possible, and we reject the view expressed by one commenter that there is no need for any usage requirement if the

---

used for educational purposes by (1) overlaying the hotspot with filtering that limits usage or (2) restricting access to the hotspot to a school-supplied laptop that is configured to only allow access for educational purposes).

[205] *See* NTCA Comments at 6-7 (asserting that "there is no practical way for schools to ensure any and every hotspot…is used *solely* for educational purposes" and noting that it may be even more difficult for libraries to do so) (emphasis added).

[206] *NPRM,* 2023 WL 8602208 at *16-17, paras. 39-41.

[207] *Id.* at *16-17, paras. 39-40.

[208] *See, e.g.*, T-Mobile Comments at 6 (asserting that the "Commission's policies should be flexible to account for reasonable periods of non-usage and avoid imposing new, onerous burdens on schools and libraries to account for usage" while also considering a range of uses that do not correlate to consistent patterns of usage); CTIA Reply at 8 ("In particular, Commission policies should be flexible to account for reasonable periods of non-usage…."); WIDPI Comments at 3 (agreeing with the Commission that hotspots should be in use as much as reasonably possible, but cautioning that "setting hard standards on use may not reflect the real-world situations our schools and libraries confront"); Verizon *Ex Parte* at 1 (arguing that any usage "rule should be flexible and simple for schools and libraries to apply, and focus primarily on guarding against large-scale warehousing").

[209] For example, valid examples of non-usage might include user error, technical challenges using the device, and user illness. *See also infra* note 225.

[210] *See* #OaklandUndivided, OUSD at 14-15 (distinguishing low usage from unused devices or services and noting that "[l]ow usage, however, does not necessarily indicate that participants are warehousing Wi-Fi hotspots or seeking reimbursement for unused devices or services" and suggesting that low usage may "signal an opportunity for additional support or training to close the Homework Gap, rather than an unnecessary expenditure").

Commission applies existing competitive bidding requirements to off-premises services.[211]  In addition, we made several important modifications to this hotspot initiative to distinguish it from the statutorily required procedures in the ECF program.  First, the competitive bidding requirements required here were not mandatory in ECF, and we believe requiring them will help ensure applicants consider available options and make cost-effective purchases.  Next, the budget mechanism we impose will also require applicants to use limited funding to target those students, school staff, and library patrons with the greatest need.  We also place funding caps for hotspot devices and recurring service, which will have the effect of limiting the E-Rate funding available for Wi-Fi hotspots and service.  Finally, we also believe requiring schools and libraries to pay the non-discount share of costs will help incentivize applicants to make measured choices and determine community needs.  These important distinctions from the ECF program will be integral to helping us protect limited funds.  We disagree with the commenter and find it is necessary to adopt additional requirements to ensure that we are maximizing the use of E-Rate supported Wi-Fi hotspots and services.[212]

55.     *Requirements.*  Considering our long-standing obligation to protect the integrity of the E-Rate program and being mindful of the concerns expressed by commenters regarding the feasibility of tracking and identifying non-usage, we adopt a combination of requirements to protect against non-usage. We first require applicants to activate the Wi-Fi hotspot and service, make it available for loan, and publicize the availability of the Wi-Fi hotspot device and service to students, teachers, and library patrons via public notice or other means.  To further protect the program from potential waste, we also require applicants to certify to having taken these steps on their FCC Forms 486.[213]  Applicants already use the FCC Form 486 to notify USAC that services have started on a particular funding request and will be required to certify to adopting measures to ensure proper use of E-Rate-funded Wi-Fi hotspots and services,[214] among other things, and are required to submit these forms 120 days after the service start date or the date of the funding commitment decision letter, whichever is later.[215]  We find that requiring applicants to also certify to having taken these steps on their FCC Forms 486 before they or their service providers can begin to submit their requests for reimbursement is reasonable and would not be overly burdensome.[216]  To be clear, we expect schools and libraries to make every effort to make available and encourage the use of Wi-Fi hotspots and services supported by the E-Rate program.

56.     Second, we expect that schools and libraries will carefully consider how to structure their lending programs to promote ongoing use of Wi-Fi hotspots and services.  ALA highlights the importance of flexibility in circulation policies to address local needs but notes a general standard is necessary to "ensur[e] the data is used regularly by users."[217]  We agree that schools and libraries understand well their community needs and are in the best position to structure a lending program to meet those needs, and can

---

[211] *See* SHLB & OTI Comments at 26.

[212] *But see* Verizon *Ex Parte* at 1 (explaining that usage rules are only necessary "when the support amount covers the entire cost of a service").

[213] *See, e.g.*, 47 CFR § 54.1711(a)(1)(viii), (a)(2)(vi) (requiring applicants and service providers to certify that they are not willfully or knowingly requesting reimbursement for equipment or services that are not being used).

[214] *See* Appendix B, adopting 47 CFR § 54.504(g) (as amended).

[215] *See* Universal Service Administrative Company, *FCC Form 486 Filing*, https://www.usac.org/e-rate/applicant-process/starting-services/fcc-form-486-filing/ (last visited July 15, 2024).

[216] We further note that applicants must file the FCC Form 486 and service providers must file the Service Provider Annual Certification (FCC Form 473) prior to filing requests for reimbursement (FCC Forms 472/474) with USAC for payment.  USAC, *Step 6: Invoicing- Invoicing Prerequisites*, https://www.usac.org/e-rate/applicant-process/invoicing/ (last visited July 15, 2024).  Applicants and service providers should not be invoicing for Wi-Fi hotspots and mobile wireless Internet service prior to the hotspot devices being made available for loan to students, school staff, and library patrons.

[217] ALA Comments at 13; *see also* WIDPI at 3 (cautioning against "hard standards on use [that] may not reflect the real-world situations our schools and libraries confront").

do so in a way that maximizes use of Wi-Fi hotspots and services following the requirements we adopt today. Such measures to encourage use may include limited lending periods (e.g., 21 days or less), providing technical assistance to students and library patrons, monitoring circulation statistics, or other approaches deemed suitable by the school or library for the local community. For example, EveryLibrary Institute explains that libraries often already have mechanisms in place to pause service to a specific device which is "typically enough reason for the patron to return the device."[218] This prevents the service provider from billing "for the time elapsed when the device was not in service, reducing program costs automatically."[219] Similarly, ALA reported that "the Dublin Public Library in Texas and Pima County Library in Arizona [are] able to work with service providers to track data usage and other aspects of hotspot use."[220]

57.     Finally, to further prevent the E-Rate program from paying for ongoing services that are not being used, lines of service that have no data usage for approximately three consecutive months must be terminated by the service provider. As discussed further below, on a monthly basis, service providers are required to notify applicants of each line of hotspot service that goes unused for at minimum 60 consecutive days and to provide applicants 30 days for the hotspot to be used before terminating the line of service. Service providers are also required to provide schools and libraries with data usage reports as described below, and schools and libraries should regularly review these reports to identify hotspots with periods of non-usage to determine if there is an issue with the device or to seek the return of a Wi-Fi hotspot after some period of non-use so the device can be loaned out again.

58.     *Warehousing.* In the ECF program, we prohibited schools and libraries from requesting E-Rate support for the purchase of additional Wi-Fi hotspots beyond the per-user limitation to "maximize the use of limited funds" and only provided support for devices and services currently needed, thus avoiding unnecessary warehousing.[221] Several commenters, including the EveryLibrary Institute, flagged "the possibility of applicants overstocking equipment to prepare for breakage or loss" and that the E-Rate program should not pay for such equipment and services.[222] We agree and adopt the same per-user limitation and prohibition against warehousing. Considering the limited funding available, we find that permitting applicants to purchase hotspots in anticipation of future use, loss, or breakage would be wasteful, and we conclude that limiting support in this way is reasonable. Applicants must certify to their compliance with this limitation on the FCC Form 471 application.[223] Wi-Fi hotspots that have not been made available for distribution per the requirements specified above will be considered to have been warehoused, a violation of our rules, and subject to a financial recovery.

59.     *Limited periods of non-use.* As well-documented in the record, there may be legitimate reasons for limited periods of non-use by students, school staff, and library patrons that are outside of the control of schools, libraries, and service providers.[224] Even in the context of the ECF program, we have

---

[218] EveryLibrary Institute at 9.

[219] *Id.*

[220] ALA *Ex Parte* at 2; *see also* E-Rate Central Comments at 4 ("Hotspot loan terms . . . should be left to the discretion of the school or library. Whatever the term, schools and libraries should be encouraged to seek the early return of devices not meeting targeted use goals.").

[221] *ECF Order*, 36 FCC Rcd at 8726, paras. 58-59.

[222] EveryLibrary Institute Comments at 8; *see also, e.g.,* EdLiNC Comments at 14 (stating that warehousing likely "only occur[s] occasionally" but "that every effort should be made to prevent" it).

[223] *See* Appendix B, adopting 47 CFR § 54.504(a)(1)(xii) (as amended).

[224] *See, e.g.,* NACEPF & Mobile Beacon Reply 8-9 (providing reasons why a device could show low usage or fluctuate in usage throughout the year, including a student not knowing how to use the hotspot or the hotspot being served by an insufficient internet connection, and urging the Commission to adopt a flexible approach as a result); ALA Comments at 13 (noting that there are many circumstances outside of an individual's control for why a hotspot might not be used in a month, including, for example, a defective battery, illness, or damage to an individual's

(continued....)

recognized that there may be circumstances where non-usage occurs but services would still be eligible for support, such as during a school's summer break.[225] At the same time, we are mindful of the need to balance the legitimate reasons for limited periods of non-use with our need to protect program integrity, and as such have adopted the approach described below, with a notice opportunity before services will be terminated.

60. Commenters expressed concern with requirements that would leave schools and libraries responsible for paying the full amount of service charges when there is limited usage[226] and indicated that such an approach would discourage participation in the program.[227] However, service providers have also asserted that they have no control over the hotspots provided by a school or library to students, staff members, or library patrons.[228] In response to the approaches proposed in the *NPRM,* commenters explained that assessing usage against numerical criteria would be challenging because usage below a pre-determined weekly, monthly, or quarterly threshold does not necessarily indicate that the hotspot devices are being warehoused and should be prohibited from reimbursement.[229] Commenters also described the importance of student access to hotspots in the summer months to complete summer reading projects and other educational activities, and that the year-round access provided by libraries is essential.[230] We agree with commenters that overly complex usage requirements would likely deter schools and libraries from seeking support for Wi-Fi hotspots and services, and find that such an outcome would negate our efforts to ensure schools and libraries can operate lending programs to connect students, school staff, and library patrons for off-premises use. Similarly, given the vital importance of Internet connectivity, we find that limiting E-Rate support to nine months would contravene the purpose of this funding and "would further exacerbate the 'summer slump' – the decrease in learning between school

---

personal device); *see also* SECA Comments at 10 (providing a non-exhaustive list of reasons why a hotspot may not be in use even during the school year, including changes in demand); Verizon Ex Parte at 1 (stating that "periods of non-use are consistent with the normal pattern of school activity, as the Commission recognized in the school bus Wi-Fi proceeding").

[225] *See* ECF Program FAQ 9.12, *available at* https://www.fcc.gov/emergency-connectivity-fund-faqs (last visited July 15, 2024) (noting that the Commission declined to adopt specific non-usage rules for the ECF program, but instead requires applicants and service providers to certify on the request for reimbursement that they are not willfully or knowingly requesting reimbursement for services and equipment that are not being used and to take reasonable actions to monitor and track usage, while acknowledging that there may be circumstances where non-usage occurs but services would still be eligible for support (e.g., summer break)); *see* 47 CFR § 54.1711(a)(1)(viii), (a)(2)(vi).

[226] *See, e.g.*, SECA Comments at 9-10 (urging the Commission not to mandate monthly usage, but instead to rely on activation and availability due to the nature of hotspot service contracts and the unpredictability of student usage); ALA Comments at 13 (explaining that removing the cost of unused services and devices from invoices would "place considerable burden on the provider and the library").

[227] #OaklandUndivided, OUSD Comments at 16-17; SHLB and OTI Comments at 27 (arguing that "[o]verly burdensome requirements will discourage participation in the program").

[228] *See, e.g.*, T-Mobile Comments at 6 (asking the Commission to be flexible and reasonable in setting usage policies, and noting that service providers cannot control or enforce use, or determine the cause for the non-usage); CTIA Reply at 8 (noting that demand varies, especially during school breaks and holidays).

[229] #OaklandUndivided, OUSD at 14-15; NACEPF & Mobile Beacon Comments at 22 (arguing that a numerical threshold would need to "be sufficiently flexible to account for period of lower use or disuse).

[230] *See, e.g.*, NACEPF & Mobile Beacon Comments at 22 ("[A] hotspot might . . . be used more frequently near the end of summer when students are completing back-to-school activities such as summer reading projects."); ALA Comments at 13 (explaining that "libraries provide vital educational opportunities of all kinds year-round, and perhaps especially so during summer enrichment and supplemental programs"); #OaklandUndivided, OUSD at 16 (observing that "the [I]nternet is essential for tackling summer learning assignments, fulfilling curricular prerequisites, recovering academic credits, participating in adaptive online learning programs . . . and other educational purposes").

years – and inhibit remote learning during summer school."[231]

61.    However, to reduce the risk of waste and inefficiencies in supporting Wi-Fi hotspots and services in the E-Rate program, we find that imposing a reasonable non-usage threshold requirement is both appropriate and necessary to ensure that E-Rate support is going to services that are actually being used.  We therefore adopt a rule to prohibit E-Rate support for lines of service that have not been used for a period of three consecutive months and have gone through the required notice process.[232]  Pursuant to this new rule, at least once every 31 days,[233] service providers are directed to identify lines of service that have gone unused for no less than 60 days and provide the school or library with 30 days' notice that failure for the hotspot service to be used within the 30-day notice period will result in service termination for that particular line.[234]  We conclude that this approach appropriately accounts for limited legitimate instances of non-usage, such as a school's summer break,[235] while also providing sufficient time to allow schools and libraries to work with their service provider, as well as their student, school staff, and library patron users to cure the non-usage without being unnecessarily penalized.  Upon receipt of a non-usage notification from a service provider, applicants should take steps to determine whether the device and services are being used, should be redistributed, or should be discontinued.  Applicants may work with their service provider to restart services that have been terminated (e.g., where a hotspot is redistributed) one time per funding year, but we caution applicants that such action to restart service after termination will be subject to program integrity reviews and therefore, applicants should take steps to ensure that they have the associated need prior to restarting services terminated for non-usage again.

62.    We are also sympathetic to the concerns expressed in the comments regarding a rule that would leave schools and libraries responsible for paying the full amount of service charges for limited usage or in this case, a terminated line of service.[236]  In the event of a terminated line of service resulting

---

[231] CTIA Reply at 8.

[232] See Appendix B, adopting 47 CFR § 54.502(e)(5).  To reduce the chances of fraudulent activity, the following does not constitute usage for these purposes: one-way data sent from the service provider to the Wi-Fi hotspot, one-way SMS messages sent from the service provider to the hotspot, and SMS messages sent or received by an E-Rate-funded hotspot.

[233] To minimize the burden associated with checking for non-usage, service providers will not be required to check for non-usage on a daily basis.  Rather, we find that checking one time per month for any lines of service with zero data usage for 60 or more days in the preceding 30 days will be more administratively feasible for both service providers and the schools and libraries receiving notice of such non-usage.

[234] Upon determining a line of service has not been used for 60 days, service providers will have five business days to issue a notice to the applicant of such non-usage.  Applicants will have 30 days from the date of the service provider's notification to begin using the services or the line of service will be terminated.

[235] We decline to adopt a grace period for certain months that might be associated with non-usage, noting that applicants can restart service.  We also encourage applicants to work with their service providers to pause service if there is a known period of time when the Wi-Fi hotspots will not be used (e.g., the devices are collected and will not be redistributed until the school year begins).  See SHLB July 11, 2024 Ex Parte Letter at 9-10.

[236] See, e.g., Dallas ISD Comments at 5 (proposing that the Commission strike certain proposed rules, including 54.504(f)(6), which would require the service provider to provide notice of non-usage after 30 days and not willfully or knowingly seek reimbursement for equipment or services that are not used); SECA Comments at 9-10 ("The Commission should **not** mandate that the monthly usage of service is a prerequisite for reimbursement of service charges….  Schools should not be penalized by having to pay for the full monthly cost whenever the projected needs did not match actual needs.  Yet this 100% accuracy requirement is the de facto standard inherent in a policy that prohibits the reimbursement for service in those months where there is no usage") (emphasis in original); #OaklandUndivided, OUSD Comments at 16 ("Any provision that automatically denies reimbursement to school districts with usage issues will discourage districts from participating in the program due to budgetary constraints."); see also T-Mobile Comments 6-7 (asserting that "the Commission should avoid proposals to hold service providers accountable for non-usage over which they have no control"); CTIA Reply at 7 (asserting that "[c]ommenters broadly agree that burdensome new usage requirements should not be imposed as the service transitions to E-Rate");

(continued….)

from this non-usage requirement, service providers are prohibited from billing the applicant for the balance that was not paid for by the E-Rate program.[237]  Service providers will be required to certify on their FCC Form 473 (Service Provider Annual Certification (SPAC) Form) that they will comply with this non-usage notice and termination requirement and will not charge applicants the balance for the terminated services.

63.     Finally, while we understand service providers' concerns regarding their lack of a direct customer relationship with a student, school staff, and library patron user, we find that imposing this usage requirement will appropriately incentivize service providers to avoid requesting reimbursement for ongoing lines of services that are not being used.  This requirement follows a similar principle to the non-usage rules adopted in other programs, like ACP and Lifeline, and therefore we expect that many mobile wireless service providers are familiar with monitoring usage and have even adapted their systems to track and provide notice accordingly.[238]  We conclude that this rule strikes a reasonable and appropriate balance between ensuring that E-Rate support for Wi-Fi hotspots is being used responsibly, while not implementing overly complex rules that would be unadministrable for schools and libraries or deter participation.

64.     Some commenters alternatively suggest that we provide program participants with an opportunity to explain the reason for the non-usage before denying funding and argue that this approach is preferable.[239]  We decline to take this approach because we find that such a process would be overly resource intensive and fail to efficiently achieve the program's goals.  In particular, we find that tracking down students, school staff members, and library patrons to ascertain the reason for non-usage while disbursements are on hold could take time and significantly delay the review and disbursement process.  In addition, such an approach would require the Commission to prescribe a comprehensive list of the permissible reasons for which Wi-Fi hotspots and services may not be used after they have been distributed, which the Commission would then need to be able to verify for purposes of ensuring program compliance.  Considering the record before us, we are reluctant to create and implement such a list because that approach would only delay reimbursements, frustrate program participants, and cause uncertainty about the availability of funding.  Comparatively, we find the non-usage notice and termination rule detailed above will better allow schools and libraries to work with their students, school staff, and library patrons, as well as their service providers to ensure the hotspots and services are being used without impacting or delaying the review and disbursement processes.

65.     Moreover, in the context of the new program safeguards that we adopt in this Order, the additional usage requirements we establish today protect public funds and maximize the use of supported Wi-Fi hotspots and services.  In particular, we believe the funding cap for monthly service described above will aid in controlling costs and the requirement of paying the non-discount share of costs will incentivize schools and libraries to avoid subscribing to unused services,[240] enabling us to provide support for Wi-Fi connectivity necessary to engage in remote learning for students, school staff, and library patrons.  However, in light of the challenges identified with the solutions proposed in the *NPRM* and lack

---

ALA Comments at 13 (stating that they are "adamantly opposed to a service provider removing the cost for the service or device from the invoice provided to the library" if a service or device is not in use in a given month as there are several reasons outside of an individual's control why a hotspot might not be used in a month").

[237] *See* Appendix B, adopting 47 CFR § 54.502(e)(6).

[238] *See, e.g.*, 47 CFR § 54.1809(d) (requiring participating service providers to de-enroll customers from the ACP benefit if the services have not been used for 30 days and after 15 days' notice); 47 CFR § 54.405(e)(3) (requiring participating service providers to de-enroll customers from the Lifeline benefit if the services have not been used for 30 days and after 15 days' notice).

[239] *See, e.g.*, WIDPI Comments at 3; EveryLibrary Institute Comments at 8-9 (proposing that applicants be given an opportunity to explain the lack of use before denying reimbursement and providing examples of valid non-usage, including weather disasters and security emergencies).

[240] Verizon Ex Parte at 1.

of information in the record to address these issues, we remain cognizant of the risk of non-usage of E-Rate-funded hotspots and want to ensure applicants are encouraging use among their students, school staff, and library patrons. We therefore find it necessary to explore further ways to monitor and address non-usage in the attached *Further Notice of Proposed Rulemaking*. Additionally, we delegate authority to the Bureau to resolve any procedural or administrative issues that arise with the usage requirements adopted herein.

66. *Usage reports.* To enable schools and libraries to monitor usage and make adjustments to the structure of their lending programs in a way that maximizes the use of Wi-Fi hotspots and services, we require service providers to provide reports regarding data usage to applicants at least once per billing period.[241] Such reports must be provided in machine-readable digital format, so that the information lines can be read and sorted, clearly identifying the lines that are not being used across billing periods[242] or that will be or have been terminated as a result of the non-usage rules adopted herein. Because service providers regularly make such reports available to applicants and we provide flexibility in how reports are provided, we find that imposing such a requirement would not be overly burdensome.[243] Further, no commenter opposes this idea.[244] Schools and libraries are also required to make these reports available to the Commission and/or USAC upon request, including to support program integrity reviews. We expect applicants to review the data usage reports and to take actions to address non-usage included in the reports, including requesting the return of the Wi-Fi hotspot or requesting the service to be turned off to prompt the return of the unused hotspot device, consistent with the requirements described herein.

67. *Program integrity reviews.* In addition to the existing standard post-commitment reviews and audits to ensure compliance with E-Rate program rules more broadly, we direct USAC to regularly conduct program integrity reviews to monitor school, library, and service provider compliance with the requirements defined above, including checking for warehousing and discontinued lines of services for non-usage. We further direct USAC, subject to approval by the Bureau, to develop risk-based procedures for these reviews. Schools and libraries subject to these program integrity reviews must provide usage reports and other documentation as requested, consistent with E-Rate program rules.

### 3. Recordkeeping

68. We modify section 54.516 of the Commission's rules to require E-Rate participants who receive support for the off-premises use of Wi-Fi hotspots and services to maintain detailed asset and service inventories of each hotspot and wireless service provided for use off-premises.[245] In the *NPRM*, we sought comment on whether to adopt the ECF program's requirement to keep detailed asset and service inventories for each hotspot device and service provided to a student, school staff member, or library patron.[246] In response, commenters raised concerns about the burdens associated with maintaining

---

[241] *NPRM,* 2023 WL 8602208 at *16-17, paras. 39-40; *see also* Verizon Ex Parte (noting that "Verizon gives its ECF customers access to an online portal that allows them to monitor usage on every activated hotspot line").

[242] Service providers must make reports available on a monthly basis even if a billing period includes multiple months. We seek further comment on how to ensure data usage reports are delivered in a manner that clearly demonstrates usage below. *See infra* Section V, para. 105.

[243] *See, e.g.,* T-Mobile Comments 6-7 (suggesting that service providers can relay usage information to schools and libraries at appropriate levels, although schools would still need to review an analyze such information to make individualized determinations about each connection); *see also* Letter from Ben Weintraub, CEO, Kajeet, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 1-2 (filed Mar. 14, 2024); Verizon *Ex Parte* at 2 (stating that is "reasonable for the Commission to require service providers to provide monthly usage data to school and library customers upon request").

[244] *See, e.g.,* NACEPF & Mobile Beacon Comments at 22 (agreeing with the Commission's proposal that service providers provide usage data to the school or library); T-Mobile Comments at 6-7; Verizon *Ex Parte* at 2.

[245] *NPRM,* 2023 WL 8602208 at *18-19, paras. 43-44.

[246] *See id.*; *see also* 47 CFR § 54.1715(a) (requiring equipment and service inventories of ECF-funded equipment).

such inventories.[247]  Our experience with the ECF program, however, demonstrated the inventory requirements served a critical purpose in ensuring that schools and libraries receiving support know where the equipment and services are located and that they comply with the program requirements.  In particular, the inventories were helpful in detecting, for example, warehousing of devices by identifying which devices had not been distributed.  As such, we conclude that the benefit to the program of adopting more detailed inventory requirements will outweigh the burden of requiring increased recordkeeping.  We are further convinced that this is a reasonable requirement by the fact that the E-Rate program is not an emergency program like the ECF program.  We therefore conclude that there is time for schools and libraries to make a reasonable assessment of their needs and ability to comply with these recordkeeping requirements, and urge applicants to do so prior to requesting support.  Relatedly, we remind participants that they may be asked to provide this information upon request to the Commission or USAC,[248] and that failure to comply with program rules, including the requirement to maintain asset and service inventories, may result in a denial of funding or a financial recovery.

69.      In adopting the more detailed inventory requirements, we are sympathetic to the concerns expressed by library commenters, who claim that the level of detail required by the ECF program's inventory requirements served as a barrier to participation in the program because of conflicts with many states' library patron privacy laws and existing library circulation systems and practices.[249]  In particular, commenters explain that the majority of states have laws in place that protect the confidentiality of library records and prohibit disclosure of patrons' personally identifiable information (e.g., individual names) without first seeking a waiver from each individual or, in some cases, needing a court order.[250]  Circulation and tracking systems are set up to be compliant with these state laws, meaning that libraries did not already track and retain records with sufficient detail to meet the ECF program's requirements, resulting in the need for manual tracking of this information, and to do so potentially in conflict with applicable state laws.  While we recognize that schools also have their own privacy laws to which they adhere, the limitations are not so strict as to create comparable burdens for recordkeeping.  We therefore agree with commenters who advocate for adopting library-specific rules to recognize the realities of libraries' abilities to maintain such records[251] and to ensure that libraries can take part in this important funding source to continue their successful hotspot lending programs.[252]

70.      We also agree with commenters who urge the Commission to be clear up front about what is expected of the recordkeeping requirements.[253]  We find that modifying section 54.516 of the Commission's rules to adopt the specific information required for an asset and service inventory of Wi-Fi hotspots and services purchased with E-Rate support is the best approach to ensure parties understand

---

[247] *See, e.g.*, ACSA-CSBA Comments at 4; Dallas ISD Comments at 5.

[248] *See* 47 CFR § 54.516(b) (requiring E-Rate program participants to produce records relating to program participation at the request of the Commission, USAC, any representative appointed by a state education department, or any local, state or federal agency with jurisdiction over the entity); *see also* Appendix B, adopting 47 CFR § 54.516 (as amended).

[249] *See, e.g.*, EveryLibrary Institute Comments at 10 ("In most cases, libraries maintain the number of circulations a given item receives and sometimes the dates of circulation, but the library cardholder is not stored in that record" and noting that smaller, less-funded libraries are likely to be disadvantaged by such "unreasonably burdensome" requirements); SHLB & OTI Comments at 27, 28; ALA Comments at 7-8 (explaining how the requirements conflict with state laws protecting the confidentiality of library records and how such laws effectively force libraries into manual recordkeeping because the systems are set up to comply with the privacy requirements, resulting in greater burden to the libraries); Maine State Library Comments at 2.

[250] *See, e.g.*, ALA Comments at 7.

[251] *See, e.g.*, ALA Comments at 7; WIDPI Comments at 3.

[252] *See NPRM,* 2023 WL 8602208 at *18, para. 43 (seeking comment on adopting library-specific inventory rules for hotspot lending programs).

[253] *See, e.g.*, SHLB & OTI Comments at 27.

exactly what is expected. We also remind applicants that the obligation of schools and libraries to keep track of and document the devices that they distribute includes documenting information about missing, lost, or damaged equipment.

71. For school participants receiving support for Wi-Fi hotspots and services, the asset and service inventory must identify: (1) the equipment make/model; (2) the equipment serial number; (3) the full name of the person to whom the equipment was provided; (4) the dates the equipment was loaned out and returned, or the date the school was notified that the equipment was missing, lost, or damaged; and (5) service detail. By "service detail," we mean the line number or other unique identifier that associates a device to that particular line of service. For library participants receiving support for Wi-Fi hotspots and services, the asset and service inventory must identify: (1) the equipment make/model; (2) the equipment serial number; (3) the dates the equipment was loaned out and returned, or the date the library was notified that the equipment was missing, lost, or damaged; and (4) service detail.

72. Consistent with the E-Rate program's current recordkeeping rule, program participants are required to retain documentation related to their participation in the E-Rate program, including the asset and service inventories,[254] acceptable use policies,[255] evidence of publicizing Wi-Fi hotspot availability,[256] and other required documentation[257] for at least 10 years after the latter of the last day of the applicable funding year or the service delivery deadline for the funding request.[258] Separately, we amend the language of section 54.516 of the Commission's rules to include E-Rate-funded equipment and services provided on school buses.[259]

73. As was the case for the ECF program, we are mindful of privacy concerns regarding the collection of personally identifiable information about the individual (e.g., student, school staff member, or library patron) that makes use of E-Rate-supported equipment and services. The Commission, USAC, and any contractors or vendors will abide by all applicable federal and state privacy laws. We also direct Commission, USAC, and contractor/vendor staff to take into account the importance of protecting the privacy of students, school staff and library patrons; to design requests for information, including those related to the data usage reports and asset and service inventories, from schools and libraries in a way that minimizes the need to produce information that might reveal personally identifiable information; and to work with auditors to accept anonymized or deidentified information in response to requests for information wherever possible.[260] In addition to the existing standard post-commitment reviews and audits to ensure compliance with E-Rate program rules more broadly, we direct USAC to regularly conduct program integrity reviews to monitor school, library, and service provider compliance with the asset and service inventory rules.

### 4. Duplicate Funding

74. In the *NPRM*, we sought comment on safeguards to prevent duplicative funding for off-premises use of Wi-Fi hotspots and services across the federal universal service programs and other

---

[254] *Supra* para. 71.

[255] *Supra* paras. 31, 48.

[256] *Supra* para. 55.

[257] *Supra* para. 32 (requiring schools, school districts, and consortia including schools or school districts that receive support for the off-premises use of Wi-Fi hotspots and/or services and use such hotspots as part of a one to one (1:1) initiative to document clearly, using individual survey results, attestations, or equivalent, that each individual student needed a Wi-Fi hotspot).

[258] *See* 47 CFR § 54.516(a).

[259] *See* Appendix B adopting 47 CFR § 54.516(e) (as amended). *See also FY 2024 Eligible Services List*, 2023 WL 8803733 at *4, para. 11 (reminding applicants that an accurate asset inventory will be required for E-Rate-funded equipment on buses).

[260] *See* Appendix B adopting 47 CFR § 54.516(b) (as amended).

funding programs, including federal, state, Tribal, or local programs.[261] We also requested comment on whether "a certification by the school or library [would] be sufficient to indicate that E-Rate support is only being sought for eligible students, school staff, or library patrons and the school or library does not already have access to Wi-Fi hotspots purchased with ECF support or other sources of funding."[262] Generally, commenters agree that the Commission should not duplicate funding for Wi-Fi hotspots and services that are funded through other sources or programs.[263] We conclude that it is appropriate to prohibit duplicative funding for off-premises Wi-Fi hotspots and services funded with E-Rate support and further find that protections against duplicate funding adopted herein should apply to all E-Rate-funded equipment and services.

75.     For example, NTCA argues that Wi-Fi hotspots and services should be limited to locations where High-Cost USF support is not distributed and where the Commission's own broadband availability data indicate service is not already available.[264] In contrast, other commenters contend that "the Commission should not impose unnecessary restrictions on households' receipt of funding from multiple federal universal service programs . . . households are entitled to apply under different USF programs for different eligible needs."[265] We agree that we should not duplicate funding for Wi-Fi hotspots and services that are already funded. However, we disagree that the availability of High-Cost support or the availability of service as indicated in the Commission's broadband data should preclude funding for an E-Rate-supported Wi-Fi hotspot because this does not guarantee that a student or library patron has the off-premises broadband access needed to complete their educational activities.

76.     As noted in the *NPRM*, households may justifiably receive support from multiple universal service programs at the same time;[266] however, to make the most of the support available through the E-Rate program, and to protect against waste, fraud, and abuse, we find it necessary to not extend E-Rate support to Wi-Fi hotspots and services that have already been funded though other sources or programs. Therefore, we will not provide E-Rate support for eligible Wi-Fi hotspots and services, or the portion of eligible Wi-Fi hotspots and services that have already been reimbursed with other federal, state, Tribal, or local funding, or other external sources of funding. Additionally, while commenters suggested that we should not provide funding to households that receive ACP benefits,[267] we note that the ACP officially ended on June 1, 2024.[268] As such, we find that not only does this eliminate the concern of duplicative funding between ACP and the Wi-Fi hotspots and services funded through the E-Rate program, but it also reinforces the need for E-Rate support to connect students, school staff, and library

[261] *NPRM,* 2023 WL 8602208 at *18, para. 42.

[262] *Id.*

[263] *See, e.g.*, EdLiNC Comments at 15 ("[S]chools and libraries should be careful not to double dip amongst different federal programs to support connectivity."); NTCA Comments at 2-4; SECA Comments at 5-6.

[264] *See* NTCA Comments at 4-5; *see also* WISPA Reply at 5 (supporting NTCA's statement); Letter from Michael Romano, Executive Vice President, NTCA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 1 (filed July 9, 2024) (NTCA *Ex Parte*).

[265] *See* NACEPF & Mobile Beacon Comments at 13; *see also* ALA Comments at 14 (stating that "some families may have home internet, using a program such as ACP or otherwise, but it is not sufficient to meet the educational needs of the entire family. In these cases, a family member may also need to check out a Wi-Fi hotspot from the library.").

[266] *NPRM,* 2023 WL 8602208 at *18, para. 42.

[267] *See* SECA Comments at 5-6 (stating that "students whose families receive support for Internet at home through [the Affordable Connectivity Program (ACP)] or other similar state or federal initiative should not be eligible for being loaned an E-[R]ate funded hotspot unless there are extenuating circumstances where the internet service at home is not available to the student").

[268] *See* Press Release, FCC, FCC Brings Affordable Connectivity Program to a Close (May 31, 2024), https://docs.fcc.gov/public/attachments/DOC-402930A1.pdf.

patrons who may now lack access as a result of losing the ACP benefit.

77.     To prevent duplicative funding, we take a similar approach to the approach we took in the ECF program[269] and adopt a rule prohibiting E-Rate participants from seeking support or reimbursement for eligible equipment and services that have been funded by other programs, including federal (e.g. other universal service programs, ECF, etc.), state, Tribal, or local programs.  Recognizing that the need to protect against duplicative funding is not limited to E-Rate-funded Wi-Fi hotspots and services used off-premises, we adopt rules to prohibit duplicative funding for all E-Rate-funded equipment and services. We also find this to be consistent with the Commission's past actions to prevent duplicate funding in other universal service support mechanisms.[270]  Additionally, consistent with record support for requiring applicants to certify that there is no duplicative funding for their requests,[271] we require applicants to certify on the application for funding and on the request for reimbursement forms (i.e., the FCC Forms 472/474) that they are not seeking support for eligible equipment and services that have been funded by other sources.  This measure balances the interest of applicants by allowing them to continue participating and receiving funding from other programs, for which they are eligible, while simultaneously preventing waste of limited E-Rate funds by not funding equipment and services that have already been funded by other programs.  These rules will help ensure that applicants are aware of the prohibition on duplicative funding for equipment and services, and are only requesting funding that they do not otherwise have available.

### 5.     Equipment Disposal

78.     Section 254(h)(3) of the Communications Act, which applies to the E-Rate program, and the existing E-Rate rules prohibit sale, resale, or transfer of E-Rate-supported equipment for five years.[272] In the *ECF Order*, we adopted a three-year wait time to dispose, sell, trade, or donate equipment purchased with ECF funds, including Wi-Fi hotspots, explaining that "devices and other equipment loaned to students, school staff, and library patrons and installed off-campus will likely have a shorter average life cycle than equipment installed and maintained on school or library premises."[273]  Consistent with our approach in the ECF program, we find that Wi-Fi hotspot devices intended for off-premises use by students, school staff, and library patrons are likely to have a shorter lifecycle and therefore, we adopt a rule that Wi-Fi hotspot devices for off-premises use and supported with E-Rate funds can be disposed of after three years.

79.     Schools and libraries requesting E-Rate support for Wi-Fi hotspots are prohibited from selling, reselling, or transferring equipment in consideration of money or any other thing of value for three years after its purchase.[274]  Wi-Fi hotspots purchased with E-Rate funds and used off-premises will

---

[269] 47 CFR §§ 54.1710 (requiring applicants to certify on the ECF FCC Form 471 that they are not requesting equipment or services that have already been funded), 54.1712 (prohibiting ECF support for equipment or services reimbursed with other sources of funding); *ECF Order*, 36 FCC Rcd at 8754-55, paras. 125-28.

[270] The Commission previously adopted a rule prohibiting healthcare providers from seeking duplicate support from the Telecommunications Program or the Healthcare Connect Fund for the same expenses funded by another universal service program.  *See* 47 CFR § 54.628; *Rural Health Care Support Mechanism*, WC Docket No. 02-60, Report and Order, 27 FCC Rcd 16678, 16812, paras. 334-38 (explaining that the rule prohibits eligible healthcare providers from "double-dip[ping]" from universal service funding for the same connections funded through the Rural Health Care programs).

[271] *See, e.g.*, EdLiNC Comments at 15 ("Additionally, to further ensure compliance with this reasonable standard, we recommend that the Commission develop an additional certification that will require schools and libraries to ensure that double-dipping among federal home broadband programs does not occur.").

[272] *See* 47 U.S.C. § 254(h)(3); *see also* 47 CFR §§ 54.513(a)-(b), 54.1713(a)-(b).

[273] *ECF Order*, 36 FCC Rcd at 8755-56, paras. 128-35.

[274] This restriction is consistent with 47 U.S.C. § 254(h)(3) ("Telecommunications services and network capacity provided to a public institutional telecommunications user under this subsection may not be sold, resold, or

(continued….)

be considered obsolete at the end of the three year period.[275]  Obsolete equipment may be resold or transferred in consideration of money or any other thing of value, disposed of, donated, or traded.  This approach takes into consideration the limited lifespan of Wi-Fi hotspots, while also helping prevent potential waste, fraud, and abuse by ensuring that the hotspot devices are used for a minimum of three years.

### 6.    Certain Populations

80.    *Head Start, Pre-Kindergarten, and Kindergarten.*  In the *NPRM*, we proposed to limit the student population eligible for E-Rate support for the off-premises use of Wi-Fi hotspots and service.[276]  Specifically, we proposed to exclude Head Start programs, providing early learning and development for pre-school children from the ages of 3 to 5,[277] and pre-kindergarten students from receiving E-Rate support for off-premises use of Wi-Fi hotspots and services.  Commenters agree with excluding the eligibility of Head Start and pre-kindergarten populations for a Wi-Fi hotspot to be used off-premises, but also urged that kindergarten populations should be excluded as well.[278]  SECA supports making young learners, pre-kindergarten, and kindergarten ineligible for Wi-Fi hotspots when they are off-campus stating that not giving them this device can "help curb lost and damaged devices" and further stating that "hotspots generally should be made available only for students in grades where they are required to access the Internet off-campus for their homework and for other educational purposes."[279]  WISPA also agrees that funding for Wi-Fi hotspots should be limited to post-kindergarten students who are more likely to need Internet access for educational purposes.[280]

81.    We agree and make Head Start, pre-kindergarten, and kindergarten populations ineligible for E-Rate-supported Wi-Fi hotspots for off-premises use, consistent with the support of commenters.  As noted in the *NPRM*, studies recommend an hour or less of Internet exposure for children under the age of five.[281]  Therefore, for these populations the risks may outweigh the benefits of receiving an E-Rate-supported Wi-Fi hotspot for off-premises use, and as a result, these populations are less likely to need the Internet for educational purposes.  As mentioned in the *NPRM*, Head Start and/or pre-kindergarten education facilities serving this particular age group may be eligible for E-Rate funding for broadband connectivity to and within their facilities, if determined to be elementary schools under their applicable state laws.[282]  Commenters also note that kindergarteners are unlikely to need Internet access for off-campus educational uses.[283]  We thus limit eligibility for Wi-Fi hotspots and Internet services to post-kindergarten students and school staff.  We note, however, that for the purposes of calculating the hotspot budgets, we seek to streamline the information collections and will use the full-time student enrollments that are used for category two budgets, which includes kindergarten students and may also include pre-

---

otherwise transferred by such user in consideration for money or any other thing of value."); *see also* 47 CFR § 54.513 (codifying the requirement for E-Rate eligible services).

[275] *See* Appendix B, adopting 47 CFR § 54.513 (as amended).

[276] *NPRM,* 2023 WL 8602208 at *14, para. 33.

[277] *Id.* (citing U.S. Department of Health and Human Services, Office of Head Start, *Head Start Services*, https://www.acf.hhs.gov/ohs/about/head-start (last visited July 15, 2024)).

[278] SECA Comments at 6; WISPA Reply at 6.

[279] SECA Comments at 6.

[280] WISPA Reply at 6.

[281] *NPRM,* 2023 WL 8602208 at *14, para. 33 (citing World Health Organization, Guidelines on Physical Activity, Sedentary Behaviour and Sleep For Children Under 5 Years of Age (Apr. 2, 2019), https://www.who.int/publications/i/item/9789241550536 (recommending no more than one hour of screen time for children under 5 years of age)).

[282] *NPRM,* 2023 WL 8602208 at *14, para. 33.

[283] *See, e.g.,* SECA Comments at 5; WISPA Reply at 6.

kindergarten students in certain states.

### 7. Gift Rule & Bundling

82.     In providing support for the off-premises use of Wi-Fi hotspots and services, we are also mindful of the longstanding goal of fair and open competitive bidding for such equipment and services. We recognize that many schools and libraries may have taken advantage in recent years of discounted Wi-Fi hotspots and/or recurring services offered during the pandemic to enable their students, school staff, and library patrons to engage in remote learning. We recognize that applicants may have done this while the Commission temporarily waived the gift rules for the ECF and E-Rate programs.[284] We remind all E-Rate program participants seeking reimbursement for Wi-Fi hotspots and services of the Commission's gift rules, which prohibit applicants from soliciting or accepting any gift or other thing of value from a service provider participating in or seeking to participate in the E-Rate program.[285] Similarly, service providers are prohibited from offering or providing any gift or other thing of value to those personnel of eligible entities involved in either program.[286] The Commission's gift rule is always applicable to E-Rate program participants and is not in effect or triggered only during the time period when competitive bidding is taking place.[287] Additionally, applicants are not permitted to solicit or accept a gift or thing of value over $20 from a service provider, and service providers are not permitted to offer or provide applicants a gift or thing of value over $20.[288]

83.     The Commission has previously explained that the gift rule is not intended to discourage charitable donations to E-Rate eligible entities as long as those donations are not directly or indirectly related to E-Rate procurement activities or decisions and provided the donation is not given with the

---

[284] *See Rural Health Care Universal Service Support Mechanism*; *Schools and Libraries Universal Service Support Mechanism*, WC Docket No. 02-60, CC Docket No. 02-6, Order, 35 FCC Rcd 2741 (WCB 2020) (*RHC and E-Rate Gift Rules Waiver Order*) (initially waiving sections 54.622(h) and 54.503(d) of the Commission's rules through September 30, 2020); *Rural Health Care Universal Service Support Mechanism*; *Schools and Libraries Universal Service Support Mechanism*, WC Docket No. 02-60, CC Docket No. 02-6, Order, 35 FCC Rcd 9416 (WCB 2020) (*First RHC and E-Rate Gift Rules Waiver Extension Order*) (extending the waiver of each program's gift rule until December 31, 2020); *Rural Health Care Universal Service Support Mechanism*; *Schools and Libraries Universal Service Support Mechanism*, WC Docket No. 02-60, CC Docket No. 02-6, Order, 35 FCC Rcd 14544 (WCB 2020) (*Second RHC and E-Rate Gift Rules Waiver Extension Order*) (extending the waiver of each program's gift rule until June 30, 2021); *Schools and Libraries Universal Service Support Mechanism; Petition for Waiver of Comcast Corporation for Lift Zone Initiative*, CC Docket No. 02-6, Order, 36 FCC Rcd 14349 (WCB 2021) (*Third E-Rate Gift Rule Waiver Extension Order* (providing a limited waiver of the E-Rate program's gift rule until June 30, 2022); *ECF Order*, 36 FCC Rcd at 8753, para. 122 (providing a limited exception for the ECF program's gift rule until June 30, 2022).

[285] 47 CFR § 54.503(d)(1) ("[A]n eligible school, library, or consortium that includes an eligible school or library may not directly or indirectly solicit or accept any gift, gratuity, favor, entertainment, loan, or any other thing of value from a service provider participating in or seeking to participate in the schools and libraries universal service program. No such service provider shall offer or provide any such gift, gratuity, favor, entertainment, loan, or other thing of value except as otherwise provided herein."); *Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18801, para. 88. "The terms 'school, library or consortium' include all individuals who are on the governing boards of such entities (such as members of a school committee), and all employees, officers, representatives, agents, consultants, or independent contractors of such entities involved on behalf of such school, library, or consortium with the [E-Rate Program]." 47 CFR § 54.503(d)(2)(i). Consistent with the gift rules applicable to federal agencies, certain de minimis gifts, including modest refreshments and items that are worth $20 or less, are allowable under the rules. *Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18801, para. 88.

[286] 47 CFR § 54.503(d)(1); *Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18801, para. 88. "The term 'service provider' includes all individuals who are on the governing boards of such an entity (such as members of the board of directors), and all employees, officers, representatives, agents, or independent contractors of such entities." *Id.* at 54.503(d)(2)(ii).

[287] *Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18801, para. 88.

[288] *Id.*

intention of circumventing the competitive bidding or other E-Rate program rules.[289]  For example, we understand that some service providers offer free or discounted Wi-Fi hotspots with a service plan.[290]  The gift rule prohibits service providers from offering these kinds of special equipment discounts or equipment with service arrangements to E-Rate recipients only if such offerings are not currently available to some other class of subscribers or segment of the public.[291]

84.      Moreover, the record and our experiences in the ECF program have shown that service providers sometimes bundle Wi-Fi hotspots and ineligible components into the costs of services.[292] Entities seeking E-Rate support for Wi-Fi hotspots and services for off-premises use are reminded that E-Rate recipients are required to cost-allocate ineligible components that are bundled with eligible equipment or services.[293]  With respect to offerings that bundle the costs of the eligible Wi-Fi hotspots and services together, applicants may continue to seek E-Rate funding for eligible components of bundled services.  However, for the ease of administration and to streamline review of funding requests, applicants and service providers should itemize these eligible components when invoicing, and Wi-Fi hotspots, services, as well as any eligible components or fees should be requested on separate funding lines when seeking support for these equipment and services.

### 8.      Audits and Other Compliance Tools

85.      We consider audits and other review mechanisms in the E-Rate program to be important tools in ensuring compliance with our rules and identifying instances of waste, fraud, and abuse. Considering the action we take today to extend the off-premises uses eligible for E-Rate funding, we expect that these tools will continue to be paramount to our ability to ensure that these finite funds are used appropriately and consistent with our rules.  We make clear, therefore, that any support provided for the off-campus use of Wi-Fi hotspots and services under the program will be subject to all audits and reviews currently used by the program (e.g., Beneficiary and Contributor Audit Program (BCAP) audits, Payment Quality Assurance (PQA) assessments, and Program Integrity Assurance (PIA) reviews and Selective Reviews (SR) reviews)[294] and could be subject to recovery should the Commission and/or USAC find a violation of our rules and deem it appropriate.  Specifically, consistent with existing E-Rate audits and reviews, applicants and service providers may be subject to audits and other investigations to evaluate compliance with the rules we adopt today, including, for example, what equipment and services are eligible and how the equipment and services may be used.

86.      As discussed above, the Commission, USAC, and contractor/vendor staff are directed to work with auditors to accept anonymized or deidentified information in response to requests for

---

[289] *Sixth Report and Order*, 25 FCC Rcd at 18802, para. 90; *Schools and Libraries Universal Service Support Mechanism, A National Broadband Plan for Our Future*, CC Docket No. 02-6, GN Docket No. 09-51, Order, 25 FCC Rcd 17324, 17328, para. 11 (WCB 2010) (*2010 Clarification Order*) (explaining that charitable donations provided with the purpose of influencing the E-Rate competitive bidding process violate the gift rule).

[290] *See, e.g.*, EveryLibrary Institute Comments at 5 (stating that hotspot devices are often bundled with the line of service or even provided without charge).

[291] *2010 Clarification Order*, 25 FCC Rcd at 17328, para. 11 ("[C]haritable donations are prohibited to the extent they function as inducements to make purchases from the donor in violation of competitive bidding requirements, reduce the applicant's share of the payment for its services, or might otherwise serve to increase the demand for an existing donor's services.").

[292] *See* ALA Comments at 11 (noting that Internet access services and Wi-Fi hotspots are typically available to purchase as a bundle).

[293] *See Schools and Libraries Universal Service Support Mechanism, A National Broadband Plan for Our Future*, CC Docket No. 02-6, GN Docket No. 09-51, Order, 29 FCC Rcd 5457, 5462, para. 11 (WCB 2014) (explaining that applicants must deduct the value of ineligible components from funding requests when seeking support for bundled services).

[294] 47 CFR § 54.516 (b), (c).

information wherever possible.[295]  If anonymized or deidentified information regarding the students, school staff, and library patrons is not sufficient for auditors' or investigative purposes, the auditors or investigators may request that the school or library obtain consent of the parents or guardians, for students, and the consent of the school staff member or library patron to have access to this personally identifiable information or explore other legal options for obtaining personally identifiable information.  In the event consent is not available, we recognize that the auditors may need to use other procedures or take different actions to determine if there is any evidence of waste, fraud, or abuse from the use of E-Rate funding for off-premises Wi-Fi hotspots.[296]  We additionally delegate to the Bureau and Office of the Managing Director, in consultation with OGC (and specifically the Senior Agency Official for Privacy) the authority to establish requirements for the Bureau's, USAC's, or any contractor's/vendor's collection, use, processing, maintenance, storage, protection, disclosure, and disposal of personally identifiable information in connection with any audit or other compliance tool.

87.     We also remind program participants of their obligation to maintain documentation sufficient to demonstrate their compliance with program rules for ten years after the latter of the last day of the applicable funding year or the service delivery deadline for the funding request.[297]  And, upon request, they must submit documents sufficient to demonstrate compliance with program rules, including the Wi-Fi hotspot-specific documentation requirements we adopt today, such as maintaining asset and service inventories and acceptable use policies.[298]  Additionally, schools, libraries, and service providers participating in the E-Rate program may be subject to other audit processes, including audits and inspections by the Office of Inspector General and other entities with authority over the entity.[299]

## F.     Legal Authority

88.     Sections 254(c)(1), (c)(3), (h)(1)(B), and (h)(2) of the Communications Act collectively grant the Commission broad and flexible authority to establish rules governing the equipment and services that will be supported for eligible schools and libraries, as well as to design the specific mechanisms of support.[300]  This authority reflects recognition by Congress that in order to advance its universal service objective, the types of services supported by the various support mechanisms are constantly evolving in light of "advances in telecommunications and information technologies and services."[301]  In the *NPRM*, we sought comment on whether these provisions authorize the Commission to provide E-Rate support for schools or libraries to purchase Wi-Fi hotspots and wireless Internet services for off-premises use, recognizing how today's technology-based educational environment has significantly evolved beyond the physical boundaries of a school or library campus.[302]  Specifically, we proposed to find that school or library purchases of Wi-Fi hotspots and Internet services for off-premises use by students, school staff, and library patrons for remote learning and the provision of virtual library services constitutes an educational purpose and enhances access to advanced telecommunications and information services pursuant to section 254 of the Communications Act.[303]  As explained further below, we conclude that the Commission has authority under section 254 of the Communications Act to permit eligible schools and libraries to receive E-Rate support for the off-premises use of Wi-Fi hotspots and

---

[295] *Supra* para. 73.

[296] *See ECF Order*, 36 FCC Rcd at 8757, para. 134.

[297] 47 CFR § 54.516(a).

[298] *Id.*

[299] 47 CFR § 54.516(c)-(d).

[300] 47 U.S.C. § 254(c)(1), (c)(3), (h)(1)(B), (h)(2).

[301] 47 U.S.C. § 254(c)(1).

[302] *NPRM*, 2023 WL 8602208 at *24-29, paras. 45-52.

[303] 47 U.S.C. § 254(h)(1)(B) and (h)(2)(A).

wireless Internet services.

89.     First, we consider our proposed finding that the off-premises use of school- or library-purchased wireless Internet services and the Wi-Fi hotspots needed to deliver such connectivity constitutes services that are "provide[d] . . . to elementary schools, secondary schools, and libraries," and thus, may be supported pursuant to section 254(h)(1)(B) of the Communications Act when used "for educational purposes."[304]  In response, many commenters agree that section 254(h)(1)(B) of the Communications Act does not prohibit the Commission from allowing E-Rate funds to be used by schools or libraries to support remote learning for students and school staff, and access to library services for library patrons so long as the Commission first finds that the equipment and services that schools or libraries purchase for off-premises use will serve an educational purpose.[305]  We find this view to be consistent with the Commission's determination in the *School Bus Wi-Fi Declaratory Ruling* that any future decision to support school or library purchases of E-Rate-supported services requires the Commission to first find that the off-premises use of such service is "integral, immediate, and proximate to the education of students or the provision of library services to library patrons" and, therefore, serves an educational purpose.[306]

90.     Turning next to the question of whether the off-premises use at issue herein serves an educational purpose, many commenters urge the Commission to find that the off-premises use of such wireless Internet services and the Wi-Fi hotspots needed to deliver such connectivity to be integral, immediate, and proximate to the education of students or the provision of library services to library patrons.[307]  For example, the North American Catholic Educational Programming Foundation (NACEPF) and Mobile Beacon argue that "[e]nabling students to participate in hybrid learning, complete their homework, or participate in other educational opportunities clearly qualifies as an 'educational purpose.'"[308]  Likewise, commenters assert that Wi-Fi hotspots are needed to ensure library patrons can

---

[304] 47 U.S.C. § 254(h)(1)(B); *see also NPRM* at *25-26, para. 46; *supra* para. 6 (defining "educational purposes"), III.E.1 (discussing safeguards to ensure use is for educational purposes).

[305] *See, e.g.*, C Spire Comments at 4 (arguing that none of the terms in section 254(h)(1)(B) "necessarily connotes a geographic limitation on where the services are provided"); SBi Comments at 7-8 (same); SHLB & OTI Comments at 6 (stating that "section 254(h)(1)(B) of the Communications Act does not prohibit the provision of E-Rate support for off-premises services, but merely requires that off-premises use serve primarily educational purposes").  We note, as well, that the safeguards we have put in place, in Section III.E.1 of this Order, serve to ensure that the use of Wi-Fi hotspots provided by schools and libraries will be used "primarily" for educational purposes, as required by our rules.  *See* 47 CFR § 54.504(a)(1)(v); *see also supra* Section III.E.1; Appendix B adopting 47 CFR § 54.516(f) (as amended).

[306] *See School Bus Wi-Fi Declaratory Ruling*, 2023 WL 8586523 at *6, para. 9 & n.32.

[307] *See, e.g.*, UETN Comments at 3 (agreeing that the off-premises use of mobile wireless services and the Wi-Fi hotspots needed to deliver such connectivity is integral, immediate, and proximate to the education of students, or in the case of libraries, integral, immediate, and proximate to the provision of library services); Dallas ISD Comments at 1 (supporting the proposal to recognize that off-campus Internet access is "integral, immediate, and proximate to the education of students, serving an educational purpose, and thus, eligible for E-[R]ate support"); SHLB & OTI Comments at 6 (agreeing that the Commission has authority to permit E-Rate support for services used for educational purposes off-premises); CTL Comments at 1 (supporting the proposal to recognize that off-campus Internet access is "integral, immediate, and proximate to the education of students, serving an educational purpose, and thus, eligible for E-[R]ate support").  *See also* SECA Comments at 4-5, n.7 (conditionally supporting the proposal to find authority under section 254(h)(1)(B) only when students do not have sufficient Internet access service at home to meet their educational needs).

[308] *See, e.g.*, NACEPF & Mobile Beacon Reply at 21 ("Here, there is extensive record evidence that high quality connectivity is often essential for students to fully participate in the modern classroom, but that high costs and other factors make this service inaccessible for many students. Thus, the provision of Wi-Fi hotspots is "integral, immediate, and proximate" to those students' ability to receive an education on equal footing with their peers. The educational purpose of this service could not be clearer.").

access library services.[309]  We agree with these commenters.  Given the lack of a reliable broadband connection at some students', school staff members', and library patrons' homes, the struggle for many households to afford high-speed broadband (particularly in light of the end of the ACP), and the increasing need for connectivity in today's technology-based educational environment that extends learning beyond a school or library building (e.g., for virtual classes, electronic research projects, homework assignments, virtual library resources, research, etc.), we find that the off-premises use of such wireless Internet services and the Wi-Fi hotspots needed to deliver such connectivity to students, school staff, or library patrons is "integral, immediate, and proximate to the education of students or the provision of library services to library patrons" and, therefore, serves an educational purpose.  For example, if a student is unable to complete their homework or participate in a virtual class or research project due to lack of Internet access while off-premises, that lack of access is likely to have an immediate, negative impact on that student's academic performance, which is integral to their education.[310]  Similarly, if a library patron is unable to access work-related research for school or career advancement, that lack of access is likely to have an immediate, negative impact on that patron's career.  As such, we find that the connectivity provided through the off-premises use of Wi-Fi hotspots can make a difference in a student's, school staff member's, or library patron's ability to meaningfully engage in learning and fully access library services; the provision of such services thus serves an educational purpose.

91.     We disagree with the commenters who assert that "educational purpose" is defined to require a physical link to a school or library campus.[311]  Although activities that occur on-campus are presumed to serve an educational purpose,[312] the Commission has never stated that the inverse would be true (i.e., that all off-premises uses are presumed *not* to be for an educational purpose).  To the contrary, the Commission has already recognized that in certain instances, the off-premises use of E-Rate-funded telecommunications services and information services are found to serve an educational purpose, such as when a school bus driver uses wireless telecommunications services while delivering children to and from school,[313] or when students use Wi-Fi or similar access point technologies on school buses to complete homework.[314]  A number of commenters agree that it is consistent with this precedent to find that the off-premises use of wireless Internet services and the Wi-Fi hotspots needed to deliver such connectivity

---

[309] *See* R. Sheffield Comments at 1 (explaining how providing Wi-Fi hotspots has increased the impact of the library for library cardholders and allowed them to access homework, telehealth, continuing education, job upskilling, and more); Laurel-Jones CLS Reply at 1-2 (explaining how successful it has been to lend Wi-Fi hotspots and services in their community that are specifically intended for educational purposes).

[310] *See, e.g.*, C Spire Comments at 3 ("[I]t is not a secret that the education system of 2024 looks much different than it did twenty-eight years ago.  The manner in which students learn is no longer focused inside the physical classroom with books, pencils, and worksheets, but rather it has migrated to what appears on the screen in front of them.  Much, if not most of today's schoolwork takes place on the computer and broadband is no longer a tool or resource.  It is an essential requirement.").

[311] *See, e.g.*, NTCA Comments at 5-6; WISPA Reply at 1-2.

[312] *Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9208, para. 17; *see also* 47 CFR § 54.500 (defining "educational purposes").

[313] *See Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9208-9209, para. 19, n.28; *see also Schools and Libraries Sixth Report and Order*, 25 FCC Rcd at 18778-79, para. 31 (providing E-Rate support for services in the residential areas of certain residential schools that serve unique populations because it would "facilitate ongoing access to educational learning materials beyond the normal school day and increase the ability of those students to complete homework assignments, such as those that require broadband access for research projects, after school hours").

[314] *See School Bus Wi-Fi Declaratory Ruling*, 2023 WL 8586523 at *6, para. 9 & n.32.

similarly serves an educational purpose.[315]  We further disagree with NTCA's claim that the Commission's prior orders have required that services be physically "tied to a place of instruction."[316]  Although the Commission has previously stated that "the purpose for which support is provided" must "be for educational purposes in a place of instruction,"[317] neither the Commission nor the statute has defined the physical confines of where instruction can take place, and the *Schools and Libraries Second Report and Order* that NTCA quotes did allow funding for certain off-premises services, demonstrating the Commission's longstanding understanding that "educational purposes in a place of instruction" can include off-premises uses.[318]  Therefore, based on the record and consistent with Commission precedent, we conclude that section 254(h)(1)(B) of the Communications Act allows E-Rate support for services purchased by "elementary schools, secondary schools, and libraries" for the purpose of allowing students, school staff, and library patrons to use those services off-premises for educational purposes.  Finally, contrary to NTCA's assertion,[319] we also find this conclusion is consistent with the statutory language requiring that services be provided "to" schools and libraries because schools or libraries are the customers and recipients of the services they purchase, and the services are therefore provided to them within the meaning of section 254(h)(1)(B), even if used elsewhere.

92.     The provision of support to schools and libraries to purchase wireless Internet services for off-premises use for educational purposes fits squarely within the Commission's long-established authority and direction under section 254(h)(1)(B) of the Communications Act to designate "'services that are within the definition of universal service under subsection (c)(3),' which itself authorizes the Commission to designate non-telecommunications services for support under E-Rate."[320]  As explained in the *NPRM*,[321] the Commission expressly rejected the assertion that the support provided under section 254(h) of the Communications Act is limited to telecommunications services when it concluded in the *First Universal Service Order* that section 254(h)(1)(B) through section 254(c)(3) of the Communications Act authorizes universal service support for telecommunications services *and* additional services such as information services.[322]  Pursuant to this longstanding precedent, authority provided by section

---

[315] *See, e.g.*, ALA Comments at 2-3 (agreeing that support for the off-premises use of hotspots and services would be consistent with past E-Rate precedent so long as it is determined to be for educational purposes); EdLiNC Comments at 5-6 (stating that allowing E-Rate to "defray the costs of Wi-Fi hotspots and home connection services is a natural outgrowth of the Commission's earlier decisions that extended E-Rate support beyond schools and libraries to ensure that students continue learning"); The Council Comments at 2.

[316] *See* NTCA Comments at 5-6 ("Orders clarifying the definition of 'educational purpose' – while authorizing the use of E-Rate supported services by school and library staff and by members of the community after normal school hours – in every case maintained the requirement that the use of such facilities was tied to a place of instruction. These Orders neither addressed nor authorized the extension of E-Rate supported services or facilities to a residential setting.").

[317] *Schools and Libraries Second Report and Order*, 18 FCC Rcd at 9209, para. 20.

[318] *Id.* at para. 19, n.28.

[319] *See* NTCA Comments at 5 (arguing that the text of section 254(h)(1)(B) "makes clear that the services are to be provided 'to' schools and libraries").

[320] *See School Bus Wi-Fi Declaratory Ruling* at *6, para. 9 & n.32; *see also First Universal Service Order*, 12 FCC Rcd at 9009-11, paras. 437-39 (concluding that section 254(h)(1)(B) through section 254(c)(3) of the Communications Act authorizes universal service support for telecommunications services *and* additional services such as information services).  Note that this was upheld in *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393, 443-44 (5th Cir. 1999).

[321] *NPRM,* 2023 WL 8602208 at *20, para. 47.

[322] In the *First Universal Service Order*, the Commission explained: "'[T]he term used in section 254(h)(1)(B), 'any of its *services* that are within the definition of universal service under subsection (c)(3),' cannot be read as a generic reference to the heading of that section.  Rather, the varying use of the terms 'telecommunications services' and 'services' in sections 254(h)(1)(A) and 254(h)(1)(B) suggests that the terms were used consciously to signify

(continued….)

254(h)(1)(B) and section 254(c)(3) is not limited to telecommunications services but also authorizes support for the off-premises use of wireless Internet services.[323]  Further, we find that section 254(h)(1)(B) through section 254(c)(3) of the Communications Act provides authority to support the Wi-Fi hotspot devices that are necessary to provide the wireless Internet services.  In the *First Universal Service Order*, the Commission concluded that "we can include 'the information services' e.g., protocol conversion and information storage, that are needed to access the Internet, as well as internal connections, as 'additional services' that section 254(h)(1)(B), through section 254(c)(3), authorizes us to support."[324]  The Commission further distinguished between ineligible types of peripheral equipment (e.g., laptops) and eligible equipment that is necessary to make the services functional.[325]  We find that because Wi-Fi hotspots can provide a critical connection for delivery of Internet service, they fall into the latter category, and we therefore conclude that the Commission has authority under section 254(h)(1)(B) through section 254(c)(3) of the Communications Act to support the off-premises use of Wi-Fi hotspot devices that are needed for the delivery of wireless Internet services.

93.      Separately, we find that section 254(h)(2)(A) of the Communications Act authorizes the Commission to permit E-Rate support for the off-premises use of Wi-Fi hotspots and services because hotspots and services that connect students, school staff, and library patrons to digital learning will "enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms . . . and libraries."[326]  First, we find that providing support for such equipment and services through the E-Rate program will be "technically feasible and economically reasonable."[327]  This is best demonstrated by the more than one million ECF-funded Wi-Fi hotspots and services that were distributed to students, school staff, and library patrons who may have otherwise lacked access and who were successfully connected to remote learning.[328]  Based on those experiences in the ECF program, as well as demand falling short of the E-Rate program's funding cap for many years and the limited lending program budget mechanism adopted herein, we believe that the cost of funding the off-premises use of Wi-Fi hotspots and services can be accomplished within the E-Rate program's existing budget.[329]

---

different *meanings*.  In addition, the mandate in section 254(h)(2)(A) to enhance access to "advanced telecommunications and information services," particularly when read in conjunction with the legislative history as discussed below, suggests that Congress did not intend to limit the support provided under section 254(h) to telecommunications services.'"  *See First Universal Service Order*, 12 FCC Rcd at 9010-11, para. 439.

[323] *See also* SBi Comments at 7 (arguing that Congress understood that learning and education would evolve over time and therefore, provided the Commission the authority to "designate additional services" that "tak[e] into account advances in telecommunications and information technologies and services").

[324] *See First Universal Service Order*, 12 FCC Rcd at 9010-11, para. 439.

[325] *See also First Universal Service Order*, 12 FCC Rcd at 9021, para. 459 (holding that equipment such as a router is eligible for support if "necessary to transport information all the way to individual classrooms").

[326] *See* 47 U.S.C. § 254(h)(2)(A).

[327] *Id.*

[328] *See* Universal Service Administrative Company, *Emergency Connectivity Fund FCC Form 471*, https://opendata.usac.org/Emergency-Connectivity-Fund/Emergency-Connectivity-Fund-FCC-Form-471/i5j4-3rvr (last visited July 15, 2024) (reporting data used to estimate Wi-Fi hotspot devices requested in the ECF program to date); *see also NPRM*, 2023 WL 8602208 at *7, para. 17.

[329] Using data available from the E-Rate program on discount rates, student counts, and square footage, staff estimate that if all eligible E-Rate applicants requested funding up to the limits established today, demand for this program could be up to $1,634.81 million.  However, we do not expect all applicants to participate, nor do we expect them to all request funding for all eligible devices, or to request funding for Wi-Fi hotspot devices annually.  Based on the number of students and the library square footage for the applicants that participated in the ECF program, staff estimate that if all previous ECF applicants requested funding up to the limits established today,

(continued….)

94.     Second, we conclude that funding Wi-Fi hotspots and services for off-premises use will help enhance access for school classrooms and libraries to the broadband connectivity necessary to facilitate digital learning for students and school staff, as well as library services for library patrons who lack broadband access when they are away from school or library premises.  As discussed above, the Internet has become critical for equitable access to education.[330]  For example, even before the pandemic, a significant number of teachers and students around the country reported requiring an Internet connection to complete homework,[331] and after the pandemic, some schools still retain the option to attend classes virtually.[332]  Beyond the context of school, digital literacy has become increasingly important in the workforce, with many applications, interviews, and forms that in an earlier era applicants might have used library resources to complete in person are now taking place online.[333]  Yet, a portion of our population still lacks Internet access,[334] meaning that they are unable to engage in such regular educational tasks like

---

demand for the program would be close to $900 million.  This amount is well under the E-Rate program's annual funding cap and does not take into account the three-year limitation for requesting funding for Wi-Fi hotspot devices.  *See Wireline Competition Bureau Announces E-Rate and RHC Programs' Inflation-Based Caps for Funding Year 2024*, CC Docket No. 02-6, WC Docket No. 02-60, Public Notice, DA 24-229, at 2 (WCB Mar. 8, 2024) (announcing the FY 2024 E-Rate funding cap as $4.940 billion); *see* Letter from Craig Davis, Vice President, Schools and Libraries Division, USAC, to Trent Harkrader, Chief, Wireline Competition Bureau, FCC, CC Docket No. 02-6 (Mar. 28, 2024) (estimating demand for funding year 2024 as $3.239 billion, including $1.921 billion in demand for category one services and $1.318 billion in demand for category two services); *see also NPRM,* 2023 WL 8602208 at *10, para. 25, n.81 (explaining that E-Rate demand has consistently been below the program's funding cap since 2016).

[330] *Supra* paras. 18-20.

[331] *See* School on Wheels, *The Impact of the Digital "Homework Gap" on our Students* (Nov. 21, 2019), https://schoolonwheels.org/the-impact-of-the-digital-homework-gap-on-our-students/; Alia Wong, *Why Millions of Teens Can't Finish Their Homework* (Oct. 30, 2018), https://www.theatlantic.com/education/archive/2018/10/lacking-internet-millions-teens-cant-do-homework/574402/.

[332] Annalise Knudson, *NYC to Offer Virtual Option at All Public High Schools* (June 14, 2023), https://www.govtech.com/education/k-12/nyc-to-offer-virtual-option-at-all-public-high-schools (explaining how New York City will offer a virtual learning program to all high school students and some middle school students, and how such virtual options enable broader range of course offerings for students, and greater reach to certain student groups, such as those that work jobs).

[333] *See, e.g.*, Southeast Oklahoma Library System, *Career Development & Resources*, https://www.seolibraries.com/services/business-career (last visited July 15, 2024) (providing links to assist job seekers, including online tools to develop resumes and cover letters, and "technology development" resources designed to help individuals grow their technology skills); Arlington Public Library, *For Job Seekers*, https://library.arlingtonva.us/for-job-seekers/ (last visited July 15, 2024) (providing links to resume and job resources, online job and career resources, and job search eBooks and eAudiobooks); Department of Education, A Call to Action for Closing the Digital Access, Design, and Use Divides: 2024 National Educational Technology Plan (2024), https://tech.ed.gov/files/2024/01/NETP24.pdf (describing how digital literacy can be incorporated into school curriculums to help students in and out of the classroom, including for career development); Isaiah Hankel, *The Virtual Interview is the New Resume: What You Need to Know* (May 5, 2022), https://www.forbes.com/sites/forbesbusinesscouncil/2022/05/05/the-virtual-interview-is-the-new-resume-what-you-need-to-know/?sh=561d4d4486d7 (reporting that employers are leveraging virtual interviews more often than before the pandemic, a trend that is likely to stay); Rebecca Torchia, *Technology in the Classroom & The Benefits for K-12 Schools* (Sep. 16, 2022), https://edtechmagazine.com/k12/article/2022/09/benefits-integrating-technology-todays-k-12-classrooms-perfcon (explaining that "[e]ven students who are learning in an in-person environment are using technology in their daily lives" and "[i]ntegrating it into the classroom gives them an opportunity to learn to use tech in a meaningful way").

[334] *See* Jessica Rosenworcel, *National Broadband Map 3.0: Thankful for Continued Improvements* (Nov. 17, 2023), https://www.fcc.gov/news-events/notes/2023/11/17/national-broadband-map-30-thankful-continued-improvements (reporting that more than 7.2 million households in the U.S. lack access to high-speed internet service based on the Commission's broadband mapping initiative).

homework, research, developing or updating resumes, or applying for jobs.[335] For many of these individuals, the Internet access provided by their local school or library is their primary means of accessing such critical resources.[336] The record is filled with examples of how Wi-Fi hotspots and services, in particular, have been very effective at closing this Homework Gap and digital divide.[337] By providing E-Rate support for Wi-Fi hotspots and wireless Internet services that can be used off-premises, the Commission can help schools and libraries to connect, for example, the student who has no way of accessing their homework to prepare for the next day's classroom lesson, or the school staff member who is unable to engage in parent-teacher meetings or professional trainings that take place after the school day ends, or the library patron who needs to attend a virtual job interview or perform bona fide research after their library's operating hours. Thus, we conclude that by permitting support for the purchase of Wi-Fi hotspots and Internet wireless services that can be used off-premises and by allowing schools and libraries to use this technology to connect the individuals with the greatest need to the resources required to fully participate in classroom assignments and in accessing library services, we will thereby extend the digital reach of schools and libraries for educational purposes and allow schools, teachers, and libraries to adopt and use technology-based tools and supports that require Internet access at home. For these reasons, we conclude that the action adopted today is within the scope of our statutory directive under section 254(h)(2)(A) of the Communications Act to enhance access to advanced telecommunications and information services for school classrooms and libraries.[338]

95.     Furthermore, we agree with commenters that permitting E-Rate support for the off-premises use of Wi-Fi hotspots and services is consistent with the Commission's exercise of its authority under section 254(h)(2)(A) of the Communications Act to establish the Connected Care Pilot Program and to clarify that the use of Wi-Fi on school buses is eligible for E-Rate funding.[339] In establishing the

---

[335] *See* The Council Comments at 1 ("Off-campus and remote connectivity that has long been needed for homework and other educational activities is now recognized as an essential part of the education experience, daily instruction, and blended learning for all students); EdLiNC Comments at 2-3 (explaining that lack of connectivity at home prevents individuals from "completing homework assignments, conducting research, communicating with their teachers and peers, applying for colleges, jobs and government services").

[336] *See, e.g.*, NACEPF & Mobile Beacon Comments at 7-8 (reporting on their 2017 survey where 62% of public libraries reported that they were the only free source of Internet in their community); SBi Comments at 4 (citing examples of Tribal students who are forced to miss school because they are unable to get to campus and how Wi-Fi hotspots would allow them to engage).

[337] *See, e.g.*, EdLiNC Comments at 2-3 ("The home connectivity gap endured by K-12 students and educators is reflective of a larger Digital Divide that America's public libraries have been on the front lines in addressing for many years – initially by providing access to computers and connectivity within their buildings and more recently by lending Wi-Fi hotspots and computing devices to their patrons"), 4-5 (reporting that addressing home internet connectivity must continue to be a priority for educators and policy makers); Tekniam Comments at 1 ("Remote education will continue beyond the pandemic, and Internet access is typically necessary for completing homework assignments. But for many students, the inability of their families to afford Internet access makes it impossible for them to engage in these activities."); ALA Comments at 13 (stating that "Wi-Fi hotspots are one tool in closing the digital divide; they provide thousands of students and library patrons needed connectivity"); The Council Comments at 1 (explaining that "[o]ff-campus and remote connectivity that has long been needed for homework and other educational activities is now recognized as an essential part of the education experience, daily instruction, and blended learning for all students"); SHLB & OTI Comments at 2-3 (reporting how students without home Internet connectivity are unable to take advantage of online educational opportunities like "videos that teachers create to allow students to review a lecture at their own pace"); SBi Comments at 2 (stating that after ECF funding for hotspots ends, "students' need to learn at home has not dissipated").

[338] *See* 47 U.S.C. § 254(h)(2)(A).

[339] *See, e.g.*, SHLB & OTI Comments at 6 (stating that the Commission's proposal is consistent with the FCC's exercise of authority to establish the Connected Care pilot program and to authorize E-Rate support for Wi-Fi on school buses); NACEPF & Mobile Beacon Reply at 2 (considering the establishment of the Connected Care pilot

(continued....)

Connected Care Pilot Program, the Commission found that providing support for patients' home broadband connections expanded health care providers' digital footprints for purposes of providing connected care services and allowed health care providers and patients to overcome the obstacle of cost to adopt beneficial connected care services through the pilot program, thus enhancing eligible health care providers' access to advanced telecommunications and information services.[340] As NACEPF & Mobile Beacon explain in their reply comments, similar reasoning exists to support off-premises access for classrooms and libraries: many students lack the broadband connectivity required to fully participate in their education and to complete their assignments. Providing for the off-premises use of Wi-Fi hotspots and services would remove this obstacle and therefore, enhance the ability of classrooms and libraries to connect with learners and enable them to participate fully in their classwork and lessons, and complete their assignments.[341] We disagree with ACA Connects' assertion that the *NPRM*'s proposal differs from the permissible actions taken in the *School Bus Wi-Fi Declaratory Ruling* because unlike a school bus, which is a school-controlled facility, no nexus exists between the school or library and the off-premises learning location (e.g., a student's home).[342] We do not agree that the school or library needs to be in control of a location where the individual learns for there to be a nexus, because we find that this is not in line with the reality of how classroom instruction incorporates online resources (e.g., assignments that must be completed and submitted online—often by a deadline outside of "school hours", schoolwork sent home with a student, online school days, required use of e-books or online videos) or the intent of E-Rate funding.[343] Rather, we find that students, school staff, and library patrons have a direct nexus with their school or library through the provision of remote learning and education and that this nexus will be further strengthened by the safeguards we also impose today.[344]

96.     Finally, we find section 254(h)(2)(A)'s reference to services for "classrooms" includes using E-Rate support to connect students, school staff, and library patrons to valuable digital educational resources when they are not located on the school or library campus. We note that the statute directs the Commission to establish rules to enhance access "*for* all public and nonprofit elementary and secondary school classrooms . . . and libraries."[345] Notably, the text does not say to enhance access to services "at" or "in" school classrooms (or libraries), as would more naturally indicate a tie to a physical location. Moreover, we sought comment in the *NPRM* on whether the reference in section 254(h)(2)(A) of the Communications Act to "elementary and secondary school classrooms . . . and libraries" includes expanding access to supported services that can be used in student, school staff, and library patron homes, given that today's educational environment often extends outside of the physical school or library

---

program pursuant to section 254(h)(2)(A) to be parallel to the proposal to fund the off-premises use of Wi-Fi hotspots and services in the E-Rate program).

[340] *Promoting Telehealth for Low-Income Consumers*; *COVID-19 Telehealth Program*, WC Docket No. 18-213, Report and Order, 35 FCC Rcd 3366, 3417-18, paras. 87-88, 90 (2020) (*Connected Care Report and Order*).

[341] *See* NACEPF & Mobile Beacon Reply at 20 ("[A]lthough hybrid learning is increasingly common, and students routinely require broadband connectivity to complete assignments, households often lack the broadband connectivity required to fully participate in these forms of education. Funding for off-campus Wi-Fi hotspots helps to remove this obstacle and, therefore, enhances the ability of libraries and classrooms to connect with these learners.").

[342] *See* ACA Connects Comments at 6-7 ("[T]here is at least some nexus that exists between the classroom and a school bus, which does not exist between the classroom and a household. While children are on the school bus, they are at a school-controlled facility. Students at home, by contrast, are at a private facility, not under the guardianship of the school. Thus, even if a plausible argument could be made that a school bus is an extension of the classroom, the same argument cannot be made for a student's home.").

[343] S. Rep. No. 104-230, at 132-33 (1996) (Joint Explanatory Statement), https://www.congress.gov/104/crpt/srpt230/CRPT-104srpt230.pdf.

[344] *See infra* Section III.E.

[345] *See* 47 U.S.C. § 254(h)(2)(A) (emphasis added).

building.[346]  In response, many commenters highlight the proliferation of online instruction and remote learning, particularly in the wake of the COVID-19 pandemic.[347]  Specifically, commenters argue that the language of section 254(h)(2)(A) of the Communications Act should be interpreted to reflect the increasingly hybrid nature of education and enable off-premises access to important educational resources that support learning, such as student access to homework or online classes,[348] or educator access to professional learning courses, networks, and materials,[349] and library patron access to e-books and virtual programs.[350]  As exemplified during the COVID-19 pandemic-era campus closures, the physical school building is not the only place where a student can be in "class" and there are myriad reasons why a student, school staff member, or library patron may not be able to travel to the physical campus but still requires access to their remote learning and other educational resources.  As such, we conclude that section 254(h)(2)(A)'s reference to "classrooms" is appropriately interpreted to extend beyond the brick and mortar school buildings.  Although a few commenters argue that our interpretation is inconsistent with the statute's use of the word "classroom" because hotspots can be used anywhere,[351] we disagree.  As explained above, in today's world, effective classroom learning often demands access to the Internet outside of the school or library building, and we therefore continue to believe that the best reading of "for . . . classrooms" allows funding for services that support effective classroom instruction, even if such services are used outside of a brick-and-mortar classroom.  At the same time, to ensure we are making the most-effective use of these scarce funds and limiting the off-premises use of Wi-Fi hotspots and services

---

[346] *See NPRM,* 2023 WL 8602208 at *21, para. 51.

[347] *See, e.g.*, EdLiNC Comments at 6 (explaining that "allowing E-Rate support for home connectivity would be reflective of much broader trends in K-12 education, with education no longer confined to classrooms and libraries"); American Speech-Language-Hearing Association Comments at 1-2 (ASHA) ("As COVID-19 demonstrated, more flexible access to the internet is vital. The proposed expansion of E-Rate will increase access to critical clinical and professional development resources for educators in school settings, such as educational audiologists and school-based SLPs, to support the learning and achievement of students, especially those with disabilities that ASHA members serve."); NACEPF & Mobile Beacon Comments at 4-5 ("The ongoing popularity of homeschooling and hybrid teaching have reframed the concept of the "classroom." Learning can and does occur beyond a school campus or library building."); ALA Comments at 1 (stating that "the needs of library patrons and students evolve, as well, to rely more heavily on access to virtual and/or hybrid learning"); National Association of Elementary School Principals Comments at 1 (NAESP) ("Broadband internet access is no longer a luxury but now a fundamental requirement for a high-quality K-12 education. Whether it be a virtual or hybrid learning environment; students completing schoolwork at home; or families communicating with school contacts, fast and stable internet connectivity is essential for educational opportunity, equity, and achievement."); C Spire Comments at 3; SBi Comments at 6 ("At least partially as a result of the pandemic, the classroom is no longer viewed as a brick and mortar building with four walls and a teacher.").

[348] *See, e.g.*, #OaklandUndivided, OUSD Comments at 2 (noting the educational activities that have been digitalized, including "classes, homework, testing, remediation, Individualized Education Program meetings, parent-teacher conferences"); OITCs Comments at 2 (explaining that "[s]tudents and staff need access to online digital resources while off-campus, as well, to engage with supplemental educational materials, complete homework assignments and connect with one another"); Qualcomm Comments at 2 ("For decades and decades, schools have provided textbooks to all students, regardless of their income level, to support learning. Broadband connectivity and end-user devices are the 21st Century version of textbooks.").

[349] *See, e.g.*, EdLiNC Comments at 6 (explaining how educators "increasingly go online from their homes" for professional training).

[350] *See, e.g.*, EveryLibrary Institute Comments at 2 (stating that "e-book and e-audiobook circulations have far outpaced physical material circulation, a trend libraries do not expect to reverse"); ALA Comments at 1 ("Increasingly, library services occur outside the walls of the library building with e-books and other ematerial, online author talks, virtual discussion groups, and more; therefore, internet access is essential to accessing the services libraries provide").

[351] *See, e.g.*, NTCA Comments at 9; ACA Connects Comments at 3-4.

to educational purposes, we find it necessary to adopt the specific safeguards discussed above.[352]

### G. Children's Internet Protection Act

97.    We conclude that the obligations of the Children's Internet Protection Act (CIPA) apply if the school or library receives E-Rate (or ECF) support for Internet access, Internet service, internal connections, and/or the related network equipment, including Wi-Fi hotspots.[353]  Enacted as part of the Consolidated Appropriations Act of 2001, CIPA prohibits certain schools and libraries from receiving funding under section 254(h)(1)(B) of the Communications Act for Internet access, Internet service, or internal connections, unless they comply with specific Internet safety requirements.[354]  Specifically, CIPA requires schools and libraries "having computers with Internet access"[355] to certify that they are enforcing a policy of Internet safety that includes the operation of a technology protection measure (e.g., a filter).[356] Congress enacted this law to ensure that children are protected from exposure to harmful material while accessing the Internet provided by a school or library.[357]  Schools and libraries are therefore required to block or filter visual depictions that are obscene, child pornography, or harmful to minors across all sites, including social media.[358]  CIPA also requires monitoring the online activities of minors and providing education about appropriate online behavior, including warnings against cyberbullying.[359]

98.    First and foremost, we remain focused on CIPA's intended purpose and expect schools and libraries to take every step necessary to ensure Internet access funded by the E-Rate program remains safe for use by minors.  Recognizing that accessing the Internet carries inherent risk for minors, many schools have already implemented measures to restrict students' access to certain websites, including social media.[360]  For example, one school district in New Mexico relies on a filter to only permit student

---

[352] *See infra* Section III.E.

[353] *See ECF Order*, 36 FCC Rcd at 8746-49, paras. 108, 111-13.

[354] Children's Internet Protection Act, H.R. 4577, Pub. L. No. 106-554, 106th Cong., tit. XVII, § 1701-1703, 1711-1712, 1721 (2000) (enacted), available at https://www.congress.gov/106/plaws/publ554/PLAW-106publ554.pdf. CIPA is codified at section 254(h)(5)-(6), and section 254(l) of the Communications Act of 1934, as amended.  47 U.S.C. § 254(h)(5)-(6), (l).  CIPA requires each covered school and library to certify that the school or library is:  (1) "enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access [by both adults and minors] through such computers" to visual depictions that are (i) obscene; (ii) child pornography; or, (iii) with respect to use of the computers by minors, harmful to minors; and (2) "enforcing the operation of such technology protection measure during any use of such computers" by minors and adults.  47 U.S.C. § 254(h)(5)(B)(i),(ii) and (C)(i),(ii), (h)(6)(B)(i)(ii) and (C)(i)(ii), and (l); 47 CFR § 54.520(c)(1)(i), (c)(2)(i); *see also Federal-State Joint Board on Universal Service*; *Children's Internet Protection Act,* CC Docket No. 96-45, Report and Order, 16 FCC Rcd 8182 (2001) (*2001 CIPA Order*); *Schools and Libraries Universal Service Support Mechanism, A National Broadband Plan for Our Future*, CC Docket No. 02-6, GN Docket No. 09-51, Report and Order, 26 FCC Rcd 11819 (2011) (*2011 CIPA Order*).

[355] 47 U.S.C. § 254(h)(5)(A)(i), (h)(6)(A)(i).

[356] 47 U.S.C. § 254(h)(5)(B)(i) and (C)(i), (h)(6)(B)(i) and (C)(i).

[357] *See* S. Rep. No. 106-141, at 1 (1999), https://www.congress.gov/106/crpt/srpt141/CRPT-106srpt141.pdf ("The purpose of the bill is to protect America's children from exposure to obscene material, child pornography, or other material deemed inappropriate for minors while accessing the Internet from a school or library receiving Federal Universal Service assistance for provisions of Internet access, Internet service, or internal connection[s].").

[358] *See* 47 U.S.C. § 254(h)(5)(B)(i),(ii) and (C)(i),(ii), (h)(6)(B)(i)(ii) and (C)(i)(ii), and (l); 47 CFR § 54.520(c)(1)(i), (c)(2)(i).

[359] *2011 CIPA Order*, 26 FCC Rcd at 11821, para. 5 (revising schools' CIPA obligations).

[360] *See, e.g.*, Letter from John Windhausen, Jr., Executive Director, SHLB, Megan Janicki, Deputy Director, ALA, Keith Krueger, CEO, CoSN, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at n.8 (filed Apr. 15, 2024) (explaining that some schools have chosen to block social media for all students or for younger students

(continued….)

access to selected sites, while also blocking access to sites deemed non-educational.[361] The top 20 domains where students were denied access by the filter included primarily social media sites, with TikTok and Snapchat comprising roughly 40% of denied requests.[362] Schools and libraries, in compliance with the requirements of CIPA, should continuously evaluate the effectiveness of their Internet safety policies and technology protection measures against the shifting nature of potentially harmful online content and the various sites and platforms that make content available to minors.[363] Similarly, many service providers offer network-level filtering in their service offerings to support schools' and libraries' deployment of network-level technology protection measures.[364] We recognize that determinations of what is considered appropriate are left to the local communities,[365] and we encourage schools and libraries to evaluate the needs of their communities and apply filters as appropriate at the network level to ensure E-Rate-funded Internet is safe for use by minors in line with the intent of the law.[366]

99. The *NPRM* sought comment on the applicability of CIPA when connecting E-Rate-funded Wi-Fi hotspots to the Internet off-premises, and proposed to require that CIPA applies if the school or library accepts E-Rate or ECF support for Internet access or Internet services, or E-Rate support for internal connections.[367] The Commission has previously clarified that Wi-Fi hotspots qualify as eligible "Network Equipment" for Internet access, Internet service, or internal connections and would trigger CIPA compliance for the purchasing school or library.[368] In response to the *NPRM*, several

---

pursuant to their local determination of what is appropriate). *But see* Letter from Annie Chestnut, Policy Analyst, The Heritage Foundation, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket No. 21-31, at 2 (filed Mar. 29, 2024) (arguing that providing hotspots to minors "provides open-ended Internet access" and "allows kids to connect online without supervision from teachers or parents" including to access social media). Schools and libraries can rely on Internet safety policies and technology protection measures to oversee what can be accessed by minors and restrict access to certain websites that are deemed inappropriate by their local community, including teachers and parents.

[361] *See* E-Rate Central Comments at 4, Appx. A (providing an example of Farmington Municipal School District's filtering configuration employed for the Wi-Fi services provided on school buses).

[362] *Id.* at Appx. A.

[363] *See, e.g.*, Pew Research Center, *Teens and Internet, Device Access Fact Sheet* (Jan. 5, 2024), https://www.pewresearch.org/internet/fact-sheet/teens-and-internet-device-access-fact-sheet/ (reporting that 96% of U.S. teens say they use the Internet every day); Monica Anderson et al., *Teens, Social Media and Technology 2023* (Dec. 11, 2023), https://www.pewresearch.org/internet/2023/12/11/teens-social-media-and-technology-2023/ (reporting survey results that show YouTube, TikTok, Snapchat, and Instagram remain popular among teens, while use of Facebook and X (formerly known as Twitter) have declined, and modest use of BeReal, a newer social media application).

[364] *See, e.g.*, WIDPI Comments at 3-4 (noting that "most filtering already happens at the network level"); EdLiNC Comments at 16 (noting that some schools already use network-level filtering); *Kajeet 2021 Remote Learning PN* Comments at 3-4 (stating that Kajeet, Verizon, and AT&T offer filtering at the network-level); Cradlepoint Reply, WC Docket No. 21-93, at 6 (rec. Apr. 23, 2021) (explaining that filtering mechanisms generally take place at the network-level).

[365] *See* 47 U.S.C. § 254(l)(2) (stating that a determination regarding what matter is inappropriate for minors shall be made by the school board, local educational agency, library or other authority responsible for making the determination).

[366] *See NPRM,* 2023 WL 8602208 at *23, para. 55 (seeking comment on whether to require implementation of technology protection measures at the network-level to ensure that minors are not accessing harmful content through E-Rate-funded Internet).

[367] *See id.* at *23, paras. 53-54.

[368] *See ECF Order*, 36 FCC Rcd at 8746, para. 112, n.301; *see also* FCC, *Emergency Connectivity Fund FAQs: FAQ 10.1,* https://www.fcc.gov/emergency-connectivity-fund-faqs (last visited July 15, 2024) (" [W]hile CIPA does not impose any requirements on a Wi-Fi hotspot device itself, the purchase of a Wi-Fi hotspot through ECF would

(continued….)

commenters express support for requiring CIPA compliance.[369] We agree with these commenters and find that the requirements of CIPA apply for off-premises use if the school or library receives E-Rate-funded Internet service, Internet access, internal connections, or related network equipment (including Wi-Fi hotspots).

100.     We find the concerns raised about the applicability and privacy implications of CIPA when funding the off-premises use of Wi-Fi hotspots and services unpersuasive.[370] We are not aware of any issues with CIPA compliance arising from the ECF program, in which we applied CIPA to off-premises use. Moreover, our rules require schools and libraries to certify to CIPA compliance,[371] under penalty of reimbursement of funds and enforcement under federal requirements regarding truthful statements.[372] The Commission has recognized the "long history" supporting this approach to CIPA compliance in the E-Rate application process.[373] Our rules also provide that the certifying entity may be "the relevant school, school board, local education agency, or other authority with responsibility for administration of the school" or the relevant "library, library board, or other authority with responsibility for administration of the library."[374] We are therefore confident that participants in E-Rate are well positioned to understand and enforce their CIPA obligations.[375]

101.     Finally, we deny requests that E-Rate funds be used to pay for CIPA implementation costs.[376] The Commission has previously determined that E-Rate recipients are statutorily prohibited from obtaining discounts under the universal service support mechanism for the purchase or acquisition of technology protection measures necessary for CIPA compliance.[377]

## IV.     SEVERABILITY

102.     All of the rules that are adopted in this Order are designed to further the support provided

---

qualify as the purchase of network equipment for internet access, internet service, or internal connections, and would trigger CIPA compliance.").

[369] *See, e.g.*, E-Rate Central Comments at 4; Tekniam Comments at 3; CTIA Reply at 7.

[370] *See, e.g.*, NTCA Comments at 8 (questioning the feasibility of CIPA compliance for those connecting to E-Rate-funded Wi-Fi off-premises and whether schools and libraries have the authority to ensure CIPA compliance from within private residences).

[371] 47 CFR § 54.520(b)-(e).

[372] *See, e.g.*, 31 U.S.C. §§ 3729-3730 (civil false claims act); 18 U.S.C. § 287 (criminal false claims act); 18 U.S.C. § 1001 (imposing criminal liability for making false statements); *see also* 47 CFR § 1.17; *Amendment of Section 1.17 of the Commission's Rules*, GC Docket No. 02-37, Report and Order, 18 FCC Rcd 4016, 4021, para. 12 (2003).

[373] *See ECF Order*, 36 FCC Rcd at 8749, para. 114.

[374] 47 CFR § 54.520(a)(1), (2); *see also 2001 CIPA Order*, 16 FCC Rcd at 8194, para. 23 ("Because individual schools or libraries may or may not have the authority to make legally binding commitments, we conclude that the statute permits certifications for schools pursuant to CIPA to be made by the relevant school, school board, local education agency, or other authority with responsibility for administration of the school. We similarly conclude that certifications for libraries pursuant to CIPA may be made by a library, library board, or other authority with responsibility for administration of the library.").

[375] While we acknowledge the "privacy concerns" from CIPA compliance raised by NTCA, we find that these concerns are endemic to CIPA itself, rather than from the actions that we take today. By its nature, CIPA is a monitoring—and not a privacy—statute. Accordingly, we find that our approach here is consistent with CIPA and its purposes, as well as section 254. And, in any event, we find that such "concerns" are outweighed by the connectivity benefits that will result from this order.

[376] *See* EveryLibrary Institute Comments at 2.

[377] *See 2001 CIPA Order*, 16 FCC Rcd at 8204, paras. 54-55 ("The statutory language is clear—no sources of funds other than those available under the Elementary and Secondary Act of 1965 or the Library Services and Technology Act are authorized for the purchase of acquisition of technology protection measures under CIPA.").

by the E-Rate program to schools and libraries to ensure affordable access to high-speed broadband and to protect the integrity of the E-Rate program funding.  However, each of the separate rules we adopt herein shall be severable.  If any of the rules are declared invalid or unenforceable for any reason, it is our intent that the remaining rules shall remain in full force and effect.

## V.     FURTHER NOTICE OF PROPOSED RULEMAKING

103.     In this Further Notice of Proposed Rulemaking (*FNPRM*), we seek further comment on how to ensure the success of schools and libraries' hotspot lending programs, including through continued collaboration by multiple stakeholders.  In particular, we seek comment on the most effective means to ensure that limited E-Rate program funds are being used effectively and efficiently, and that Wi-Fi hotspots and services are being used for educational purposes and are not going unused.  In the *Order* above, we focus on ensuring distribution of the Wi-Fi hotspots and setting a maximum period of non-usage that will result in a line being terminated.  We also rely on program integrity and post-commitment reviews to check compliance with our rules.  Now, we seek to further refine our rules to determine a fair and administratively feasible mechanism to set clear limits on E-Rate support for hotspot devices that have been distributed, but that may have limited periods of non-use, without unfairly burdening both applicants and service providers.  As described, the applicant community seeks assurance that schools and libraries do not become the financial guarantors of all service charges for which there was non-usage,[378] while service providers assert that they have no way to control or enforce the use of a hotspot provided by an applicant to a student, staff member, or library patron.[379]  For this reason, we have adopted what we find to be a sensible approach for addressing non-usage by focusing on distribution, prohibiting warehousing, terminating service to lines that go unused for approximately 90 days, and relying on program integrity reviews to check compliance as we begin implementing Wi-Fi hotspot and service support.  We now seek further comment on administratively feasible methods to encourage maximal usage of these services and devices.

104.     For instance, we seek comment on ways applicants could take active steps to ensure that E-Rate-supported Wi-Fi hotspots are being used by the students, school staff, and library patrons to whom they are distributed.  We recognize that even under the best circumstances, there may be students or library patrons who simply do not turn on a device once they have checked it out.  In these instances, are there steps the applicant should be required to take in order to decrease the chances that the distributed hotspots go unused by the users?  Should schools and libraries be required to have technical support available to teach users how to use the Wi-Fi hotspots or troubleshoot issues that may arise?  Should schools and libraries be required to limit the lending period to a short period (e.g., 21 days or less) in order to redistribute hotspots to other students or library patrons that may have both the need and ability to use the hotspot?  For longer lending periods, should we impose a specific period of non-usage (e.g., 30 days) after which schools and libraries must seek the return of the hotspot so the device can be loaned out again to another user who will use the device?  As described previously, we understand that schools and libraries often already do this, but seek comment on whether such policies and processes should be required before reimbursement is permitted and, if so, what the best approaches are for enforcing this requirement.  What other steps can schools and libraries take to ensure the E-Rate-funded hotspots and services are being used by students, school staff members, and library patrons?  Are there better ways to implement certifications to reduce the chances that the E-Rate program is supporting Wi-Fi hotspots and services during periods of non-use?  To the extent we continue to require applicants to have activated and made the Wi-Fi hotspots available, as well as publicized their availability, is certifying to having taken these steps on the FCC Form 486 prior to submitting their or their service provider's request(s) for reimbursement sufficient?  Would requiring applicants to certify to having taken these measures on the request for reimbursement form or some other form provide better certainty that these actions have been

---

[378] *See, e.g.*, SECA Comments at 9-10 (urging the Commission not to mandate monthly usage, but instead to rely on activation and availability due to the nature of hotspot service contracts and the unpredictability of student usage).

[379] *See, e.g.*, T-Mobile Comments at 6 (asking the Commission to be flexible and reasonable in setting usage policies, and noting that service providers cannot control or enforce use, or determine the cause for the non-usage).

taken?  How else might we ensure that applicants have taken sufficient measures to make effective use of these E-Rate funded hotspots and services?  Please include examples from current hotspot lending programs on how non-usage is currently being addressed.

105.    We next seek comment on ways service providers could take additional actions to reduce the amount of E-Rate funds being spent on Wi-Fi hotspots and services that are not being actively used by the intended users.  Should we shorten the period of non-usage from approximately 90 days and require service providers to terminate service when there are 30 days of unused services associated with a particular Wi-Fi hotspot line of service?  If not at 60 days, when should notice to the applicant be made and how?  Should we require additional steps or documentation before allowing an applicant to restart service on a terminated line?  Is there an appropriate amount of time the applicant should be required to wait to restart the service?  Consistent with the category two budgets, applicants may file a request to reduce or cancel a funding commitment in order to use that funding in a future funding year of the budget cycle.  However, if the applicant has service terminated due to non-usage, should we consider prohibiting them from later reducing their funding commitment to restore the undisbursed funding to their hotspot budget?  We also seek comment on other billing paradigms that could make the program more responsive to usage.  Should the Commission consider requiring alternative billing methods, such as usage-based pricing models, for Wi-Fi hotspot service supported by the E-Rate program?[380]  In effect, this would allow reimbursement from the E-Rate program only for the service that was used, but such an approach would present new difficulties in determining the amount being requested during the FCC Form 471 application.  If we use this approach, should the Commission remove the funding cap for recurring service adopted above?[381]  Why or why not?

106.    While we are requiring that service providers provide usage reports to applicants at least once per billing cycle, we also seek comment on whether the Commission should require submission of data usage reports during the invoicing process.  For example, should service providers provide USAC with reports when an applicant is using fewer than 25% (or some other threshold) of the service lines?  Recognizing that the format for these data submissions may also be important to preventing waste and improving program integrity, what structure should data usage reports have and what format should they be provided in?  Are there ways to make such data usage reports easier for applicants, and in particular small applicants without dedicated staff for a hotspot lending program, to quickly identify the hotspot devices and services that are going unused?  Would it make sense to have the reports identify the number of lines that went unused during a particular billing cycle and reduce the reimbursement for each unused line to a nominal amount, such as $3, that would pay for the continued access to the network that went unused?  Similarly, would additional structure be needed for the applicant asset inventories to better match the data usage reports and would that have value?  What steps should the Commission take to make sure the information provided does not include personally identifiable information or other sensitive information?  Should there be a data usage threshold higher than zero to consider a line used, and if so, what would that threshold be?  Should service providers be required to offer a simple way to remotely discontinue and reestablish lines when requested by the applicant?[382]  Some libraries reported already having such a mechanism to stop service to a specific device if it is not being used;[383] does the size of the school or library impact the feasibility of implementing such a mechanism for all of the E-Rate funded Wi-Fi hotspots and services in circulation?  Why or why not?  We also seek comment on the experiences of schools and libraries being able to discontinue and reestablish lines of services when they request to do so from their service provider.  Are different levels of service needed depending on the school or library size?  Are there provisions regarding non-usage that could be included in a contract between a service

---

[380] *See* Letter from Ben Weintraub, CEO, Kajeet, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, 1-2 (filed Mar. 14, 2024).

[381] *See supra* para. 33.

[382] *See* E-Rate Central Comments at 4.

[383] *See, e.g.*, EveryLibrary Institute at 9.

provider and an applicant to help address these concerns in a manner that balances the responsibility between the service provider and applicant? Are there times that an early termination fee for lost or broken hotspot devices should be permitted to ensure that service providers are not left responsible for the cost of a broken hotspot?[384]

107. We seek comment on these approaches and whether they would benefit the E-Rate program and reduce the amount of funding spent on Wi-Fi hotspots and services during periods of non-use. To the extent applicants and service providers believe burdens would increase under any of these scenarios, we seek detailed information on the potential costs and benefits. What other steps could be taken to reduce that amount of E-Rate funding disbursed for Wi-Fi hotspots and services during periods of non-use? Are there other practices the Commission should adopt to achieve these goals? For instance, should the E-Rate program reduce and limit the number of service lines or the quantity of hotspot devices that can be requested in future funding years based on the applicant's prior funding year data on non-usage?[385] Would this incentivize applicants to better right-size their E-Rate supported hotspot lending program? Why or why not?

108. Relatedly, we seek further comment on whether to adopt user access restrictions, such as asking for student credentials, like a school-issued email and password, or more technical limitations on who or which devices may connect to the E-Rate-funded Wi-Fi hotspots.[386] To the extent entities already employ user access restrictions, we encourage commenters to provide specific information about the programs they use, the costs they are paying, and the technical functionalities and/or limitations of such restrictions. In the absence of adopting restrictions, we also seek comment on best practices for user access restrictions. Have library hotspot lending programs also implemented user access restrictions? If so, do they differ from school credentialing options? For example, is user access for Wi-Fi hotspots based on the patron's library card or other library loaning access mechanism?

109. *Cybersecurity Risk Management.* We seek comment on ways to encourage cybersecurity best practices and risk management for schools, libraries, and service providers offering Wi-Fi hotspots through E-Rate. The Commission adopted the Schools and Libraries Cybersecurity Pilot Program (Pilot Program) in June 2024 to explore whether and how to utilize USF support to improve cybersecurity practices for K-12 schools and libraries.[387] Recognizing the critical needs of schools and libraries to protect their broadband networks and sensitive student, school staff, and library patron data, we seek comment on how to ensure that using E-Rate support for Wi-Fi hotspots does not introduce additional vulnerabilities or risks to cyberattacks. Specifically, we seek comment on whether service providers providing Wi-Fi hotspots and service to schools and libraries in the E-Rate program should be required to implement cybersecurity and supply chain risk management plans.[388] Service providers receiving support through the High Cost Enhanced Alternative Connect America Cost Model (Enhanced A-CAM) program are required to develop and submit cybersecurity and supply chain risk management plans to USAC and certify compliance with these requirements. These plans must reflect the latest version of the NIST

---

[384] *See* CTIA *Ex Parte* at 2 (opposing the prohibition on fees related to lost and broken devices).

[385] For example, if 10% of the hotspots distributed were unused, future service line commitments might be limited by 10% in an effort to right-size the number of hotspots that are needed. *See* ALA Comments at 9 (suggesting the use of prior usage reports to limit support for future funding years).

[386] *See* State Cable Providers *Ex Parte* at 1-2 (recommending adoption of user and content restrictions).

[387] *See generally Schools and Libraries Cybersecurity Pilot Program*, WC Docket No. 23-234, Report and Order, FCC 24-63, 2024 WL 3010578 (June 11, 2024).

[388] *Establishing a 5G Fund for Rural America*, GN Docket No. 20-32, Further Notice of Proposed Rulemaking, FCC 23-74, 2023 WL 6263801 at *16, para. 52 (Sept. 22, 2023); *Connect America Fund: A National Broadband Plan for Our Future High-Cost Universal Service Support et al.*, WC Docket No.10-90 et al., Report and Order, Notice of Proposed Rulemaking, and Notice of Inquiry, FCC 23-60, 2023 WL 4784127 at *36, para. 109 & n. 311 (Jul. 24, 2023) (*Enhanced A-CAM Report and Order*). *See also* Letter from Michael Romano, Executive Vice President, NTCA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 21-31, at 2 (filed July 9, 2024) (NTCA *Ex Parte*).

Framework for Improving Critical Infrastructure Cybersecurity and cybersecurity best practices.[389] Should service providers receiving support for Wi-Fi hotspots be required to meet the same or similar standards? Are these service providers already in the practice of maintaining these or similar plans? Why or why not? Would a certification on the FCC Form 473 (Service Provider Annual Certification) be sufficient to allay concerns over cybersecurity vulnerabilities faced by schools and libraries? What are the risks of allowing third-party Wi-Fi hotspots access to a network? What burdens would resellers or smaller service providers face in complying with such requirements?

110. *OPEN Government Data Act.* We also seek comment about whether information reported to the FCC or to the Administrator pursuant to the requirements adopted above relating to data usage reports and asset and service inventories are "data assets" potentially subject to the requirements of the OPEN Government Data Act.[390] The OPEN Government Data Act,[391] requires agencies to make "public data assets" available under an open license and as "open Government data assets," *i.e.*, in machine-readable, open format, unencumbered by use restrictions other than intellectual property rights, and based on an open standard that is maintained by a standards organization.[392] This requirement is to be implemented "in accordance with guidance by the Director" of the Office of Management and Budget.[393]

111. We tentatively conclude that data usage reports and/or asset and service inventories provided to the Commission or the Administrator do not constitute a "data asset" as defined in 44 U.S.C. § 352(17). A "data asset" is defined as "a collection of data elements or data sets that may be grouped together,"[394] and "data" as "recorded information, regardless of form or the media on which the data is recorded."[395] Each usage report and asset and service inventory is separate and distinct from one another, and we do not expect that the information contained in the reports and inventories could readily be grouped together in any meaningful way. We tentatively conclude therefore that, in the absence of a standardized collection form, the proposed collection of data usage reports and asset and service inventories would not constitute a "data asset" subject to the requirements of the OPEN Government Data Act. We seek comment on this tentative conclusion.

---

[389] *Id.* at para. 111. *See generally* NIST, Framework for Improving Critical Infrastructure Cybersecurity, v.1.1 (2018), https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf; *see also* Cybersecurity and Infrastructure Security Agency, Cross-Sector Cybersecurity Performance Goals and Objectives, https://www.cisa.gov/cpgs (last visited July 15, 2024) (setting forth cross-sector cybersecurity standards and controls); Center for Internet Security, Critical Security Controls Version 8, https://www.cisecurity.org/controls (last visited July 15, 2024) (providing security controls grouped by priority and feasibility for different sizes and resources of businesses); NIST, Key Practices in Cyber Supply Chain Risk Management: Observations from Industry (2021), https://csrc.nist.gov/publications/detail/nistir/8276/final (presenting key practices); NIST, Cybersecurity Supply Chain Risk Management Practices for Systems and Organizations (2022), https://csrc.nist.gov/publications/detail/sp/800-161/rev-1/final (identifying critical success factors).

[390] *See supra* para. 66 (requiring service providers to provide reports regarding data usage in a machine-readable digital format to applicants and applicants to make these reports available to the Commission and/or USAC upon request to better enable the Commission "to monitor non-usage" of Wi-Fi hotspots and services by students, school staff, and library patrons during first year of implementation); *see also supra* para. 68 (requiring "E-Rate participants who receive support for the off-premises use of Wi-Fi hotspots and services to maintain detailed asset and service inventories of each hotspot and wireless service provided for use off-premises" and "to present this information upon request to the Commission or USAC.").

[391] Congress enacted the OPEN Government Data Act as Title II of the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435 (2019), §§ 201-202.

[392] 44 U.S.C. § 3502(20), (22) (definitions of "open Government data asset" and "public data asset"); *id.* § 3506(b)(6)(B) (public availability).

[393] OMB has not yet issued final guidance.

[394] *Id.* § 3502(17).

[395] *Id.* § 3502(16).

112.     If, however, our proposed collection of data usage reports and asset and service inventories can be viewed as a "data asset," we seek comment on the extent to which such information would constitute a "public data asset" under the OPEN Government Data Act.  A "public data asset" is "a data asset, or part thereof, maintained by the Federal Government that has been, or may be, released to the public, including any data asset, or part thereof, subject to disclosure under [the Freedom of Information Act (FOIA)]."[396]  Thus, we seek comment on the extent to which the information contained in these reports and inventories would be protected from disclosure under the FOIA or as personally identifiable information.[397]  If the information is subject to disclosure under the FOIA, and therefore something the FCC would be required to publish in a machine-readable format, we seek comment on whether we should also require the information to meet certain requirements to enable that publication.  Should we require that the information be submitted in machine-readable and structured format to facilitate data analysis regardless of the extent to which the data may be subject to the OPEN Government Data Act public availability requirement?

113.     *Promoting Digital Equity and Inclusion.*  The Commission, as part of its continuing effort to advance digital equity for all,[398] including people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality, invites comment on any equity-related considerations[399] and benefits (if any) that may be associated with the proposals and issues discussed herein.  Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility, as well the scope of the Commission's relevant legal authority.

## VI.     PROCEDURAL MATTERS

114.     *Regulatory Flexibility Act.*  The Regulatory Flexibility Act of 1980, as amended (RFA),[400] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[401]  Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this *Report and Order* on small entities.  The FRFA is set forth in Appendix C.

115.     We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of the rule and policy changes contained in the *Further Notice of Proposed Rulemaking*.  The IRFA is set forth in Appendix D.  The Commission invites the general public, in particular small

---

[396] 44 U.S.C. § 3502(22).

[397] The definition of a public data asset excludes information that would be withheld in fulfilling a Freedom of Information Act request, including any PII (e.g., the name of the person to whom a school provided equipment).  Therefore, a public data asset would, by definition, exclude such PII.

[398] Section 1 of the Communications Act of 1934, as amended, provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex."  47 U.S.C. § 151.

[399] The term "equity" is used here consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality.  *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

[400] 5 U.S.C. §§ 601–612.  The RFA has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[401] 5 U.S.C. § 605(b).

businesses, to comment on the IRFA. Comments must be filed by the deadlines for comments on the *Further Notice of Proposed Rulemaking* indicated on the first page of this document and must have a separate and distinct heading designating them as responses to the IRFA.

116. *Paperwork Reduction Act.* This Report and Order contains new information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies are invited to comment on the revised information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198,[402] the Commission previously sought specific comment on how it might further reduce the information collection burden on small business concerns with fewer than 25 employees. The Further Notice of Proposed Rulemaking seeks comment on possible modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on the information collection requirements contained in this document, as required by the Paperwork Reduction Act of 1995, Public Law 104-13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

117. *Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget (OMB), concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2). The Commission will send a copy of this Report and Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

118. *Late-Filed Comments.* We note there were several comments filed in this proceeding after the January 16, 2024 comment deadline and January 29, 2024 reply comment deadline. In the interest of having as complete and accurate record as possible, and because we would be free to consider the substance of those filings as part of the record in any event,[403] we will accept the late-filed comments and waive the requirements of 47 CFR § 1.46(b), and have considered them in this Report and Order.

119. *Providing Accountability Through Transparency Act.* Consistent with the Providing Accountability Through Transparency Act, Public Law 118-9, a summary of this document will be available on https://www.fcc.gov/proposed-rulemakings.

120. *Ex Parte Rules – Permit but Disclose.* The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[404] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex*

---

[402] *See* 44 U.S.C. § 3506(c)(4).

[403] *See* 47 CFR § 1.1206 (discussing *ex parte* filings in permit-but-disclose proceedings).

[404] 47 CFR §§ 1.1200 *et seq.*

*parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

121. *Comment Period and Filing Procedures.* Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. All filings must refer to WC Docket No. 21-31.

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the Commission's Electronic Comment Filing System (ECFS): https://www.fcc.gov/ecfs/.

- Filers: Parties who choose to file by paper must file an original and one copy of each filing.

  - Filings can be sent by hand or messenger delivery, by commercial courier, or by the U.S. Postal Service. **All filings must be addressed to the Secretary, Federal Communications Commission.**

  - Hand-delivered or messenger-delivered paper filings for the Commission's Secretary are accepted between 8:00 a.m. and 4:00 p.m. by the FCC's mailing contractor at 9050 Junction Drive, Annapolis Junction, MD 20701. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes and boxes must be disposed of before entering the building.

  - Commercial courier deliveries (any deliveries not by the U.S. Postal Service) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

  - Filings sent by U.S. Postal Service First-Class Mail, Priority Mail, and Priority Mail Express must be sent to 45 L Street NE, Washington, DC 20554.

122. People with Disabilities: To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (TTY).

123. Availability of Documents: Comments, reply comments, and *ex parte* submissions will be publicly available online via ECFS.[405]

124. For additional information on this proceeding, contact Molly O'Conor in the Telecommunications Access Policy Division, Wireline Competition Bureau, at Molly.OConor@fcc.gov or (202) 418-0578.

# VII. ORDERING CLAUSES

125. ACCORDINGLY, IT IS ORDERED, that pursuant to the authority contained in sections 1 through 4, 201-202, 254, 303(r), and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 201-202, 254, 303(r), and 403, this Report and Order and Further Notice of Proposed Rulemaking IS ADOPTED effective thirty (30) days after the publication of this Report and Order and Further Notice of Proposed Rulemaking in the Federal Register.

126. IT IS FURTHER ORDERED, that pursuant to the authority contained in sections 1 through 4, 201 through 202, 254, 303(r), and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 201-202, 254, 303(r), and 403, Part 54 of the Commission's rules, 47 CFR Part 54, is AMENDED as set forth in Appendix A, and such rule amendments shall be effective (30) days after the publication of this Report and Order and Further Notice of Proposed Rulemaking in the Federal Register,

---

[405] Documents will generally be available electronically in ASCII, Microsoft Word, and/or Adobe Acrobat.

except for sections 54.504(a)(1)(x)-(xii), 54.504(g), and 54.516(e)-(g), which contain information collection requirements that are not effective until approved by the Office of Management and Budget. The FCC will publish a document in the Federal Register announcing the effective date for those sections.

127.     IT IS FURTHER ORDERED that the Office of the Secretary SHALL SEND a copy of the Report and Order and Further Notice of Proposed Rulemaking, including the Final Regulatory Flexibility Analysis and Initial Regulatory Flexibility Act Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

128.     IT IS FURTHER ORDERED that the Office of the Managing Director, Performance Program Management, SHALL SEND a copy of this Report and Order in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX A**

**List of Commenters, Reply Commenters, & Ex Partes**

| Commenter | Abbreviation |
|---|---|
| A for Arizona, All4Ed, Bluum, Inc., Data Quality Campaign, DelawareCAN, EdTrust Louisiana, Education Civil Rights Now, Education Reform Now, Education Reform Now, New York, Kids First Chicago, National Urban League, Our Turn, SchoolHouse Connection, Tennesseans for Student Success, The Education Trust, UnidosUS, 2541 LLC | A for Arizona, et al. |
| ACA Connects - America's Communications Association | ACA Connections |
| Adams 12 Five Star Schools | Adams 12 |
| Adina Dunn | A. Dunn |
| American Library Association | ALA |
| American Speech-Language-Hearing Association | ASLHA |
| Anna Segur | A. Segur |
| Association of California School Administrators, California School Boards Association | ACSA-CSBA |
| Ben Weintraub, Kajeet | Kajeet |
| Billie McGraw | B. McGraw |
| Brandon Steili | B. Steili |
| Branson R. Rasko | B. Rasko |
| Bryan Davenport | B. Davenport |
| California Association of School Business Officials | CASBO |
| Carol Anne DeLuca | C.A. DeLuca |
| Cellular South Licenses, LLC | C Spire |
| Cindy Murdock Ames | C. Murdock Ames |
| Council of the Great City Schools | The Council |
| Cox Communications, Inc. | Cox |
| CTIA | CTIA |
| CTL Corporation | CTL |
| Dallas Independent School District | Dallas ISD |
| Donna Jahnke | D. Jahnke |
| Dr. Gladys Cruz | Dr. G. Cruz |
| Education & Libraries Networks Coalition | EdLiNC |
| Electronic Privacy Information Center | EPIC |
| Elizabeth Hoover de Galvez | E. Hoover de Galvez |
| Enterprise Wireless Alliance | EWA |
| E-Rate Central | E-Rate Central |
| EveryLibrary Institute NFP | EveryLibrary Institute |
| Funds For Learning, LLC | Funds For Learning |
| Harvey Chauvin | H. Chauvin |
| John Donnelly | J. Donnelly |
| Joseph Clement | J. Clement |
| Katie Gallagher | K. Gallagher |
| Kim Whitman | K. Whitman |
| Kyle McKinney | K. McKinney |
| Landon Finch, El Paso County School District 8 | L. Finch |
| Laurel-Jones County Library System, Inc. | Laurel-Jones Libraries |
| Lee Ann Wentzel | L. Wentzel |
| Leech Lake Band Of Ojibwe | LLBO |
| Lisa Cline | L. Cline |

| Commenter | Abbreviation |
|---|---|
| Los Angeles Unified School District | LAUSD |
| Lower Yukon School District | Lower Yukon |
| Maine State Library | Maine State Library |
| Maurice Draggon | M. Draggon |
| Michael Mahanay | M. Mahanay |
| Mike Jakel | M. Jakel |
| Mike Porter | M. Porter |
| Mikki Grebetz | M. Grebetz |
| Mississippi Center for Justice | MCJ |
| Nana Anokye | N. Anokye |
| National Association of Elementary School Principals | NAESP |
| NCTA - The Internet & Television Association | NCTA |
| New York State Library | NY State Library |
| North American Catholic Educational Programming Foundation, Inc., Mobile Beacon | NACEPF & Mobile Beacon |
| NTCA - The Rural Broadband Association | NTCA |
| #OaklandUndivided, Oakland Unified School District | #OaklandUndivided, OUSD |
| Ohio Internet Technology Centers | OITCs |
| Qualcomm Incorporated | Qualcomm |
| Robert Frisby | R. Frisby |
| Rutland Grade School | Rutland Grade School |
| Ryan Sheffield, Private | R. Sheffield |
| Samantha Bodine | S. Bodine |
| Schools, Health & Libraries Broadband Coalition & Open Technology Institute at New America | SHLB & OTI |
| Shelbi Morrison | S. Morrison |
| Shirley Taylor | S. Taylor |
| Smith Bagley, Inc. | SBi |
| State E-Rate Coordinators' Alliance | SECA |
| Suzanne Hall | S. Hall |
| Tekniam, LLC | Tekniam |
| Texoma Communications, LLC d/b/a TekWav | TekWav |
| T-Mobile USA, Inc. | T-Mobile |
| Utah Education and Telehealth Network | UETN |
| Verizon | Verizon |
| Vincent Bocchino, Denver Public Schools | V. Bocchino |
| Wired Broadband, Inc., Odette Wilkens, President & General Counsel, Forest Hills, NY | Wired Broadband, Inc. |
| Wisconsin Department of Public Instruction | WIDPI |
| WISPA - Broadband Without Boundaries | WISPA |

## APPENDIX B

## Final Rules

For the reasons discussed above, the Federal Communications Commission amends 47 CFR part 54 as follows:

## PART 54 – UNIVERSAL SERVICE

The authority citation for part 54 continues to read as follows:

**Authority:** 47 U.S.C. 151, 154(i), 155, 201, 205, 214, 219, 220, 229, 254, 303(r), 403, 1004, 1302, 1601-1609, and 1752, unless otherwise noted.

1.  Section 54.500 is amended by adding definitions of "Wi-Fi" and "Wi-Fi hotspot" to read as follows:

### § 54.500 Terms and Definitions

* * * * *

*Wi-Fi.* "Wi-Fi" is a wireless networking protocol based on Institute of Electrical and Electronics Engineers standard 802.11.

*Wi-Fi hotspot.* A "Wi-Fi hotspot" is a device that is capable of receiving advanced telecommunications and information services, and sharing such services with another connected device through the use of Wi-Fi.

2.  Section 54.502 is amended by redesignating paragraph (e) as (f) and adding paragraph (e) as follows:

### § 54.502 Eligible services.

* * * * *

(e) *Off-Premises Wi-Fi Hotspot Program*.  Each eligible school district, school operating independently of a school district, library system and library operating independently of a system shall be eligible for support for category one services for a maximum pre-discount budget for off-premises Wi-Fi hotspots and recurring services pursuant to the formula described in paragraphs (e)(1) through (4) and subject to the limitations described in paragraphs (e)(5) through (6) of this section.

(1) *Fixed three-year funding cycle*.  Beginning in funding year 2025, each eligible school, school district, library, or library system shall be eligible for a budgeted amount of pre-discount support for category one off-premises Wi-Fi hotspots and recurring services over a three-year funding cycle that will reset every three funding years.  Each school, school district, library, or library system shall be eligible for the total available budget less the pre-discount amount of any support received for these services in the prior funding years of that fixed three-year funding cycle.

(2) *School and school district mechanism.* Each eligible school operating independently of a school district or school district shall be eligible for up to a pre-discount price calculated by multiplying the student count by 0.2 and the category one discount rate, rounded up to the nearest ten.  This value is then multiplied by $630.  The formula will be based on the number of full-time students.

(3) *Library and library system mechanism.*  Each eligible library operating independently of a system, or library system shall be eligible for up to a pre-discount price calculated by multiplying the square footage by 0.0055 and the category one discount rate, rounded up to the nearest ten.  This value is then multiplied by $630.

(4) The available funding for Wi-Fi hotspots is capped at $90 and services at $15 per month.  An applicant may not request more than 45 percent of the Wi-Fi hotspot budget in a single funding year.  Each E-Rate-supported Wi-Fi hotspot must have an accompanying request for recurring service.

(5) At least once every 31 days, service providers shall determine whether any E-Rate-supported lines

have zero data usage in the prior 60 days and provide notice to the applicant of the particular lines within 5 business days.  If there is zero data usage for 90 days, service providers shall discontinue service to such lines.

(6) Service providers must exclude or waive early termination fees for lines of service associated with Wi-Fi hotspots that are lost, broken, or unused, including those for which service is discontinued in paragraph (e)(5).  Service providers shall not bill applicants for unused lines of service that are discontinued.

(7) The Chief, Wireline Competition Bureau, is delegated authority to adjust the limiting mechanism amounts and the Wi-Fi hotspot program cost caps, after seeking comment on a proposed adjustment.

(8) Eligible schools and libraries are permitted to request and receive support for the purchase of Wi-Fi hotspots and services for off-premises use by:

> (i) In the case of a school, students and school staff; and

> (ii) In the case of a library, patrons of the library.

(9) Support for eligible Wi-Fi hotspots and services used off-premises is limited to not more than one Wi-Fi hotspot per student, school staff member, or library patron.

(f) ***Eligible services list process.*** The Administrator shall submit by March 30 of each year a draft list of services eligible for support, based on the Commission's rules for the following funding year. The Wireline Competition Bureau will issue a Public Notice seeking comment on the Administrator's proposed eligible services list. The final list of services eligible for support will be released at least 60 days prior to the opening of the application filing window for the following funding year.

3.  Section 54.504 is amended by adding paragraphs (a)(1)(x) through (xii), and (g) to read as follows:

### § 54.504 Requests for services.

(a) * * *

> (1) * * *

> > (x) The school, library, or consortium is not seeking support and reimbursement for eligible equipment and/or services that have been purchased and reimbursed with other federal, state, Tribal, or local funding.

> > (xi) The school, library, or consortium will create and maintain an asset and service inventory as required by § 54.516(e).

> > (xii) The school, library, or consortium will not use Wi-Fi hotspots or service as part of a one to one Wi-Fi hotspot initiative, nor will the Wi-Fi hotspots be purchased for future use, emergency use, or use in the case of theft, loss, or breakage.

* * * * *

(g) *Off-Premises Wi-Fi Hotspot Certification on the FCC Form 486.*  An eligible school, library, or consortium that includes an eligible school or library receiving support for Wi-Fi hotspots and service for use off-premises must certify on FCC Form 486 that the school, library, or consortium has updated and publicly posted their acceptable use policy consistent with the requirements set forth in § 54.516(f); the Wi-Fi hotspots and/or services the school, library, or consortium purchased using E-Rate support for off-premises use have been activated and made available to students, school staff, and/or library patrons; public notice of their availability has been provided; and the authorized person is not requesting reimbursement for Wi-Fi hotspots and/or services that have not been made available for distribution.

4.  Section 54.506 is added to read as follows:

### § 54.506 Duplicate support.

Entities participating in the E-Rate program may not seek E-Rate support or reimbursement for eligible

equipment and services that have been purchased and reimbursed with other Federal, state, Tribal, or local funding.

5.   Section 54.507 is amended by revising paragraph (f)(4) and adding paragraph (f)(5) to read as follows:

**§ 54.507 Cap.**

* * * * *

(f) * * *

(4) In the event that demand exceeds available funding, requests for category one services used off-premises shall be funded after on-premises category one and category two services.

(5) For paragraphs (f)(1)-(4) of this section, if the remaining funds are not sufficient to support all of the funding requests within a particular discount level, the Administrator shall allocate funds at that discount level using the percentage of students eligible for the National School Lunch Program. Thus, if there is not enough support to fund all requests at the 40 percent discount level, the Administrator shall allocate funds beginning with those applicants with the highest percentage of NSLP eligibility for that discount level by funding those applicants with 19 percent NSLP eligibility, then 18 percent NSLP eligibility, and shall continue committing funds in the same manner to applicants at each descending percentage of NSLP until there are no funds remaining.

6.   Section 54.513 is amended by revising paragraph (b) to read as follows:

**§ 54.513 Resale and transfer of services.**

* * * * *

(b) *Disposal of obsolete equipment components of eligible services.* Eligible equipment components of eligible services purchased at a discount under this subpart shall be considered obsolete if the equipment components have been installed for at least five years, except that Wi-Fi hotspots for off-premises use shall be considered obsolete after three years. Obsolete equipment components of eligible services may be resold or transferred in consideration of money or any other thing of value, disposed of, donated, or traded.

* * * * *

7.   Section 54.516 is amended by revising paragraphs (a)(1) and (b), and adding paragraphs (e), (f), and (g) to read as follows:

**§ 54.516 Auditing and inspections.**

(a) *Recordkeeping requirements* —

(1) *Schools, libraries, and consortia.* Schools, libraries, and any consortium that includes schools or libraries shall retain all documents related to the application for, receipt, and delivery of supported services for at least 10 years after the latter of the last day of the applicable funding year or the service delivery deadline for the funding request. Any other document that demonstrates compliance with the statutory or regulatory requirements for the schools and libraries mechanism shall be retained as well. Subject to paragraph (e) of this subsection, schools, libraries, and consortia shall maintain asset and inventory records for a period of 10 years after purchase.

* * * * *

(b) *Production of records.* Schools, libraries, consortia, and service providers shall produce such records at the request of any representative (including any auditor) appointed by a state education department, the Administrator, the FCC, or any local, state or federal agency with jurisdiction over the entity. Where necessary for compliance with Federal or state privacy laws, E-Rate participants may produce records regarding students, school staff, and library patrons in an anonymized or deidentified format.  When requested by the Administrator or the Commission, as part of an audit or investigation, schools, libraries,

and consortia must seek consent to provide personally identifiable information from a student who has reach age of majority, the relevant parent/guardian of a minor student, or the school staff member or library patron prior to disclosure.

* * * * *

(e) *Asset and service inventory requirements.*

(1) *Schools*.  Schools, school districts, and consortia including any of these entities, shall keep asset and service inventories as follows:

(i) For equipment purchased as components of supported category two services, the asset inventory must be sufficient to verify the actual location of such equipment.

(ii) For equipment needed to make wireless service for school buses functional, the asset inventory must be sufficient to verify the actual location of such equipment.

(iii) For each Wi-Fi hotspot provided to an individual student or school staff member, the asset and service inventory must identify: 1) the equipment make/model; 2) the equipment serial number; 3) the full name of the person to whom the equipment was provided; 4) the dates the equipment was loaned out and returned, or the date the school was notified that the equipment was missing, lost, or damaged; and 5) the service detail.

(2) *Libraries*.  Libraries, library systems, and consortia including any of these entities, shall keep asset and service inventories as follows:

(i) For equipment purchased as components of supported category two services, the asset inventory must be sufficient to verify the actual location of such equipment.

(ii) For each Wi-Fi hotspot provided to an individual library patron, the asset and service inventory must identify: 1) the equipment make/model; 2) the equipment serial number; 3) the dates the equipment was loaned out and returned, or the date the library was notified that the equipment was missing, lost, or damaged; and 4) the service detail.

(f) *Acceptable Use Policies*.  Schools, school districts, libraries, library systems, and consortia including any of these entities that receive support for the off-premises use of Wi-Fi hotspots and/or services, shall maintain, provide notice, and, where necessary, update an acceptable use policy that clearly states that the off-premises use of the Wi-Fi hotspot and/or service is primarily for educational purposes as defined in § 54.500 and that the Wi-Fi hotspot and/or service is for use by students, school staff members, and/or library patrons who need it.

(g) *Data Usage Reports*.  Service providers shall provide reports regarding Wi-Fi hotspot data usage for off-premises use to applicants, and applicants shall make such reports available to any representative (including any auditor) appointed by a state education department, the Administrator, the FCC, or any local, state, or federal agency with jurisdiction over the entity upon request.  Data usage reports must be in machine-readable digital format so that information lines can be read and sorted, clearly identifying the lines that are not being used across billing periods and the lines that have been terminated pursuant to paragraph 54.502(e)(5).

8.  Section 54.520 is amended by revising paragraphs (c)(1)(iii)(C), (c)(2)(iii)(C), and (c)(3)(i)(C) to read as follows:

**§ 54.520 Children's Internet Protection Act certifications required from recipients of discounts under the federal universal service support mechanism for schools and libraries.**

* * * * *

(c) * * *

(1) * * *

(iii) * * *

(C) The Children's Internet Protection Act, as codified at 47 U.S.C. 254(h) and (l), does not apply because the recipient(s) of service represented in the Funding Request Number(s) on this Form 486 is (are) receiving discount services only for telecommunications services, or is (are) receiving support under the Federal universal service support mechanism for schools and libraries for Internet access or internal connections that will not be used in conjunction with a computer owned by the recipient(s).

(2) * * *

   (iii) * * *

(C) The Children's Internet Protection Act, as codified at 47 U.S.C. 254(h) and (l), does not apply because the recipient(s) of service represented in the Funding Request Number(s) on this Form 486 is (are) receiving discount services only for telecommunications services, or is (are) receiving support under the Federal universal service support mechanism for schools and libraries for Internet access or internal connections that will not be used in conjunction with a computer owned by the recipient(s).

(3) * * *

   (i) * * *

(C) The Children's Internet Protection Act, as codified at 47 U.S.C. 254(h) and (l), does not apply because the recipient(s) of service under my administrative authority and represented in the Funding Request Number(s) for which you have requested or received Funding Commitments is (are) receiving discount services only for telecommunications services; and, or is (are) receiving support under the Federal universal service support mechanism for schools and libraries for Internet access or internal connections that will not be used in conjunction with a computer owned by the recipient(s); and

**APPENDIX C**

**Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Addressing the Homework Gap through the E-Rate Program Notice of Proposed Rulemaking* ("*NPRM*"), released in November of 2023.[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  No comments were filed addressing the IRFA.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

**A.        Need for, and Objectives of, the Order**

2.        The Commission is required by section 254 of the Communications Act of 1934, as amended, to promulgate rules to implement the universal service provisions of section 254.[4]  Under the schools and libraries universal service support mechanism, also known as the E-Rate program, eligible schools, libraries, and consortia that include eligible schools and libraries may receive discounts for eligible telecommunications services, Internet access, and internal connections.[5]  The Commission's E-Rate program provides support to schools and libraries allowing them to obtain affordable, high-speed broadband services and internal connections, which enables them to connect students and library patrons to critical next-generation learning opportunities and services.  The E-Rate program thus plays an important role in closing the digital divide, a top priority for the Commission.

3.        In the *Report and Order*, we address the remote learning needs of today's students, school staff, and library patrons and help close the country's digital/educational divide by making the off-premises use of Wi-Fi hotspots and services by students, school staff, and library patrons eligible for E-Rate support.  The Emergency Connectivity Fund (ECF) program highlighted the demand and need for off-premises use of Wi-Fi hotspots and services for educational success.  As mentioned in the *NPRM*, "[b]roadband access is proven to improve individuals' educational outcomes, while lack of access has been shown to severely hamper educational opportunities."[6]  Allowing E-Rate support for the off-premises use of Wi-Fi hotspots and services is an important step to ensure student and library patrons can take advantage of all available educational opportunities, and to help close the "homework gap", especially as the ECF program is winding down and support under the Affordable Connectivity Program (ACP) ended as of June 1, 2024.

4.        In the *Report and Order*, we find that the off-premises use of Wi-Fi hotspots and services constitutes an educational purpose and enhances access to advanced telecommunications and information services for schools and libraries.  Applicants will have a calculated budget, limiting the amount of E-Rate support available for Wi-Fi hotspots and services based on applicant size and E-Rate discount rate. This will help schools and libraries create a hotspots lending program, lending Wi-Fi hotspots and services to students or patrons who most need remote access to meet their educational goals.  Further, to balance our goal of reducing the digital divide with the responsibility of being a prudent steward of the universal service funds, we adopt funding caps of $15 month for service and $90 for a Wi-Fi hotspot (for 3 years) to keep the costs low, limit the impact on the fund, and to encourage support to only those that

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601–612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Addressing the Homework Gap through the E-Rate Program*, WC Docket No, 21-31, Notice of Proposed Rulemaking, FCC 23-91, 2023 WL 8602208 at *30-40, Appendix B (Nov. 8, 2023) (*NPRM*).

[3] 5 U.S.C. § 604.

[4] *See generally* 47 U.S.C. § 254.

[5] 47 CFR § 54.502.

[6] *NPRM,* 2023 WL 8602208 at *7, para. 17.

need the devices and services the most. The budget mechanism and funding caps, along with other safeguards (e.g. certifications, competitive bidding, prohibition against duplicative funding, audits, recordkeeping, usage requirements, etc.) will protect program integrity and prevent potential waste, fraud, and abuse. Additionally, we will ensure that off-premises funding for Wi-Fi on school buses and for Wi-Fi hotspots and wireless Internet service does not deter on-premises funding by prioritizing on-campus funding before these off-premises funding requests. Overall, the measures taken in the *Report and Order*, help ensure that off-premises educational opportunities are available to students, school staff, and library patrons with the most need, while also protecting E-Rate's critical funds.

> **B.** **Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

5.     There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

> **C.** **Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

6.     Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[7] The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

> **D.** **Description and Estimate of the Number of Small Entities to Which the Rules Will Apply**

7.     The RFA directs agencies to provide a description of, and, where feasible, an estimate of, the number of small entities that may be affected by the rules, adopted herein.[8] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[9] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[10] A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[11]

8.     *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[12] First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[13] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million

---

[7] 5 U.S.C. § 604(a)(3).

[8] 5 U.S.C. § 604(a)(4).

[9] *Id.* § 601(6).

[10] *Id.* § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)). Pursuant to the RFA, the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[11] 15 U.S.C. § 632.

[12] *See* 5 U.S.C. § 601(3)-(6).

[13] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf. (Mar. 2023)

businesses.[14]

9.      Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[15]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[16]  Nationwide, for tax year 2022, there were approximately 530,109 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[17]

10.      Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[18]  U.S. Census Bureau data from the 2022 Census of Governments[19] indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[20]  Of this number, there were 36,845 general purpose governments (county,[21] municipal, and town or township[22]) with populations of less than 50,000 and 11,879 special purpose governments—independent school districts[23] with enrollment

---

[14] *Id.*

[15] *See* 5 U.S.C. § 601(4).

[16] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[17] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2022 with revenue less than or equal to $50,000 for Region 1-Northeast Area (71,897), Region 2-Mid-Atlantic and Great Lakes Areas (197,296), and Region 3-Gulf Coast and Pacific Coast Areas (260,447) that includes the continental U.S., Alaska, and Hawaii.  This data does not include information for Puerto Rico (469).

[18] *See* 5 U.S.C. § 601(5).

[19] *See* 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, , https://www.census.gov/programs-surveys/economic-census/year/2022/about.html.

[20] *See* U.S. Census Bureau, 2022 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2022 [CG1700ORG02], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG2200ORG02 Table Notes_Local Governments by Type and State_2022.

[21] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2022 [CG2200ORG05], https://www.census.gov/data/tables/2022/econ/gus/2017-governments.html.  There were 2,097 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[22] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2022 [CG2200ORG06], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 18,693 municipal and 16,055 town and township governments with populations less than 50,000.

[23] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2022 [CG2200ORG10], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 11,879

(continued….)

populations of less than 50,000.[24]  Accordingly, based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 entities fall into the category of "small governmental jurisdictions."[25]

### 1. Schools and Libraries

11.    *Schools.*  The closest applicable industry with a SBA small business size standard is Elementary and Secondary Schools.[26]  This industry comprises establishments primarily engaged in furnishing academic courses and associated course work that comprise a basic preparatory education.[27]  A basic preparatory education ordinarily constitutes kindergarten through 12th grade.[28]  The SBA small business size standard for Elementary and Secondary Schools classifies firms with annual receipts of $17.5 million or less as small.[29]  The Commission does not have a size standard for small entities specifically applicable to schools.  The Commission's definition of schools pertains to entities that participate in the E-Rate program which provides support to eligible schools and libraries to enable access to high-speed Internet access and telecommunications services at affordable rates, consistent with the objectives of universal service.

12.    Under the E-Rate program, an elementary school is generally defined as "a non-profit institutional day or residential school that provides elementary education, as determined under state law."[30]  A secondary school is generally defined as "a non-profit institutional day or residential school that provides secondary education, as determined under state law," and not offering education beyond grade 12.[31]  For-profit schools, and schools with endowments in excess of $50,000,000, are not eligible to receive discounts under the E-Rate program.[32]  In calendar year 2017, the E-Rate program provided funding to approximately 104,722 schools throughout the U.S. and its territories.[33]  While we do not have financial information that would allow us to estimate the number of schools that would qualify as small entities under SBA's small business size standard, because of the nature of these entities we estimate that the majority of schools in the E-Rate program are small entities under the SBA size standard.

13.    *Libraries.*  The closest applicable industry with a SBA small business size standard is

---

independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2022 [CG2200ORG04], CG2200ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2022.

[24] While the special purpose governments category also includes local special district governments, the 2022 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[25] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,845) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (11,879), from the 2022 Census of Governments - Organizations tbls.5, 6 & 10.

[26] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*611110 Elementary and Secondary Schools,*" https://www.census.gov/naics/?input=611110&year=2017&details=611110.

[27] *Id.*

[28] *Id.*

[29] *See* 13 CFR § 121.201, NAICS Code 611110.

[30] 47 CFR § 54.500.

[31] *Id.*

[32] 47 CFR § 54.501.

[33] *See* Universal Service Administrative Company, Annual Report, at 7, https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2017/USAC-2017-Annual-Report.pdf.

Libraries and Archives.[34]  This industry comprises establishments primarily engaged in providing library or archive services.[35]  These establishments are engaged in maintaining collections of documents (e.g., books, journals, newspapers, and music) and facilitating the use of such documents (recorded information regardless of its physical form and characteristics) as required to meet the informational, research, educational, or recreational needs of their users.[36]  These establishments may also acquire, research, store, preserve, and generally make accessible to the public historical documents, photographs, maps, audio material, audiovisual material, and other archival material of historical interest.[37]  All or portions of these collections may be accessible electronically.[38]  The SBA small business size standard for Libraries and Archives classifies firms with annual receipts of $18.5 million or less as small.[39]  For this industry, U.S. Census Bureau data for 2017 show that there were 1,864 firms that operated for the entire year.[40]  Of this number, 1,228 firms had revenues of less than $10 million.[41]  Based on this data, the majority of firms in this industry can be considered small.

14.     The Commission does not have a size standard for small entities specifically applicable to libraries.  The Commission's definition of libraries pertains to entities that participate in the E-Rate program which provides support to eligible schools and libraries to enable access to high-speed Internet access and telecommunications services at affordable rates, consistent with the objectives of universal service.  Under the E-Rate program, a library includes "(1) a public library, (2) a public elementary school or secondary school library, (3) a Tribal library, (4) an academic library, (5) a research library [] and (6) a private library, but only if the state in which such private library is located determines that the library should be considered a library for the purposes of this definition."[42]  For-profit libraries are not eligible to receive discounts under the program, nor are libraries whose budgets are not completely separate from any schools.[43]  In calendar year 2017, the E-Rate program provided funding to approximately 11,475 libraries throughout the U.S. and its territories.[44]  While we do not have financial information which would allow us to estimate the number of libraries that would qualify as small entities under SBA's small business size standard, because of the nature of these entities we estimate that the majority of libraries in

---

[34] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*519120 Libraries and Archives,"* https://www.census.gov/naics/?input=519120&year=2017&details=519120.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *See* 13 CFR § 121.201, NAICS Code 519120 (as of 10/1/22 NAICS Code 519210).

[40] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 519120, https://data.census.gov/cedsci/table?y=2017&n=519120&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[41] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/*revenue* in the individual category for less than $100,000, to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in this category).  Therefore, the number of firms with revenue that meet the SBA size standard would be higher than noted herein.  We also note that the U.S. Census Bureau economic data includes sales, value of shipments or revenue information reported by firms.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[42] 47 CFR § 54.500.

[43] 47 CFR § 54.501.

[44] *See* Universal Service Administrative Company, Annual Report, at 7,  https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2017/USAC-2017-Annual-Report.pdf.

the E-Rate program are small entities under the SBA size standard.

## 2. Telecommunications Service Providers

15.    *Wired Telecommunications Carriers.*  The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[45]  Transmission facilities may be based on a single technology or a combination of technologies.  Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband Internet services.[46]  By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[47]  Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[48]

16.    The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[49]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[50]  Of this number, 2,964 firms operated with fewer than 250 employees.[51]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services.[52]  Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[53]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

17.    *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[54]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from,

---

[45] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[46] *Id.*

[47] *Id.*

[48] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers.  Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers is not included in this industry.

[49] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[50] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[51] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[52] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf. https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[53] *Id.*

[54] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

satellite systems.[55]  Providers of Internet services (e.g. dial-up ISPs) or VoIP services, via client-supplied telecommunications connections are also included in this industry.[56]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[57]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[58]  Of those firms, 1,039 had revenue of less than $25 million.[59]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

18.    *Wireless Telecommunications Carriers (except Satellite)*.  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[60]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless Internet access, and wireless video services.[61]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[62]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[63]  Of that number, 2,837 firms employed fewer than 250 employees.[64]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[65]  Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[66]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

19.    *Wireless Telephony*.  Wireless telephony includes cellular, personal communications services, and specialized mobile radio telephony carriers.  The closest applicable industry with an SBA small business size standard is Wireless Telecommunications Carriers (except Satellite).[67]  The size

---

[55] *Id.*

[56] *Id.*

[57] 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[58] U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[59] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[60] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[61] *Id.*

[62] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[63] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[64] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[65] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[66] *Id.*

[67] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"*  https://www.census.gov/naics/?input=517312&year=2017&details=517312.

standard for this industry under SBA rules is that a business is small if it has 1,500 or fewer employees.[68] For this industry, U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated for the entire year.[69] Of this number, 2,837 firms employed fewer than 250 employees.[70] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 331 providers that reported they were engaged in the provision of cellular, personal communications services, and specialized mobile radio services.[71] Of these providers, the Commission estimates that 255 providers have 1,500 or fewer employees.[72] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

### 3. Internet Service Providers (ISPs)

20.    *Wired Broadband Internet Access Service Providers (Wired ISPs)*.[73] Providers of wired broadband Internet access service include various types of providers except dial-up Internet access providers. Wireline service that terminates at an end user location or mobile device and enables the end user to receive information from and/or send information to the Internet at information transfer rates exceeding 200 kilobits per second (kbps) in at least one direction is classified as a broadband connection under the Commission's rules.[74] Wired broadband Internet services fall in the Wired Telecommunications Carriers industry.[75] The SBA small business size standard for this industry classifies firms having 1,500 or fewer employees as small.[76] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[77] Of this number, 2,964 firms operated with fewer than 250 employees.[78]

21.    Additionally, according to Commission data on Internet access services as of June 30, 2019, nationwide there were approximately 2,747 providers of connections over 200 kbps in at least one direction using various wireline technologies.[79] The Commission does not collect data on the number of

---

[68] 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[69] U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[70] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[71] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[72] *Id.*

[73] Formerly included in the scope of the Internet Service Providers (Broadband), Wired Telecommunications Carriers and All Other Telecommunications small entity industry descriptions.

[74] *See* 47 CFR § 1.7001(a)(1).

[75] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[76] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[77] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[78] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[79] *See* Federal Communications Commission, Internet Access Services: Status as of June 30, 2019 at 27, Fig. 30 *(IAS Status 2019)*, Industry Analysis Division, Office of Economics & Analytics (March 2022). The report can be

(continued….)

employees for providers of these services, therefore, at this time we are not able to estimate the number of providers that would qualify as small under the SBA's small business size standard.  However, in light of the general data on fixed technology service providers in the Commission's *2022 Communications Marketplace Report*,[80] we believe that the majority of wireline Internet access service providers can be considered small entities.

22.     *Wireless Broadband Internet Access Service Providers (Wireless ISPs or WISPs)*.[81] Providers of wireless broadband Internet access service include fixed and mobile wireless providers.  The Commission defines a WISP as "[a] company that provides end-users with wireless access to the Internet[.]"[82]  Wireless service that terminates at an end user location or mobile device and enables the end user to receive information from and/or send information to the Internet at information transfer rates exceeding 200 kilobits per second (kbps) in at least one direction is classified as a broadband connection under the Commission's rules.[83]  Neither the SBA nor the Commission have developed a size standard specifically applicable to Wireless Broadband Internet Access Service Providers.  The closest applicable industry with an SBA small business size standard is Wireless Telecommunications Carriers (except Satellite).[84]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[85]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[86]  Of that number, 2,837 firms employed fewer than 250 employees.[87]

23.     Additionally, according to Commission data on Internet access services as of June 30, 2019, nationwide there were approximately 1,237 fixed wireless and 70 mobile wireless providers of connections over 200 kbps in at least one direction.[88]  The Commission does not collect data on the number of employees for providers of these services, therefore, at this time we are not able to estimate the number of providers that would qualify as small under the SBA's small business size standard.  However, based on data in the Commission's *2022 Communications Marketplace Report* on the small number of large mobile wireless nationwide and regional facilities-based providers, the dozens of small regional

---

accessed at https://www.fcc.gov/economics-analytics/industry-analysis-division/iad-data-statistical-reports.  The technologies used by providers include aDSL, sDSL, Other Wireline, Cable Modem and FTTP). Other wireline includes: all copper-wire based technologies other than xDSL (such as Ethernet over copper, T-1/DS-1 and T3/DS-1) as well as power line technologies which are included in this category to maintain the confidentiality of the providers.

[80] *See Communications Marketplace Report*, GN Docket No. 22-203, 2022 WL 18110553 at 10, paras. 26-27, Figs. II.A.5-7. (2022) (*2022 Communications Marketplace Report*).

[81] Formerly included in the scope of the Internet Service Providers (Broadband), Wireless Telecommunications Carriers (except Satellite) and All Other Telecommunications small entity industry descriptions.

[82] Federal Communications Commission, Internet Access Services: Status as of June 30, 2019 at 27, Fig. 30 (*IAS Status  2019*), Industry Analysis Division, Office of Economics & Analytics (March 2022).  The report can be accessed at https://www.fcc.gov/economics-analytics/industry-analysis-division/iad-data-statistical-reports.

[83] *See* 47 CFR § 1.7001(a)(1).

[84] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite)," * https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[85] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[86] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[87] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[88] *See IAS Status 2018,* Fig. 30.

facilities-based providers and the number of wireless mobile virtual network providers in general,[89] as well as on terrestrial fixed wireless broadband providers in general,[90] we believe that the majority of wireless Internet access service providers can be considered small entities.

24.     *Internet Service Providers (Non-Broadband)*.  Internet access service providers using client-supplied telecommunications connections (e.g., dial-up ISPs) as well as VoIP service providers using client-supplied telecommunications connections fall in the industry classification of All Other Telecommunications.[91]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[92]  For this industry, U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[93]  Of those firms, 1,039 had revenue of less than $25 million.[94]  Consequently, under the SBA size standard a majority of firms in this industry can be considered small.

### 4.     Vendors of Internal Connections

25.     *Vendors of Infrastructure Development or Network Buildout*.  The Commission nor the SBA have developed a small business size standard specifically directed toward manufacturers of network facilities.  There are two applicable industries in which manufacturers of network facilities could fall and each have different SBA business size standards.  The applicable industries are "Radio and Television Broadcasting and Wireless Communications Equipment"[95]  with a SBA small business size standard of 1,250 employees or less,[96] and "Other Communications Equipment Manufacturing"[97] with a SBA small business size standard of 750 employees or less."[98]  U.S. Census Bureau data for 2017 show that for Radio and Television Broadcasting and Wireless Communications Equipment there were 656 firms in this industry that operated for the entire year.[99]  Of this number, 624 firms had fewer than 250

---

[89] *See Communications Marketplace Report*, GN Docket No. 22-203, 2022 WL 18110553 at 27, paras. 64-68. (2022) (*2022 Communications Marketplace Report*).

[90] *Id.* at 8, para. 22.

[91] *See* U.S. Census Bureau, *2017 NAICS Definition, "517919 All Other Telecommunications,"* https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[92] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[93] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[94] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[95] *See* U.S. Census Bureau, *2017 NAICS Definition, "334220 Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing,"* https://www.census.gov/naics/?input=334220&year=2017&details=334220.

[96] 13 CFR § 121.201, NAICS Code 334220.

[97] *See* U.S. Census Bureau, *2017 NAICS Definition, "334290 Other Communications Equipment Manufacturing,"* https://www.census.gov/naics/?input=334290&year=2017&details=334290.

[98] 13 CFR § 121.201, NAICS Code 334290.

[99] U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334220, https://data.census.gov/cedsci/table?y=2017&n=334220&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

employees.[100]  For Other Communications Equipment Manufacturing, U.S. Census Bureau data for 2017 show that there were 321 firms in this industry that operated for the entire year.[101]  Of that number, 310 firms operated with fewer than 250 employees.[102]  Based on this data, we conclude that the majority of firms in this industry are small.

26. *Telephone Apparatus Manufacturing*.  This industry comprises establishments primarily engaged in manufacturing wire telephone and data communications equipment.[103]  These products may be stand-alone or board-level components of a larger system.  Examples of products made by these establishments are central office switching equipment, cordless and wire telephones (except cellular), PBX equipment, telephone answering machines, LAN modems, multi-user modems, and other data communications equipment, such as bridges, routers, and gateways.[104]  The SBA small business size standard for Telephone Apparatus Manufacturing classifies businesses having 1,250 or fewer employees as small.[105]  U.S. Census Bureau data for 2017 show that there were 189 firms in this industry that operated for the entire year.[106]  Of this number, 177 firms operated with fewer than 250 employees.[107]  Thus, under the SBA size standard, the majority of firms in this industry can be considered small.

27. *Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing*.  This industry comprises establishments primarily engaged in manufacturing radio and television broadcast and wireless communications equipment.[108]  Examples of products made by these establishments are: transmitting and receiving antennas, cable television equipment, GPS equipment, pagers, cellular phones, mobile communications equipment, and radio and television studio and broadcasting equipment.[109]  The SBA small business size standard for this industry classifies businesses having 1,250 employees or less as small.[110]  U.S. Census Bureau data for 2017 show that there were 656

---

[100] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[101] U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334290, https://data.census.gov/cedsci/table?y=2017&n=334290&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[102] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[103] *See* U.S. Census Bureau, *2017 NAICS Definition, "334210 Telephone Apparatus Manufacturing,"* https://www.census.gov/naics/?input=334210&year=2017&details=334210.

[104] *Id.*

[105] *See* 13 CFR § 121.201, NAICS Code 334210.

[106] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334210, https://data.census.gov/cedsci/table?y=2017&n=334210&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[107] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[108] *See* U.S. Census Bureau, *2017 NAICS Definition, "334220 Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing,"* https://www.census.gov/naics/?input=334220&year=2017&details=334220.

[109] *Id.*

[110] *See* 13 CFR § 121.201, NAICS Code 334220.

firms in this industry that operated for the entire year.[111]  Of this number, 624 firms had fewer than 250 employees.[112]  Thus, under the SBA size standard, the majority of firms in this industry can be considered small.

### E.    Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

28.    In the *Report and Order*, we apply existing or modified E-Rate or ECF recordkeeping requirements for the off-premises use of Wi-Fi hotspots and services.  We limit the use of services to those that can be supported by and delivered with Wi-Fi hotspots provided to an individual user.  Schools and libraries must adopt and provide notice of an acceptable use policy (AUP) highlighting that the goal of the hotspot lending program is to provide broadband access to students and library patrons who need it and for educational purposes.  When E-Rate-funded hotspots are used in conjunction with hotspots funded via other sources, applicants must document clearly (e.g., individual survey results or attestations) that each individual student needed a Wi-Fi hotspot, in accordance with the AUPs, and may not rely on general or estimated findings about income levels.  Applicants will have a calculated budget, limiting the amount of E-Rate support available for off-premises Wi-Fi hotspots and services based on their full-time student count or library square footage, and their category one discount rate.

29.    Additionally, we require applicants to certify on their FCC Form 486 that they have taken reasonable steps to ensure proper use, to prevent warehousing, and to manage non-usage of devices.  This will not be overly burdensome, because applicants already use FCC Form 486 to notify USAC that services have started on a particular funding request.  Considering the limited funding available, applicants may not request funding for hotspot devices for future use or to be stored in case of an emergency, and we will not allow applicants to purchase extra devices to store in case of theft, loss, or breakage.  We find that this would be wasteful in this first year of expanding the program.  Each device must be associated with a line of service, and applicants may not request more than 45 percent of the three-year hotspot budget in a single funding year.

30.    At least once every 31 days, service providers are required to identify lines of hotspot service that have gone unused for 60 consecutive days and to provide applicants 30 days to use the hotspot before the line of service is terminated.  Additionally, service providers must provide data usage reports to applicants at least once per billing period.  The reports need to clearly identify the lines that are not being used across billing periods or that will be or have been terminated as a result of non-usage._The usage reports should not be overly burdensome because service providers regularly make such reports available to applicants.  Applicants are also required to make these usage reports available to the Commission and/or USAC upon request, including to support program integrity reviews.  Service providers are required to certify on their FCC Form 473 (Service Provider Annual Certification (SPAC) Form) that they will comply with this non-usage notice and termination requirement and will not charge the balance for terminated services.

31.    Schools are required to maintain a similar, but modified asset and service inventory requirements to the ECF's program's asset and service inventory requirements, which details equipment and service inventories for each device or service purchased with E-Rate support and provided to an individual student or school staff member.  The school's asset inventory must identify:  1) the equipment make/model; 2) the equipment serial number; 3) the full name of the person to whom the equipment was provided; 4) the dates the equipment was loaned out and returned, or the date the school was notified that the equipment was missing, lost, or damaged and 5) service detail.  By "service detail," we mean the line

---

[111] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334220, https://data.census.gov/cedsci/table?y=2017&n=334220&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[112] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

number or other identifier that associates a device to that particular line of service.

32.     Taking into consideration the state's library patron privacy laws that some libraries must adhere to and existing library circulation systems and practices, the *Report and Order*, adopts a limited asset and service inventory requirement for libraries.  The limited asset and service inventory provides libraries more flexibility in accounting and tracking Wi-Fi hotspots and services funded with E-Rate support.  For library participants receiving support for Wi-Fi hotspots and services, the asset and service inventory must identify: 1) the equipment make/model; 2) the equipment serial number; 3) the dates the equipment was loaned out and returned, or the date the library was notified that the equipment was missing, lost, or damaged; and 4) service detail.  The asset inventories of schools and libraries will help us verify that there is no warehousing of hotspots, and confirm that hotspots are being used as intended.

33.     Consistent with the E-Rate program's current recordkeeping rule, program participants will be required to retain documentation related to their participation in the E-Rate program, including the asset and service inventories, acceptable use policies, and data usage reports for at least ten years after the latter of the last day of the applicable funding year or the service delivery deadline for the funding request.[113] Commenters are concerned about adopting new recordkeeping requirements, but there is support for maintaining the E-Rate program's existing recordkeeping requirements,[114] due to applicants familiarity with the requirements.  The recordkeeping adopted in this *Report and Order*, would be similar to what most applicants, including small entities, are already familiar with and currently undertake for the E-Rate and ECF programs.  As such, we anticipate that the costs for compliance created by the decisions in the *Report and Order* will be minimal.  The recordkeeping requirements also help protect E-Rate funds from potential waste, fraud and abuse.

### F.     Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

34.     The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[115]

35.     In the *Report and Order*, the Commission minimizes the economic impact on small entities by making the off-premises use of Wi-Fi hotspots and services eligible for E-Rate funding to support remote learning for students, school staff, and library patrons.  The availability of E-Rate funding for Wi-Fi hotspots and services gives applicants, including small entities, the opportunity to administer hotspot lending programs and provide students, school staff, and library patrons the off-premise broadband connectivity needed for educational success.  The steps taken in this *Report and Order* are especially important now that the ECF program is winding down and applicants will no longer have ECF funding available to meet the remote learning needs of their students, school staff, or library patrons and as of June 1, 2024, ACP support is no longer available for many households as well.

36.     We considered the benefits of multi-functional devices, including smartphones, tablets, and laptops with built-in wireless connections, but decline to include them at this time because we do not have sufficient information to justify this use and we found them to be more expensive than sole-function Wi-fi hotspots.  Further, equipment such as laptops and tablets remain ineligible for E-Rate support.  We recognize that off-premises connectivity provided via Wi-Fi hotspots is not a one-size-fits-all solution, however the actions in the *Report and Order* are a step in creating an economically reasonable method of

---

[113] *See* 47 CFR § 54.516(a).

[114] EveryLibrary Institute Comments at 10; ALA Comments at 6-7 (urging the FCC to leverage current E-Rate procedures to minimize applicant burden).

[115] 5 U.S.C. § 604(a)(6).

meeting our statutory obligations.

37.     The *NPRM* asked whether applicants should be required to determine and maintain records of students', school staff members', or library patrons' unmet need by, for example, conducting surveys.  Commenters were not in favor of recordkeeping for unmet need.[116]  Commenters mentioned that schools and libraries are in the best position to know which students and patrons need the hotspots and services most, and therefore, the Commission should not impose recordkeeping requirements for unmet needs, but should allow schools and libraries to determine who to lend the devices and services to.[117]  In consideration of the comments, and finding that a budget mechanism approach for a lending program reduces the need to implement any unmet needs requirements, the *Report and Order* does not impose recordkeeping requirements for unmet needs.  Applicants, including small entities, will be able to determine their unmet need and not be burdened by unmet need documentation.

38.     Further, to minimize significant economic impact on applicants, service providers are not allow to bill applicants for the balance that was not paid for by the E-Rate program for terminated lines of service from the non-usage requirements adopted in the *Report and Order*.

39.     Finally, any burdens for applicants presented in the *Report and Order* are outweighed by the benefits to applicants.  With funding from the E-Rate program applicants will now have the opportunity to offer off-campus access to broadband to help meet the educational necessities of students, staff, and library patrons.

### G.     Report to Congress

40.     The Commission will send a copy of the *Report and Order*, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[118]  In addition, the Commission will send a copy of the *Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  A copy of the *Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[119]

---

[116] Dallas ISD Comments at 4; EveryLibrary Institute Comments at 5-6; WIDPI Comments at 2 (noting that very few schools and libraries have the time or resources to conduct a survey).

[117] NACEPF & Mobile Beacon Comments at 18; OITCs Comments at 3-4; SECA Comments at 6-7; EdLiNC Comments at 12-13 (schools should annually collect connectivity data for students, but it should not be required by the Commission).

[118] 5 U.S.C. § 801(a)(1)(A).

[119] 5 U.S.C. § 604(b).

**APPENDIX D**

**Initial Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Federal Communications Commission (Commission) has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies and rules proposed in the *Addressing the Homework Gap through the E-Rate Program Further Notice of Proposed Rulemaking* (*FNPRM*).  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments in the *FNPRM*.  The Commission will send a copy of the *FNPRM*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the *FNPRM* and IRFA (or summaries thereof) will be published in the *Federal Register*.[3]

A.        **Need for, and Objectives of, the Proposed Rules**

2.        The E-Rate program will help fund the off-premises use of Wi-Fi hotspots and services for students, school staff, and library patrons by funding Wi-Fi hotspots and services for schools and libraries to establish lending programs.  The primary objective of the *FNPRM* is to seek comments that will help maintain the success of the Wi-Fi hotspots lending programs by ensuring there is usage for educational purposes.  In the *FNPRM*, the Commission seeks comments from stakeholders including schools, libraries, and service providers, to come up with an administratively feasible method to encourage maximal usage of the Wi-Fi hotspots and services.  The *FNPRM* requests examples on how non-usage is being addressed in current hotspot lending programs.  The *FNPRM* invites comments on how to avoid unfairly burdening either applicants or service providers, and asks what steps both can take to reduce non-usage.

3.        For example, in the *FNPRM* the Commission asks how to safeguard Wi-Fi hotspots' usage by asking if schools and libraries should have technical support for users and if they should have a limit on the lending period before redistributing the hotspots.  The *FNPRM* further requests comments on usage reports and how schools, libraries, and providers can use the reports to assist in preventing non-usage.  The *FNPRM* also asks about certifications to reduce the possibility that E-Rate funds are going to unuse devices and services.  Further, the *FNPRM* requests comments on what further actions, providers and schools should take after the discovery of non-usage.  Additionally, the *FNPRM* seeks comment on how to ensure that using E-Rate support for Wi-Fi hotspots does not introduce additional vulnerabilities or risks to cyberattacks.  The information and comments requested in the *FNPRM* will help strengthen the integrity of the E-Rate program by ensuring usage of Wi-Fi hotspots and services.

B.        **Legal Basis**

4.        The proposed actions are authorized pursuant to sections 1 through 4, 201 through 202, 254, 303(r), and 403 of the Communications Act of 1934, as amended.[4]

C.        **Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

5.        The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[5]  The RFA generally

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601–612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] 5 U.S.C. § 603(a).

[3] *Id.*

[4] 47 U.S.C. §§ 151-154, 201-202, 254, 303(r), 403.

[5] 5 U.S.C. § 603(b)(3).

defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[6] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[7] A small business concern is one that: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[8]

6. *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[9] First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[10] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[11]

7. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[12] The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[13] Nationwide, for tax year 2022, there were approximately 530,109 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[14]

8. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special

---

[6] *Id.* § 601(6).

[7] *Id.* § 601(3) (incorporating by reference the definition of "small business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[8] 15 U.S.C. § 632.

[9] 5 U.S.C. § 601(3)-(6).

[10] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf (Mar. 2023).

[11] *Id.*

[12] 5 U.S.C. § 601(4).

[13] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction. Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description. S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard. We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[14] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf. The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations. The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2022 with revenue less than or equal to $50,000 for Region 1-Northeast Area (71,897), Region 2-Mid-Atlantic and Great Lakes Areas (197,296), and Region 3-Gulf Coast and Pacific Coast Areas (260,447) that includes the continental U.S., Alaska, and Hawaii. This data includes information for Puerto Rico (469).

districts, with a population of less than fifty thousand."[15]  U.S. Census Bureau data from the 2022 Census of Governments[16] indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[17]  Of this number, there were 36,845 general purpose governments (county,[18] municipal, and town or township[19]) with populations of less than 50,000 and 11,879 special purpose governments (independent school districts[20]) with enrollment populations of less than 50,000.[21]  Accordingly, based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 entities fall into the category of "small governmental jurisdictions."[22]

### 1.       Schools and Libraries

9.       *Schools.*  The closest applicable industry with a SBA small business size standard is Elementary and Secondary Schools.[23]  This industry comprises establishments primarily engaged in furnishing academic courses and associated course work that comprise a basic preparatory education.[24]  A basic preparatory education ordinarily constitutes kindergarten through 12th grade.[25]  The SBA small business size standard for Elementary and Secondary Schools classifies firms with annual receipts of $17.5 million or less as small.[26]  The Commission does not have a size standard for small entities

---

[15] 5 U.S.C. § 601(5).

[16] 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/economic-census/year/2022/about.html.

[17] *See* U.S. Census Bureau, 2022 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2022 [CG2200ORG02], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG2200ORG02 Table Notes_Local Governments by Type and State_2022.

[18] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2022 [CG2200ORG05], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 2,097 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[19] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2022 [CG2200ORG06], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 18,693 municipal and 16,055 town and township governments with populations less than 50,000.

[20] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2022 [CG2200ORG10], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 11,879 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2022 [CG2200ORG04], CG2200ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2022.

[21] While the special purpose governments category also includes local special district governments, the 2022 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[22] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,845) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (11,879), from the 2022 Census of Governments - Organizations tbls. 5, 6 & 10.

[23] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*611110 Elementary and Secondary Schools,*" https://www.census.gov/naics/?input=611110&year=2017&details=611110.

[24] *Id*.

[25] *Id*.

[26] *See* 13 CFR § 121.201, NAICS Code 611110.

specifically applicable to schools. The Commission's definition of schools pertains to entities that participate in the E-Rate program which provides support to eligible schools and libraries to enable access to high-speed Internet access and telecommunications services at affordable rates, consistent with the objectives of universal service.

10.     Under the E-Rate program, an elementary school is generally defined as "a non-profit institutional day or residential school that provides elementary education, as determined under state law."[27] A secondary school is generally defined as "a non-profit institutional day or residential school that provides secondary education, as determined under state law," and not offering education beyond grade 12.[28] For-profit schools, and schools with endowments in excess of $50,000,000, are not eligible to receive discounts under the E-Rate program.[29] In calendar year 2017, the E-Rate program provided funding to approximately 104,722 schools throughout the U.S. and its territories.[30] While we do not have financial information that would allow us to estimate the number of schools that would qualify as small entities under SBA's small business size standard, because of the nature of these entities we estimate that the majority of schools in the E-Rate program are small entities under the SBA size standard.

11.     *Libraries.* The closest applicable industry with a SBA small business size standard is Libraries and Archives.[31] This industry comprises establishments primarily engaged in providing library or archive services.[32] These establishments are engaged in maintaining collections of documents (e.g., books, journals, newspapers, and music) and facilitating the use of such documents (recorded information regardless of its physical form and characteristics) as required to meet the informational, research, educational, or recreational needs of their users.[33] These establishments may also acquire, research, store, preserve, and generally make accessible to the public historical documents, photographs, maps, audio material, audiovisual material, and other archival material of historical interest.[34] All or portions of these collections may be accessible electronically.[35] The SBA small business size standard for Libraries and Archives classifies firms with annual receipts of $18.5 million or less as small.[36] For this industry, U.S. Census Bureau data for 2017 show that there were 1,864 firms that operated for the entire year.[37] Of this number, 1,228 firms had revenues of less than $10 million.[38] Based on this data, the majority of firms in this industry can be considered small.

---

[27] 47 CFR § 54.500.

[28] *Id.*

[29] 47 CFR § 54.501.

[30] *See* Universal Service Administrative Company, Annual Report, at 7, https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2017/USAC-2017-Annual-Report.pdf.

[31] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*519120 Libraries and Archives*," https://www.census.gov/naics/?input=519120&year=2017&details=519120.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *See* 13 CFR § 121.201, NAICS Code 519120 (as of 10/1/22, NAICS Code 519210).

[37] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 519120, https://data.census.gov/cedsci/table?y=2017&n=519120&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[38] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard. We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue in the individual category for less than $100,000, to avoid disclosing

(continued....)

12.     The Commission does not have a size standard for small entities specifically applicable to libraries.  The Commission's definition of libraries pertains to entities that participate in the E-Rate program which provides support to eligible schools and libraries to enable access to high-speed Internet access and telecommunications services at affordable rates, consistent with the objectives of universal service.  Under the E-Rate program, a library includes "(1) a public library, (2) a public elementary school or secondary school library, (3) a Tribal library, (4) an academic library, (5) a research library [] and (6) a private library, but only if the state in which such private library is located determines that the library should be considered a library for the purposes of this definition."[39]  For-profit libraries are not eligible to receive discounts under the program, nor are libraries whose budgets are not completely separate from any schools.[40]  In calendar year 2017, the E-Rate program provided funding to approximately 11,475 libraries throughout the U.S. and its territories.[41]  While we do not have financial information which would allow us to estimate the number of libraries that would qualify as small entities under SBA's small business size standard, because of the nature of these entities we estimate that the majority of libraries in the E-Rate program are small entities under the SBA size standard.

## 2.     Telecommunications Service Providers

13.     *Wired Telecommunications Carriers.*  The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[42]  Transmission facilities may be based on a single technology or a combination of technologies.  Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband Internet services.[43]  By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[44]  Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[45]

14.     The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[46]  U.S. Census Bureau data for 2017 show that there

---

data for individual companies (see Cell Notes for the sales/value of shipments/revenue in this category).  Therefore, the number of firms with revenue that meet the SBA size standard would be higher than noted herein.  We also note that the U.S. Census Bureau economic data includes sales, value of shipments or revenue information reported by firms.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[39] 47 CFR § 54.500.

[40] 47 CFR § 54.501.

[41] *See* Universal Service Administrative Company, Annual Report, at 7,  https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2017/USAC-2017-Annual-Report.pdf.

[42] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[43] *Id.*

[44] *Id.*

[45] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers.  Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers is not included in this industry.

[46] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

were 3,054 firms that operated in this industry for the entire year.[47] Of this number, 2,964 firms operated with fewer than 250 employees.[48] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services.[49] Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[50] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

15. *All Other Telecommunications.* This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[51] This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[52] Providers of Internet services (e.g. dial-up ISPs) or VoIP services, via client-supplied telecommunications connections are also included in this industry.[53] The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[54] U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[55] Of those firms, 1,039 had revenue of less than $25 million.[56] Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

16. *Wireless Telecommunications Carriers (except Satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[57] Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless Internet access, and wireless video services.[58] The SBA size standard for this industry classifies a business as small if it has

---

[47] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[48] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[49] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[50] *Id.*

[51] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[52] *Id.*

[53] *Id.*

[54] 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[55] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[56] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard. We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[57] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[58] *Id.*

1,500 or fewer employees.[59] U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[60]  Of that number, 2,837 firms employed fewer than 250 employees.[61]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[62]  Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[63]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

    17.    *Wireless Telephony*.  Wireless telephony includes cellular, personal communications services, and specialized mobile radio telephony carriers.  The closest applicable industry with an SBA small business size standard is Wireless Telecommunications Carriers (except Satellite).[64] The size standard for this industry under SBA rules is that a business is small if it has 1,500 or fewer employees.[65] For this industry, U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated for the entire year.[66]  Of this number, 2,837 firms employed fewer than 250 employees.[67]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 331 providers that reported they were engaged in the provision of cellular, personal communications services, and specialized mobile radio services.[68]  Of these providers, the Commission estimates that 255 providers have 1,500 or fewer employees.[69]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

    18.    *Wireless Carriers and Service Providers*.  Wireless Telecommunications Carriers (*except* Satellite) is the closest industry with a SBA small business size standard applicable to these service providers.[70]  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[71]  U.S. Census Bureau data for 2017 show that there were 2,893 firms that

---

[59] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[60] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[61] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[62] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[63] *Id.*

[64] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"*  https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[65] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[66] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[67] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[68] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[69] *Id.*

[70] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers* (*except Satellite*)," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[71] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

operated in this industry for the entire year.[72]  Of this number, 2,837 firms employed fewer than 250 employees.[73] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[74]  Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[75]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

19.     *Telecommunications Resellers*.  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.[76]  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[77]  Mobile virtual network operators (MVNOs) are included in this industry.[78]  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[79]  U.S. Census Bureau data for 2017 show that 1,386 firms operated in this industry for the entire year.[80]  Of that number, 1,375 firms operated with fewer than 250 employees.[81]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 666 providers that reported they were engaged in the provision of local or toll resale services.[82]  Of these providers, the Commission estimates that 640 providers have 1,500 or fewer employees.[83]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

20.     *Local Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers.  Telecommunications Resellers is the closest industry with

---

[72] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[73] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[74] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[75] *Id.*

[76] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[77] *Id.*

[78] *Id.*

[79] 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[80] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[81] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[82] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022),

https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[83] *Id.*

a SBA small business size standard.[84]  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.[85]  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[86]  Mobile virtual network operators (MVNOs) are included in this industry.[87]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[88]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[89]  Of that number, 1,375 firms operated with fewer than 250 employees.[90]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 207 providers that reported they were engaged in the provision of local resale services.[91]  Of these providers, the Commission estimates that 202 providers have 1,500 or fewer employees.[92]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

### 3.      Internet Service Providers (ISPs)

21.      *Wired Broadband Internet Access Service Providers (Wired ISPs).*[93]  Providers of wired broadband Internet access service include various types of providers except dial-up Internet access providers.  Wireline service that terminates at an end user location or mobile device and enables the end user to receive information from and/or send information to the Internet at information transfer rates exceeding 200 kilobits per second (kbps) in at least one direction is classified as a broadband connection under the Commission's rules.[94]  Wired broadband Internet services fall in the Wired Telecommunications Carriers industry.[95]  The SBA small business size standard for this industry classifies firms having 1,500 or fewer employees as small.[96]  U.S. Census Bureau data for 2017 show that there

---

[84] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[89] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[90] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[91] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[92] *Id.*

[93] Formerly included in the scope of the Internet Service Providers (Broadband), Wired Telecommunications Carriers and All Other Telecommunications small entity industry descriptions.

[94] *See* 47 CFR § 1.7001(a)(1).

[95] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[96] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

were 3,054 firms that operated in this industry for the entire year.[97] Of this number, 2,964 firms operated with fewer than 250 employees.[98]

22.    Additionally, according to Commission data on Internet access services as of June 30, 2019, nationwide there were approximately 2,747 providers of connections over 200 kbps in at least one direction using various wireline technologies.[99] The Commission does not collect data on the number of employees for providers of these services, therefore, at this time we are not able to estimate the number of providers that would qualify as small under the SBA's small business size standard. However, in light of the general data on fixed technology service providers in the Commission's *2022 Communications Marketplace Report*,[100] we believe that the majority of wireline Internet access service providers can be considered small entities.

23.    *Wireless Broadband Internet Access Service Providers (Wireless ISPs or WISPs)*.[101] Providers of wireless broadband Internet access service include fixed and mobile wireless providers. The Commission defines a WISP as "[a] company that provides end-users with wireless access to the Internet[.]"[102] Wireless service that terminates at an end user location or mobile device and enables the end user to receive information from and/or send information to the Internet at information transfer rates exceeding 200 kilobits per second (kbps) in at least one direction is classified as a broadband connection under the Commission's rules.[103] Neither the SBA nor the Commission have developed a size standard specifically applicable to Wireless Broadband Internet Access Service Providers. The closest applicable industry with an SBA small business size standard is Wireless Telecommunications Carriers (except Satellite).[104] The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[105] U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that

---

[97] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[98] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[99] *See* Federal Communications Commission, Internet Access Services: Status as of June 30, 2019 at 27, Fig. 30 *(IAS Status 2019)*, Industry Analysis Division, Office of Economics & Analytics (March 2022). The report can be accessed at https://www.fcc.gov/economics-analytics/industry-analysis-division/iad-data-statistical-reports. The technologies used by providers include aDSL, sDSL, Other Wireline, Cable Modem and FTTP). Other wireline includes: all copper-wire based technologies other than xDSL (such as Ethernet over copper, T-1/DS-1 and T3/DS-1) as well as power line technologies which are included in this category to maintain the confidentiality of the providers.

[100] *See Communications Marketplace Report*, GN Docket No. 22-203, 2022 WL 18110553 at 10, paras. 26-27, Figs. II.A.5-7. (2022) (*2022 Communications Marketplace Report*).

[101] Formerly included in the scope of the Internet Service Providers (Broadband), Wireless Telecommunications Carriers (except Satellite) and All Other Telecommunications small entity industry descriptions.

[102] Federal Communications Commission, Internet Access Services: Status as of June 30, 2019 at 27, Fig. 30 *(IAS Status 2019)*, Industry Analysis Division, Office of Economics & Analytics (March 2022). The report can be accessed at https://www.fcc.gov/economics-analytics/industry-analysis-division/iad-data-statistical-reports.

[103] *See* 47 CFR § 1.7001(a)(1).

[104] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[105] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

operated for the entire year.[106]  Of that number, 2,837 firms employed fewer than 250 employees.[107]

24.     Additionally, according to Commission data on Internet access services as of June 30, 2019, nationwide there were approximately 1,237 fixed wireless and 70 mobile wireless providers of connections over 200 kbps in at least one direction.[108]  The Commission does not collect data on the number of employees for providers of these services, therefore, at this time we are not able to estimate the number of providers that would qualify as small under the SBA's small business size standard.  However, based on data in the Commission's *2022 Communications Marketplace Report* on the small number of large mobile wireless nationwide and regional facilities-based providers, the dozens of small regional facilities-based providers and the number of wireless mobile virtual network providers in general,[109]  as well as on terrestrial fixed wireless broadband providers in general,[110] we believe that the majority of wireless Internet access service providers can be considered small entities.

25.     *Internet Service Providers (Non-Broadband).*  Internet access service providers using client-supplied telecommunications connections (e.g., dial-up ISPs) as well as VoIP service providers using client-supplied telecommunications connections fall in the industry classification of All Other Telecommunications.[111]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[112]  For this industry, U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[113]  Of those firms, 1,039 had revenue of less than $25 million.[114]  Consequently, under the SBA size standard a majority of firms in this industry can be considered small.

26.     *Wireless Telephony.*  Wireless telephony includes cellular, personal communications services, and specialized mobile radio telephony carriers.  The closest applicable industry with an SBA small business size standard is Wireless Telecommunications Carriers (except Satellite).[115]  The size standard for this industry under SBA rules is that a business is small if it has 1,500 or fewer employees.[116]  For this industry, U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated for the

---

[106] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[107] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[108] *See IAS Status 2019,* Fig. 30.

[109] *See Communications Marketplace Report*, GN Docket No. 22-203, 2022 WL 18110553 at 27, paras. 64-68. (2022) (*2022 Communications Marketplace Report*).

[110] *Id.* at 8, para. 22.

[111] *See* U.S. Census Bureau, *2017 NAICS Definition, "517919 All Other Telecommunications,"* https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[112] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[113] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[114] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[115] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"*  https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[116] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

entire year.[117]  Of this number, 2,837 firms employed fewer than 250 employees.[118]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 331 providers that reported they were engaged in the provision of cellular, personal communications services, and specialized mobile radio services.[119]  Of these providers, the Commission estimates that 255 providers have 1,500 or fewer employees.[120]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

### 4.    Vendors of Internal Connections

27.    *Vendors of Infrastructure Development or Network Buildout.*  Neither the Commission nor the SBA have developed a small business size standard specifically directed toward manufacturers of network facilities.  There are two applicable industries in which manufacturers of network facilities could fall and each have different SBA business size standards.  The applicable industries are "Radio and Television Broadcasting and Wireless Communications Equipment"[121]  with a SBA small business size standard of 1,250 employees or less,[122] and "Other Communications Equipment Manufacturing"[123] with a SBA small business size standard of 750 employees or less."[124]  U.S. Census Bureau data for 2017 show that for Radio and Television Broadcasting and Wireless Communications Equipment there were 656 firms in this industry that operated for the entire year.[125]  Of this number, 624 firms had fewer than 250 employees.[126]  For Other Communications Equipment Manufacturing, U.S. Census Bureau data for 2017 show that there were 321 firms in this industry that operated for the entire year.[127]  Of that number, 310 firms operated with fewer than 250 employees.[128]  Based on this data, we conclude that the majority of

---

[117] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[118] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[119] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[120] *Id.*

[121] *See* U.S. Census Bureau, *2017 NAICS Definition, "334220 Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing,"* https://www.census.gov/naics/?input=334220&year=2017&details=334220.

[122] *See* 13 CFR § 121.201, NAICS Code 334220.

[123] *See* U.S. Census Bureau, *2017 NAICS Definition, "334290 Other Communications Equipment Manufacturing,"* https://www.census.gov/naics/?input=334290&year=2017&details=334290.

[124] 13 CFR § 121.201, NAICS Code 334290.

[125] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334220, https://data.census.gov/cedsci/table?y=2017&n=334220&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[126] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[127] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334290, https://data.census.gov/cedsci/table?y=2017&n=334290&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[128] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that

(continued….)

firms in this industry are small.

28.      *Telephone Apparatus Manufacturing*.  This industry comprises establishments primarily engaged in manufacturing wire telephone and data communications equipment.[129]  These products may be stand-alone or board-level components of a larger system.  Examples of products made by these establishments are central office switching equipment, cordless and wire telephones (except cellular), PBX equipment, telephone answering machines, LAN modems, multi-user modems, and other data communications equipment, such as bridges, routers, and gateways.[130]  The SBA small business size standard for Telephone Apparatus Manufacturing classifies businesses having 1,250 or fewer employees as small.[131]  U.S. Census Bureau data for 2017 show that there were 189 firms in this industry that operated for the entire year.[132]  Of this number, 177 firms operated with fewer than 250 employees.[133]  Thus, under the SBA size standard, the majority of firms in this industry can be considered small.

29.      *Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing*.  This industry comprises establishments primarily engaged in manufacturing radio and television broadcast and wireless communications equipment.[134]  Examples of products made by these establishments are: transmitting and receiving antennas, cable television equipment, GPS equipment, pagers, cellular phones, mobile communications equipment, and radio and television studio and broadcasting equipment.[135]  The SBA small business size standard for this industry classifies businesses having 1,250 employees or less as small.[136]  U.S. Census Bureau data for 2017 show that there were 656 firms in this industry that operated for the entire year.[137]  Of this number, 624 firms had fewer than 250 employees.[138]  Thus, under the SBA size standard, the majority of firms in this industry can be considered small.

**D.      Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

30.      The potential rule changes proceeding out of this *FNPRM*, could impose some new or

---

meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[129] *See* U.S. Census Bureau, *2017 NAICS Definition, "334210 Telephone Apparatus Manufacturing,"* https://www.census.gov/naics/?input=334210&year=2017&details=334210.

[130] *Id.*

[131] *See* 13 CFR § 121.201, NAICS Code 334210.

[132] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334210, https://data.census.gov/cedsci/table?y=2017&n=334210&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[133] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[134] *See* U.S. Census Bureau, *2017 NAICS Definition, "334220 Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing,"* https://www.census.gov/naics/?input=334220&year=2017&details=334220.

[135] *Id.*

[136] *See* 13 CFR § 121.201, NAICS Code 334220.

[137] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334220, https://data.census.gov/cedsci/table?y=2017&n=334220&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/31SG2//naics~334220.

[138] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

modified reporting, recordkeeping, or other compliance requirements on schools, libraries, service providers, including small entities. The *FNPRM* requests comments on how to prevent non-usage of Wi-Fi hotspots and services funded by the E-Rate program and the comments receive will help determine what reporting, recordkeeping, or other compliance requirements the Commission should adopt to prevent or reduce non-usage. The *FNPRM* specifically seeks comments on data usage reports, and it is possible that schools, libraries, and service providers, including small entities, could have additional requirements related to retaining and producing usage reports and certifications. The *FNPRM* also seeks comments on certifications as a measure to help ensure usage prior to reimbursement. It is also possible that schools, libraries, and service providers, including small entities, could have new requirements related to certifications.

31.     Additionally, the *FNPRM* seeks comments on whether applicants should be required to limit the lending period to a shorter period and this may create more recordkeeping, since an increase in the frequency of redistribution is likely to increase the frequency of recording the inventory and asset requirements that are mandatory for a loaned hotspot and service. The *FNPRM* also seeks comment on whether schools and libraries must have technical support available to teach users how to use the Wi- Fi hotspots, and troubleshoot issues as they arise. For service providers, in addition to possible new requirements with usage reports, including making the reports transparent and easier for applicants and the Commission to identify when hotspots are unused, they may also be required to offer a simple way to remotely discontinue and reestablish lines when requested by applicants, which may create more reporting and recordkeeping requirements. Further, applicants and providers may be required to include provisions regarding non-usage in their contracts to help address these concerns in a manner that balances the burden between the provider and applicant. The *FNPRM* also seeks comment on whether service providers providing Wi-Fi hotspots and service to schools and libraries in the E-Rate program should be required to implement cybersecurity and supply chain risk management plans.

32.     In assessing the cost of compliance for small entities, at this time the Commission cannot quantify the cost of compliance with any of the potential rule changes that may be adopted. Further, the Commission is not in a position to determine whether, if adopted, the matters upon which the *FNPRM* seeks comment will require small entities to hire professionals to comply. The information we receive in comments, including, where requested, cost information, will help the Commission identify and evaluate relevant compliance matters for small entities, including compliance costs and other burdens that may result from potential changes discussed in the *FNPRM*. The Commission will ensure that any reporting, recordkeeping, or other compliance burdens are outweigh by the benefits of protecting the integrity of the E-Rate program, and by having a successful Wi-Fi hotspot lending program to meet the educational needs of students, school staff, and library patrons.

**E.      Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

33.     The RFA requires an agency to describe any significant alternatives that could minimize impacts to small entities that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[139]

34.     In the *FNPRM*, the Commission seeks comment on how to ensure that there is educational usage of the E-Rate supported Wi-Fi hotspots and services. The Commission also requests comments that considers the impact on small entities. For example, the Commission seeks comments on how service providers participating in the E-Rate program for hotspot lending should be required to provide transparent reporting to applicants on data usage that makes it easy for schools and libraries, and

---

[139] 5 U.S.C. § 603(c)(1) – (c)(4).

in particular small applicants without dedicated staff for a hotspot lending program, to identify the devices that are going unused.  In the *FNPRM*, the Commission considers alternatives by asking if for the E-Rate program, it should consider the requirement of alternative billing methods, such as usage-based pricing models.  The *FNPRM* also requests comments on whether service providers should be required to offer a simple way to remotely discontinue and reestablish lines when requested by applicants and if there are different levels of service needed depending on the school or library size.

35.     Further, the *FNPRM* seeks comments on potential costs and benefits of the proposed rule changes.  The Commission expects the information received in the comments in response to this *FNPRM* will allow it to more fully consider ways to minimize the economic impact on small entities and explore additional alternatives to improve and simplify opportunities for small entities to participate in the E-Rate program, while also ensuring usage in the E-Rate funded school and library hotspot lending programs.

### F.     Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules

36.     None.

**STATEMENT OF
CHAIRWOMAN JESSICA ROSENWORCEL**

Re:     *Addressing the Homework Gap through the E-Rate Program,* WC Docket No. 21-31, Report and Order and Further Notice of Proposed Rulemaking (July 18, 2024).

Remember the pandemic?  The images from those days still sting.  For me, the most searing are the ones that exposed that when we were told to go online for modern life, so many people in so many places lacked the connections they needed to get there.  The pictures are hard to forget.  We saw students lingering outside of fast food restaurants with laptops on their knees, using the free Wi-Fi just to keep up with school.  We saw people who struggled with telemedicine appointments because they did not have the bandwidth they needed to keep up with their healthcare.  And we saw it in the parking lots of libraries, where folks sat outside in their cars with their devices just to connect to family, friends, and co-workers.

It is hard to believe this happened in the United States.  But we saw it with our own eyes.  The pandemic exposed the depth of our Nation's digital divide.  We also saw Congress respond quickly to meet the moment by establishing the Emergency Connectivity Fund, which allowed libraries and schools to support internet access through devices and connectivity.  But this fund was a one-time effort.  It expired this year.  Still, it demonstrated what a modern library and school can do to help a community learn without limits and keep connected.

Today we have a choice.  We can go back to those days when people sat in parking lots to get a signal to get online and students struggling with the Homework Gap hung around fast food places just to get the internet access they needed do their schoolwork.  Or we can go forward and build a digital future that works for everyone.

The Federal Communications Commission has been a long-time champion of libraries and schools.  We see clearly the role they play in our digital future.  After all, for more than two decades, we have supported the E-Rate program.  It is a quiet powerhouse responsible for providing schools and libraries in every state with support for communications.  Yet despite E-Rate's overwhelming success connecting schools and libraries, too often that connectivity ends at the edge of the building.  The time has come to modernize this program and support students and library patrons wherever they are.

I believe every library and every school library in this country should be able to loan out Wi-Fi hotspots to help keep their patrons and kids connected.  It is 2024 in the United States.  This should be our baseline.  We can use the E-Rate program to make it happen.

That is why today we modernize E-Rate to ensure that schools and libraries nationwide can loan out Wi-Fi hotspots to support high-speed internet access in rural America, urban America, and everything in between.  The time to do this is now.  We do not need to go back; we can go forward and make it possible for everyone to get the connections they need.

The Communications Act clearly supports this approach.  Section 254 directs the agency to update the definition of universal service, which includes E-Rate, so that it evolves over time.  That is what we do here.  Moreover, in the same section Congress specifically directed the Commission to designate additional services in this program as needed for schools and libraries.  Again, that is what we do here.  To the extent that classrooms get a mention in the law, the statute makes clear it is descriptive and not restrictive.

We also have developed a way to do this within the existing E-Rate budget.  That means this modernization does not require new universal service funds nor does it come at the cost of the support E-Rate provides to connectivity in schools and libraries.

In addition, we establish that the Children's Internet Protection Act applies here.  That means, as with other E-Rate supported efforts, providers with hotspot lending programs must comply with this law, which requires restricting access to content that is harmful to minors.

We can help close the digital divide, keep our communities connected, and support the millions of students who fall into the Homework Gap with this updated approach to E-Rate. So let's make it happen.

I want to thank Senator Markey, Senator Van Hollen, and Representative Meng for their commitment to connect students and library patrons across the country. Their work in this area is historic and it has informed our efforts today.

I also want to thank the staff responsible for their work connecting schools and libraries, including Allison Baker, Bryan Boyle, Callie Coker, Kate Dumouchel, Veronica Garcia-Ulloa, Jodie Griffin, Gabriela Gross, Trent Harkrader, Molly O'Conor, Kiara Ortiz, and Johnnay Schrieber from the Wireline Competition Bureau; Jim Bird, Terry Cavanaugh, Sarah Citrin, Thomas Driscoll, Richard Mallen, Rachel May, Erika Olsen, Karen Onyeije, Joel Rabinovitz, Anjali Singh, Elliot Tarloff, and Chin Yoo from the Office of General Counsel; Liesl Himmelberger, Eugene Kiselev, Paul Lafontaine, Cher Li, Eric Ralph, Emily Talaga, and Maciej Wachala from the Office of Economics and Analytics; Warren Firschein and Mark Stephens from the Office of the Managing Director; and Joycelyn James from the Office of Communications Business Opportunities.

### DISSENTING STATEMENT OF
### COMMISSIONER BRENDAN CARR

Re:     *Addressing the Homework Gap through the E-Rate Program,* WC Docket No. 21-31, Report and
        Order and Further Notice of Proposed Rulemaking (July 18, 2024).

In 2021, Congress passed a law authorizing the FCC to provide funding that schools and libraries
could use to lend Wi-Fi hotpots out to students and patrons.[545]  It was called the Emergency Connectivity
Fund or ECF.  For my part, I was pleased to work with my FCC colleagues to vote in favor of standing up
the ECF program, consistent with the statutory provisions passed by Congress.  And I was grateful that
my colleagues agreed to a number of my suggestions that helped maximize the program's benefits for
those families that remained stuck on the wrong side of the digital divide.

In passing the COVID-era statute, Congress specified a number of limitations on this Wi-Fi
initiative.  First, Congress provided a specific cap on the amount of taxpayer dollars that could be used on
the initiative.  Second, Congress provided clear congressional authorization for the FCC to fund hotspots
that would be used at locations other than a school or library—a marked contrast, as we will see, from the
language that Congress included in the E-Rate portion of the Communications Act.  Third, Congress
ensured that the initiative would not increase consumers' monthly telecom bills by expressly providing
that Universal Service Fund dollars could not be expended on the ECF Wi-Fi effort.  And fourth,
Congress specifically provided that the program would sunset when the COVID-19 emergency ended—a
date that, for ECF purposes, included a transition period that expired at the end of the last month.
Congress's decision to include a sunset date makes sense.  After all, Congress passed the law to address
the spike in remote learning that flowed from the government's decision to close down in person learning.

Now that the ECF program has expired, its future is up to Congress.  The Legislative Branch
retains the power to decide whether to continue funding this Wi-Fi loaner program—or not.  But
Congress has made clear that the FCC's authority to fund this initiative is over.

Except that is not how the FCC sees it today.  Instead, the Commission cites to Congress's
decision to end this Wi-Fi hotspot program as a reason for the FCC to keep it going—and to keep it going
in a way that is fundamentally out of step with the decisions that Congress has made.  Indeed, the FCC
Order runs contrary to every one of the four guardrails that Congress included when it did authorize the
FCC to fund Wi-Fi hotspots in the ECF law.[546]  The FCC includes no limit on the amount of ratepayer
dollars that can be expended in aggregate over the course of years, no limit on the locations at which the
hotpots can be used, no sunset date on the program, and no protection against this program increasing
consumers' monthly bills.

Regardless of one's views on the issue as a policy matter, this is not how the Constitution or
delegations of authority work.  The Supreme Court's recent decision in *Loper Bright* makes this
abundantly clear.  After *Loper Bright,* the FCC can no longer point to a merely permissible construction
of a statute to prevail in court.[547]  Instead, courts will now determine the best reading of the relevant law.
So what does the text of the statute say?

In Section 254, Congress limited the FCC's E-Rate authority to enhancing the access of, to use
Congress's terms, "classrooms" and "libraries" to telecommunication services—not any remote location

---

[545] *See* American Rescue Plan Act, 2021, H.R. 1319, Pub. L. No. 117-2, 117th Cong., tit. VII, § 7402.

[546] *See, e.g.*, FCC Chairwoman Jessica Rosenworcel and Senator Ed Markey, "We Got Millions of Low-Income
Students and Families Online Before Funding Expired. Restoring It Is Essential." USNews, June 27, 2024,
https://www.usnews.com/opinion/articles/2024-06-27/we-got-millions-of-low-income-students-and-families-online-
before-funding-expired-restoring-it-is-essential.

[547] This is not to suggest that the FCC is adopting the type of permissible reading that a court might have deferred to
under *Chevron*.

at which people might want to learn.[548]  This language stands in stark contrast to the ECF law.  Indeed, unlike the ECF statute, Congress has never authorized the FCC to use its E-Rate program to provide funding that schools and libraries could use to lend Wi-Fi hotspots out to students and patrons—and that is certainly not the best reading of the law.  It may be a good idea, but it is not one that Congress has authorized the FCC to carry out.  If it were, I would imagine that this FCC or another would have taken this action long ago.

The FCC's erroneous reading of Section 254 is further highlighted by the fact that it has no limiting principle—none.  If the FCC can rely on Section 254 to fund students' and patrons' connectivity at locations other than schools and libraries, then I don't see why the FCC's reading would not allow it to use Section 254 as authority to fund Internet service for virtually every single person in the country, since everyone could be either a student or a library patron.  That would be an absurd result and out of step with the plain text of the Communications Act.  But that is what happens when an agency takes an action that is untethered to the statutory text.

The FCC's decision here and elsewhere to exceed the limits of our E-Rate authorization has not gone unnoticed by Members of Congress that write the laws.  Just look at a recent brief that Senator Ted Cruz, Ranking Member of the Senate Commerce Committee, filed in the Fifth Circuit.  In a case challenging the FCC's 2023 decision to support Wi-Fi on school busses, Senator Cruz and his Senate colleagues expressed deep concerns about the FCC's "unlawful and misguided" attempts to expand E-Rate support beyond Congressional intent.[549]  "Once limitations are set by Congress, they must be followed—not thwarted—by the federal regulators charged with their enforcement," the Senators wrote.[550]  Yet that is exactly what the Commission does today—again.

But legal authority is not my only concern today.  The FCC's decision to expand the USF program has put the entire endeavor on an unsustainable path.  While the contribution factor keeps hitting record highs, the FCC is not taking any action to address some of the fundamental contributions, disbursement, and oversight concerns that I and others have been raising for years now.  We cannot continue to spend other peoples' money in this way without a real conversation at this agency about reform.  I have put ideas out there and would welcome a discussion about paths forward.

My concerns today are only compounded by the lack of data and analysis into the hundreds of millions of dollars that have gone towards supporting various federal and state Wi-Fi hotspot programs that were stood up since 2020.  Indeed, the data we do have is concerning.  For instance, earlier this year, the Chicago Public Schools' Inspector General published a report that found that every single device from three dozen schools were unaccounted for.[551]  And that IG report also showed that during the 2021-2022 school year, more than 77,000 devices were reported lost or stolen—including $23 million worth of laptops, hotspots, and iPads.

To be sure, one school district's failure to put in place commonsense safeguards doesn't necessarily mean that other efforts will lead to similar results.  But it counsels in favor of the FCC ensuring that strong protections are in place.

In closing, I'd like to thank staff from the Wireline Competition Bureau for their work on this item.  But because the Order exceeds our authority, I must respectfully dissent.

---

[548] 47 U.S.C. § 254(h)(2)(A).

[549] Brief of U.S. Senators as Amici Curiae in Support of Petitioners, *Molak v. FCC*, Case No. 23-60641, at 2.

[550] *Id.* at 1.

[551] *See* Dana Rebik, Peter Curi," CPS report shows $23M worth of technology unaccounted for," Jan. 9, 2024, WGN9, https://wgntv.com/news/chicago-news/cps-report-shows-23m-worth-of-technology-unaccounted-for/.

**STATEMENT OF**
**COMMISSIONER GEOFFREY STARKS**

Re:     *Addressing the Homework Gap through the E-Rate Program*, WC Docket No. 23-31, Report and
          Order and Further Notice of Proposed Rulemaking (July 18, 2024).

We all know that, for our children, access to broadband at both school and home is vital to
reaching their potential.  Their education simply doesn't stop when they exit the school building.
Instruction, homework, group projects, extra assignments, and more all happen outside of the physical
school grounds, and often outside of official school hours.  Ensuring that students have the tools to
harness this power is critical for their academic development.

Unfortunately, millions of students still lack this power.  They do not have access to the Internet,
or have inadequate service at home.  This number has only increased since the expiration of the
Affordable Connectivity Program, where over 35% of the 23 million households enrolled reported using
their ACP service to attend school or do homework.  During the COVID-19 pandemic, Congress
recognized the need for students to access the Internet at home for school and created the Emergency
Connectivity Fund (ECF).  It proved a fantastic test run for the program we adopt today, showcasing the
need to help students outside of their physical school.  While ECF sunset at the end of June, the lessons
we learned from it have been incorporated into the rules we adopt today to support the use of E-Rate
funding for hotspots for those in need.

I am proud to support this Order, which, I note, includes many safeguards to limit the risk of
waste, fraud, and abuse, and incentivizes E-Rate recipients to use their limited funds judiciously.  I also
appreciate the Chairwoman agreeing to my edits to add a section in the Further Notice seeking comment
on adding cybersecurity and risk management obligations to providers that supply these hotspots to
schools.

I thank the Commission staff for their great work on this item and approve.

## DISSENTING STATEMENT OF
## COMMISSIONER NATHAN SIMINGTON

Re:    *Addressing the Homework Gap through the E-Rate Program*, WC Docket No. 23-31, Report and Order and Further Notice of Proposed Rulemaking (July 18, 2024).

When reading this item, I had thought to quote Jacque's monologue from Shakespeare's *As You Like It* and liken the lines "All the world's a stage, and all the men and women merely players" to today's item: "All the world's a classroom, and all the schools and libraries merely funding conduits." But there is actually another line from that monologue on which I'd prefer to focus: "the whining schoolboy, with his satchel and shining morning face, creeping like snail unwillingly to school." Few children actively *enjoy* school, at least in its instructional aspects, and certainly I was little different. Memorization by rote, homework, tests—who has the time when there is life to be lived? I'm sure most of us can relate, though perhaps not my colleagues on the Commission: all, no doubt, more accomplished pupils than myself.

And why don't kids enjoy school? Because schools are sites of the sometimes boring and usually uncomfortable work of learning. Granted, the ambit of instruction has changed over time, to include the kitchen table, laptops, and even "third spaces." But the classroom does not stretch beyond the horizon into infinity. Not everywhere is a place for children to learn; some places are just for children to play. You may learn anywhere, but classrooms are not everywhere. And while we may kid ourselves that yonder loaned Wi-Fi hotspot is actually a hotbed of learning, I can promise you that, without actual site blocking akin to the Eyes on the Board Act, most of what is learned is going to be "off-menu" as it relates to the school curriculum. The item indicates that, rather than real usage safeguards, children using Wi-Fi hotspots will be governed by a clickwrap acceptable use policy posted on a bulletin board. That's interesting. As it happens, parents often have an "acceptable use policy" for their younger children for all kinds of things, zealously enforced, and yet their usage is often anything but acceptable.

But even if the item had incorporated some version of Eyes on the Board, which might draw students' usage of hotspots more in line toward legitimate uses related to instruction, I still couldn't support the item. We simply lack the authority to take the action we take today. Indeed, our gap-filler E-Rate authority, Section 254(h)(2)(A)—on which this item ought to be premised, even if erroneously— really isn't doing much of the load-bearing work. Section 254(h)(2)(A) provides that the Commission may act to promulgate rules to enhance access to "advanced telecommunications and information services" for "school classrooms and libraries." Tabling for one moment that off-campus Wi-Fi hotspots *obviously* will reduce incentives to physically show up in a classroom, the Commission is only authorized to enhance access *to school classrooms and libraries*. The last I checked, schools, which have classrooms, and libraries, are physical locations with addresses; not philosophical, conceptual ideas of instruction or education. So while it is easy to agree with the notion that children ought to be able to learn anywhere (stipulating to the premise that students will actually use the Wi-Fi hotspots for learning), it is not within the Commission's statutory authority to deliver on that goal by any means necessary. Indeed, when the Commission has argued this point, it has tried to distinguish between "for classrooms" and "in classrooms," indicating that while the latter might tie the Commission's hands as it relates to ubiquitous, global Wi-Fi connectivity, the former does not. Yet if a teacher purchases chalk *for* her classroom, where might you expect to find it? On the school bus? At a student's home? The argument would strike me as silly if it weren't so consequential.

Nor is the Commission's Section 254(h)(1)(B) authority, on which the item principally relies, up to snuff. To be very clear, that provision only relates to telecommunications services provided by telecommunications providers, and no more. Well, last I checked, that's not what a Wi-Fi hotspot is: at least, not yet. And, you'll have to pardon me, but I find the comments in the record supporting our 254(h)(1)(B) authority from the likely beneficiaries of E-Rate funding relatively unavailing on this point. I further disagree that our own precedent—*viz,* the 1997 Universal Service Order or its progeny—actually stands for the proposition cited. The 1997 Order largely centered authority in 254(h)(2)(A) rather than in 254(h)(1)(B) precisely because the Commission at the time recognized that it was limited by the terms of

the former provision to "telecommunications services" and "telecommunications carriers."  The redshift of subsequent Commission decisions to expand the E-Rate program do not distort that truth.

At any rate, the heady days of *Chevron* are behind us and it's time for the Commission to get serious and start acting like its statute means what it says rather than means whatever it needs to mean in order to secure a desired policy outcome.  For these reasons, I dissent.